Eric H. Gibbs (*pro hac vice* forthcoming)
David K. Stein (*pro hac vice* forthcoming)
Iudis Sominskaia (*pro hac vice* forthcoming)
**GIBBS LAW GROUP LLP**
505 14th Street
Oakland, California 94612
(510) 350-9700
ehg@classlawgroup.com
ds@classlawgroup.com
ids@classlawgroup.com

Scott L. Silver (*pro hac vice* forthcoming)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, Florida 33065
(954) 755-4799
ssilver@silverlaw.com

Miles N. Clark (NBN 13848)
**KNEPPER & CLARK LLC**
5510 S. Fort Apache Rd., Suite 30
Las Vegas, NV 89148-7700
(702) 856-7430
miles.clark@knepperclark.com

*Counsel for Plaintiffs and Proposed Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| BARRETT HENZEL; BRYCE BUSSEY; TINA GUILDER; ANTHONY GUILDER; on behalf of themselves and all others similarly situated, | Case No.: 2:22-cv-00529 |
| *Plaintiffs,* | **CLASS ACTION COMPLAINT** |
| v. | |
| JEFFREY JUDD; J & J CONSULTING SERVICES, INC., a Nevada corporation; J & J CONSULTING SERVICES, INC., an Alaska corporation; J and J PURCHASING, LLC, a Florida limited liability company; MATTHEW BEASLEY; and BEASLEY LAW GROUP PC, a Nevada professional corporation, | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

Plaintiffs Barrett Henzel, Bryce Bussey, Tina Guilder, and Anthony Guilder, on behalf of themselves and all others similarly situated, allege the following against Defendants Jeffrey Judd; J & J Consulting Services, Inc., a Nevada corporation; J & J Consulting Services, Inc., an Alaska corporation; J and J Purchasing, LLC, a Florida limited liability company; Matthew Beasley; and Beasley Law Group PC, a Nevada professional corporation.

## INTRODUCTION

1.  This case arises from a classic Ponzi operation run by two Nevadans who ensnared investors across several states. Defendants used investors' money to finance lavish lifestyles replete with luxury cars, extravagant homes, and even a private jet. They utilized a network of promoters to push their venture through churches, fitness clubs, and the like. Investors were told to send tens of thousands of dollars at a time to a lawyer's trust account with Wells Fargo, where the money was to be used strictly for investment purposes. Instead, their retirement savings, college funds, and other monies were plundered in what one Defendant has admitted was a massive Ponzi scheme involving $300 million or more. The scheme came crashing down in dramatic fashion—with an FBI visit to one Defendant's home ending in a shooting and a four-hour standoff.

2.  Beginning in 2017, Defendant Jeffrey Judd began soliciting investments for the then-new business venture. He told investors the venture would purchase future interests in personal-injury settlements from plaintiffs who wanted immediate payouts at a portion of their value.

3.  Judd offered investment opportunities at set dollar levels, which purportedly would be bundled with Judd's own capital and used to purchase the settlements. Each investment, and the risk involved in it, was said to depend on payment from the settling defendant, usually an insurance company.

4.  The purchases of the personal-injury settlements were to be facilitated by Matthew Beasley, a Nevada attorney, with whom Judd ran his venture. Beasley was ostensibly locating personal-injury plaintiffs willing to accept lower payments in exchange for faster payouts and negotiating the purchase of those settlements.

5.  Defendants promised investors that when they later collected the full amount of the

settlement, investors would be entitled to a portion of the profits realized from the deal as interest. The principal, on the other hand, was typically reinvested automatically.

6.   In March 2022, Defendants' venture collapsed. FBI agents took Beasley into custody following a shoot-out at his Nevada home. The FBI also issued a call to the public for information about this "slip-and-fall lawsuit Ponzi scheme."[1] Per the *Wall Street Journal*, Beasley confessed to FBI agents during the altercation, admitting that Defendants' venture had been a Ponzi scheme.[2]

7.   Plaintiffs are among the many investors who have been defrauded by Defendants, with each investing significant sums of money in Defendants' venture. They bring this action on behalf of themselves and for the benefit of all other similarly situated investors to recoup their investments and to disgorge Defendants of all ill-gotten gains.

**PARTIES**

**I.     Plaintiffs**

8.   Plaintiff Barrett Henzel is a citizen and resident of Las Vegas, Nevada, who invested money with Defendants.

9.   Plaintiffs Tina Guilder and Anthony Guilder are citizens and residents of Trabuco Canyon, California, who invested money with Defendants.

10. Plaintiff Bryce Bussey is a citizen and resident of Payson, Utah, who invested money with Defendants.

**II.    Defendants**

11. Defendant Jeffrey Judd is a citizen and resident of Nevada, and an owner, officer, or manager of Defendants J & J Consulting Services, Inc., a Nevada corporation; J & J Consulting Services, Inc., an Alaska corporation; and J & J Purchasing, LLC, a Florida limited liability company.

---

[1] *See generally*, Ex. A, Federal Bureau of Investigation, "Seeking Victim Information in Slip-and-Fall Lawsuit Ponzi Scheme Investigation" (hereinafter "FBI Form"), available at: https://forms.fbi.gov/seeking-victim-information-in-slip-and-fall-lawsuit-ponzi-scheme-investigation/ (last accessed Mar. 24, 2022).

[2] B Ex. B, Ben Foldy, "An Alleged Fraud Uncovered by a Short Seller Ends in Gunfire," THE WALL STREET JOURNAL, (Mar. 23, 2022, 12 p.m. ET), at p. 8, (hereinafter "WSJ Article").

12. Defendant J & J Consulting Services, Inc. ("J & J Consulting"), is a Nevada corporation with its principal place of business in Nevada.

13. J & J Consulting Services, Inc. ("J & J Consulting (AK)") is an Alaska corporation with its principal place of business in Nevada.

14. J & J Purchasing, LLC ("J & J Purchasing"), is a Florida limited liability company with its principal place of business in Nevada.

15. Matthew Beasley is a citizen and resident of Nevada, and an owner of Beasley Law Group PC.

16. Beasley Law Group PC is a Nevada professional corporation with its principal place of business in Nevada.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 (codified at 28 U.S.C. § 1332(d)(2)). At least one member of the proposed class is a citizen of a different state than at least one defendant, there are more than one hundred members of the proposed class, and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

18. This Court has general personal jurisdiction over Defendants because J & J Consulting, J & J Consulting (AK), J and J Purchasing, and Beasley Law Group PC all maintain their principal place of business in this District, and because Defendants Judd and Beasley reside in Nevada and at all relevant times have engaged in continuous and systemic business in Nevada, including by committing the tortious acts described in this complaint. Each Defendant is also amenable to service of process under Federal Rule of Civil Procedure 4(e)–(f).

19. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants' unlawful course of conduct occurred in large part in this District

## STATEMENT OF FACTS

### I.    Defendants' Ponzi Scheme

20. In March 2017, Judd, through his company J & J Consulting, began offering would-be investors the opportunity to buy what he styled as "lawsuit settlement contracts" or "settlement

funding contracts."[3] Several years later, Judd continued the same venture under a new business, J and J Purchasing. Despite the shift to this new entity, the venture—and its fraudulent nature—remained fundamentally the same.

21. In describing the venture, Judd claimed that he used "his own money and money from friends and family" to purchase interests in personal-injury plaintiffs' settlements. Upon information and belief, he did this through a separate entity he controlled, J & J Consulting (AK).

22. Judd told investors that Matthew Beasley, a personal injury and family law attorney, would assist him in finding settlement interests to purchase and in writing the contracts he offered investors.

23. Judd had no background in investments; he had previously worked selling pharmaceuticals and home mortgage loans.

24. Judd said he purchased the settlement interests from personal-injury plaintiffs for less than their face value, usually around 25% less, and then realized a profit when the settlement was paid in full. In 2021, Judd claimed that he had made between 16,000 and 20,000 settlement interest purchases, and he had never had one go bad.[4] He pitched the investments not just as "risk-free,"[5] but also "immaculate."[6]

25. Judd and several promoters acting at his direction represented that these contracts were available for purchase in amounts of $80,000 or $100,000, although investors were sometimes able to purchase half of the contract ($40,000 or $50,000, respectively). He promised investors high rates of return: for instance, 12.5% after 90 days, which translated into 50% on annual basis.[7] Further, if the settlement was not paid out within 90 days, Judd promised as much as an additional $5,000 per month. *Id.*

26. As part of the transaction, Defendants purportedly retained the remainder of the profits, including a $5,000 "administration fee" on each investment, which was split between the

---

[3] *See generally,* FBI Form.
[4] WSJ Article at p. 10; *see also* Ex. C, Hindenburg Research, "J&J Purchasing: When It Sounds Too Good Too Be True" (hereinafter "Hindenburg Report"), at p. 22.
[5] WSJ Article at p. 10.
[6] Hindenburg Report at p. 24.
[7] *Id.* at p. 23.

personal-injury plaintiff's attorney and Beasley.[8]

27. From the venture's beginning, through as late as December 2021, Judd and Beasley drafted individual investment agreements and presented them to investors for execution in order to confirm their agreement to invest in Defendants' venture. Typically, these agreements contained a barebones statement of the terms. The agreements were called "investor," "buyer," or "letter" agreements, and usually referenced the name of the personal-injury plaintiff whose settlement interest was to be purchased along with the dollar amount that investors were providing.

28. Defendants primarily accepted the investments from business entities. This required some investors to form business entities to make the investments. The entities functioned as pass-throughs for investment capital and any returns earned from it. Defendants required investors to enter the agreements referenced in the preceding paragraph in the name of, and sign on behalf of, their pass-through entities—although drafting errors sometimes resulted in the omission of the entity names from the agreements.

29. Defendants laid out instructions in the contracts for wiring the investment capital to a Wells Fargo Interest on Lawyers' Trust Account ("IOLTA account") belonging to Beasley's law firm, Beasley Law Group PC. Since 2017, over $300 million passed into this account from investors.[9]

30. Defendants required investors to sign non-disclosure agreements encompassing all facts relating to—and even the existence of—the investment agreements.

31. Defendants marketed these investment agreements primarily through a group of individual promoters in Nevada, Utah, and California. Upon information and belief, Judd utilized up to 15 of these promoters.[10] These promoters approached potential investors with whom they shared some common interest, often at their gym or place of worship. Judd directed the promoters' communications. When Judd spoke directly with investors, which was rare, he used the same language and talking points as his promoters.

---

[8] *Id.* at p. 37.
[9] WSJ Article, at p. 12.
[10] Hindenburg Report, at p. 22.

32. Upon information and belief, neither the investments nor the promoters were properly registered with the SEC or FINRA and the promoters were operating as unregistered stockbrokers improperly taking a commission on every investment.

33. Defendants and their promoters lured investors into these contracts by telling them that settlement purchase contracts were scarce and therefore rare and attractive investment opportunities. Investors' funds were usually automatically re-allocated to new purchase contracts once their initial investment had matured.

34. Defendants and their promoters told investors to move on a strict time frame or else miss out on these opportunities. Defendants thus frequently required investors to make additional investments on short notice.

35. Promoters controlled the flow of information from Defendants, including the instructions for making the investment. This was often made explicit in the investment agreements. Sometimes the agreements were executed by these promoters as agents "representing J & J Consulting."

36. The promoters also controlled investors' up-the-chain communications with Defendants and generally discouraged direct contact with Defendants.

37. Investors, therefore, remained in the dark on the details and management of their investments, including the nature of Defendants' venture.

38. In late 2021, however, Defendants made changes intended to increase the appearance of transparency and legitimacy from the outside.

39. Defendants shifted their operations from J & J Consulting to a newly formed Florida entity, J and J Purchasing, and had attorneys draft a 30-page "Confidential Private Placement Memorandum" and other related documents purporting to offer investors more details—and caveats—about the venture. Defendants also standardized the investment agreements and presented them to investors, through their promoters, often via DocuSign.

40. But, in several material aspects, Defendants' moves reduced transparency. For example, investors were given fewer details about the settlements purportedly tied to their investments. Defendants now provided investors with only the personal-injury plaintiff's last name, if that—

and not his or her location or the names of the lawyers who represented that plaintiff.

41. Defendants also adjusted their model to make it easier to invest. For instance, they billed the fund as now using a "subscription" model, which made investments automatically renewable after the first 90 days and permitted investors to keep their money in the fund indefinitely. Defendants also dropped the requirement of investors' needing to pass investments through a business entity.

42. In private conversations with investors, Judd remarked that these changes were necessary because the work of managing the investors had become too much to handle. He also suggested that it was necessary for the venture to clean up appearances in case regulators looked into its operations. For example, he said that abandoning J & J Consulting in favor of J and J Purchasing was necessary because the former entity's name suggested he was offering investment advice.[11]

43. But Judd did not tell his investors what was actually prompting these actions: The FBI had begun an investigation into Defendants on suspicion that they had been running a Ponzi scheme.

44. The FBI's involvement apparently sprang from the efforts of a Wall Street firm that specializes in detecting fraud in publicly traded companies, as well as Ponzi schemes.[12] Its owner, Nate Anderson, had received a tip from a financial professional working with several investors.[13] His curiosity piqued, Anderson undertook a sting operation to uncover potential fraud by Defendants.[14] Using a high-school classmate of Judd's posing undercover as a potential investor, he recorded conversations with Judd and his promoters about the scheme and then tipped off federal authorities.[15]

45. Judd learned about the FBI's efforts as early as late fall 2021, when his promoters were claiming to have collected over $400 million from over 1,000 investments.[16]

---

[11] *Id.* at p. 23
[12] WSJ Article at p. 12.
[13] *Id.*
[14] *Id.*; Anderson's findings are collected at Hindenburg Report.
[15] WSJ Article at pp. 10-13.
[16] *See* Hindenburg Report at p. 24.

46. In early 2022, federal law enforcement agents visited the home of Beasley to question him about Defendants' Ponzi scheme.[17] Beasley answered the door standing sideways, then turned to reveal a gun pressed against his own head.[18] When he pointed his gun at the agents, they shot him twice.[19] Beasley ran inside, which began a stand-off that required the intervention of a hostage negotiator.[20] During this time, Beasley confessed that the investment agreement were a Ponzi scheme and that it would be clear from his IOLTA account records. Eventually a SWAT team raided the home, and he was taken into federal custody.[21]

47. Upon learning this news, investors began their own investigations into Defendants' venture in attempt to assuage their fears that their capital had never gone towards the purchase of personal-injury settlement interests, but instead had been used to pay interest promised to earlier investors—and had been pocketed by Defendants. For some investors, these fears were confirmed when they contacted attorneys listed in their earlier investment agreements and learned that those attorneys had no knowledge or recollection of working with Beasley or Judd, or otherwise had never heard of the personal-injury plaintiffs Defendants said they purchased settlement interests from. One attorney who was contacted said he had no dealings with Beasley—but remembered him from law school.

48. At Beasley's initial court hearing on the charge of assaulting a federal officer, Assistant U.S. Attorney Tony Lopez, Chief of the Department of Justice's White Collar Crime Section, stated that since as early as 2017, Defendants' Ponzi scheme had taken in over $300 million from investors through the IOLTA account. Yet Beasley claimed he had only about $40,000 in the bank account at the time of his arrest, and bank statements reviewed by the U.S. attorney showed daily balances of just $3-4 million.[22]

49. At the hearing, Lopez also stated that Beasley had acquired significant assets in the recent

---

[17] WSJ Article at pp. 7-8.
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] Ex. D, Tr. of Initial Hr'g Mar. 8, 2022, *United States v. Matthew Wade Beasley*, Case No. 2:22-MJ-00171-EJY (D. Nev.) (hereinafter "Beasley Hearing Tr."), at p. 63.

years: at least $7,500,000 in real estate, and numerous luxury vehicles. Similarly, per Anderson's Report and the Wall Street Journal, Judd purchased several multi-million-dollar properties, luxury vehicles, and even a $5,000,000 private jet in the past several years.[23]

50. Promoters confessed to investors that their funds could be at risk, and that they were likely victims of a Ponzi scheme.[24]

**II.    Plaintiffs' Facts**

Plaintiff Barrett Henzel

51. Between December 2019 and March 2022, when Defendants' scheme was exposed, Plaintiff Barrett Henzel invested $400,000 into Defendants' venture, using Henzelhaus, LLC, a Nevada limited liability company that Henzel owns jointly with his wife.

52. Henzel learned of the opportunity to invest in Defendants' venture from a friend who had known Judd since college and who had promoted the venture to others on Judd's behalf.

53. On or about December 9, 2019, per Defendants' promoter's instructions, Henzel wired $70,000 to fund his initial investment. The promoter told Henzel that his money would purchase 70% of a $100,000 purchase contract, and that he would receive a 12.5% return on his investment in 90 days. Subsequently, Henzel funded a total of $300,000 more in additional investments, also to purportedly purchase interests in personal-injury settlements.

54. Throughout his dealings with the venture, Henzel was typically instructed to wire investment funds directly to Beasley's IOLTA account.

55. To date, Henzel received payments of approximately $296,250 as purported returns on his investments. The losses Henzel has incurred have caused hardship to Henzel and his family.

Plaintiffs Tina and Anthony Guilder

56. Between November 2019 and March 2022, the Guilder Plaintiffs invested $2,100,000 on behalf of themselves and their family members, including through TTT Partners, LLC dba T&T Partners, a California limited liability company, of which Tina Guilder is the sole owner and of which Anthony Guilder is the manager.

---

[23] *Id.; see also* Hindenburg Report at pp. 43-44.
[24] *See* FBI Form.

57. Plaintiffs Tina and Anthony Guilder were friendly with others in their California community who had invested in Defendants' venture. In November 2019, they were introduced to a promoter who worked directly with Jeffrey Judd to solicit and process investments.

58. On or about November 29, 2019, per Defendants' promoter's instructions, the Guilder Plaintiffs wired funds for their initial investment of $100,000. The promoter told them this would purchase a $100,000 purchase contract, and that they would receive a 10% return on their investment in 90 days. Subsequently, the Guilder Plaintiffs funded in total an additional $2,000,000 in investments, also to purportedly purchase interests in personal-injury settlements.

59. Throughout their dealings with Defendants venture, the Guilder Plaintiffs were typically instructed to wire investment funds directly into Beasley's IOLTA account.

60. To date, the Guilder Plaintiffs have received payments of approximately $940,000 as purported returns on their investments. The losses that the Guilders have incurred have caused hardship for the Guilders and their family.

<u>Bryce Bussey</u>

61. Between May 2020 and March 2022, when Defendants' scheme was exposed, Plaintiff Bryce Bussey invested $1,340,000 of his money, and that of his family and friends, in Defendants' venture.

62. Plaintiff Bussey was connected to one of the promoters of Defendants' venture by an acquaintance who had invested into it as well.

63. On or about May 12, 2020, per Defendants' promoter's instructions, Bussey wired $40,000 to fund his initial investment. The promoter told Bussey that his money would purchase half of an $80,000 purchase contract, and that he would receive a 6.25% return on his investment in 90 days. Subsequently, Bussey funded $700,000 in additional investments, also to purportedly purchase interests in personal-injury settlements. Bussey also assisted family and friends in investing $600,000 of their own funds in Defendants' venture.

64. All of Bussey's investments with Defendants were made in Bussey's name and through DIY CEO LLC, a Wyoming limited liability company of which Bussey is the sole owner.

65. Throughout his dealings with the venture, Bussey was typically instructed to wire

investment funds directly to Beasley's IOLTA account.

66. To date, Bussey has not recouped any of the principal investment amount for his own investments, nor those made on behalf of family and friends. This has caused hardship for Bussey and his family.

67. To date, Bussey has received payments of approximately $239,875 as purported returns on his personal investments, and payments of approximately $91,125 as purported returns on the investments made on behalf of family members and friends. The losses that Bussey has incurred have caused hardship for Bussey and his family.

## TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION

68. Plaintiffs and the proposed class did not and could not have discovered the facts constituting Defendants' fraud and unlawful conduct until March 4, 2022, the day after charges against Beasley were filed following the FBI shootout, and the day the FBI victim bulletin was published[25].  Plaintiffs then retained counsel.

69. Until then, Plaintiffs and class members received information from Defendants that Defendants used to fraudulently conceal their unlawful conduct, and which purported to establish legitimate investment activity.

70. Because Plaintiffs and class members could not have reasonably discovered the facts constituting Defendants' unlawful conduct until March 4, 2022, their claims accrued on that date and any applicable statutes of limitations were tolled until that date.

## CLASS ACTION ALLEGATIONS

71. Plaintiffs bring this case as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all persons and entities who invested money with J and J Purchasing or J & J Consulting. Excluded from the class are all Defendants; all members of the immediate families of any Defendant; all employees and agents of any Defendant; and any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to either of them, as well as the spouses of such persons.

72. The class satisfies the requirements of Rule 23(a), as well as 23(b)(1)(B) and 23(b)(3).

---

[25] Beasley Hearing Tr. at p. 57.

73. <u>Numerosity</u>. The members of the class are so numerous that joinder of all members is impracticable. The size of the class, which is estimated to consist of hundreds if not thousands of individuals and business entities, can only be ascertained through discovery. Class members may be notified of the pendency of this action by mail, supplemented by published notice (if deemed necessary or appropriate by the Court).

74. <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the members of the class as all members of the class are similarly affected by Defendants' wrongful conduct.

75. <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the interests of the members of the class and have retained counsel competent and experienced in class action and financial fraud litigation.

76. <u>Commonality and Predominance</u>. Common questions of law and fact exist as to all members of the proposed class and predominate over any questions solely affecting individual members of the proposed class. The questions of law and fact common to the class include:

    a. Whether Defendants owed fiduciary duties to the Plaintiffs and the proposed class;

    b. Whether Defendants breached their fiduciary duties (or aided and abetted the breaching of others' fiduciary duties) to Plaintiffs and the proposed class;

    c. Whether Defendants operated a pyramid scheme within the meaning of NRS § 598.100;

    d. Whether Defendants misrepresented the nature of their business venture;

    e. Whether Defendants failed to disclose and concealed information about the nature of their business venture;

    f. Whether Defendants' misrepresentations and omissions were material;

    g. Whether Defendants' actions amounted to a civil conspiracy under the law;

    h. Whether Defendants' conduct constitutes the unlawful conversion of Plaintiffs' and class members' personal property;

    i. Whether and to what extent the class was damaged by Defendants' unlawful and fraudulent conduct; and

j.  Whether and to what extent Defendants have been unjustly enriched at the expense of Plaintiffs and the class.

77. <u>Superiority</u>. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions economically feasible. Even if class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the same fraudulent scheme, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

78. In the alternative, the proposed class may be certified because: (a) the prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent adjudications; (b) the prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the proposed class, thereby making appropriate final and injunctive relief with respect to the members of the proposed class as a whole.

## CAUSES OF ACTION

### Count I

### *Breach of Fiduciary Duty*

### (Against Defendants Jeffrey Judd, J & J Consulting, J and J Purchasing, Matthew Beasley, and Beasley Law Group PC)

79. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

80. Defendants named in this Count owed a fiduciary duty to Plaintiffs and the class. They

fostered a special relationship with Plaintiffs and the members of the class that engendered fiduciary duties of loyalty, care, honesty and good faith. They had a duty to act for the benefit of Plaintiffs and the members of the class upon matters within the scope of their special relationship with Plaintiffs and the members of the class. They undertook to act, agreed to act, and acted as trustee for the benefit of Plaintiffs and members of the class.

81. Specifically, as custodians of investor funds and fundraisers for the purported investment venture, Defendants Jeffrey Judd, J & J Consulting, and J and J Purchasing had a duty to take Plaintiffs' and members of the class's money and use it to purchase interests in personal-injury settlements, and to collect payments from those settlements and deliver money to Plaintiffs and members of the class. Beasley and Beasley Law Group, as holders of the IOLTA Account, were custodians of investor funds, were holding funds in trust, and were thus bound to act for the benefit of Plaintiffs and the class.

82. Plaintiffs and members of the class reposed their trust and confidence in Defendants.

83. Defendants undertook such trust and assumed a duty to advise, counsel, and protect Plaintiffs and the class.

84. The Defendants breached their fiduciary duty to Plaintiffs and the class.

85. Defendants prompted Plaintiffs and the class to send investments into the IOLTA Account where the funds would be held in trust and used solely for the purpose of purchasing interests in personal-injury settlements. Defendants perpetrated a scheme through which Defendants misappropriated, commingled, and otherwise misused investor funds and otherwise acted as alleged above in violation of their fiduciary duties to investors, including Plaintiffs and the class. Instead of protecting the funds invested by Plaintiffs and the class, the Defendants caused or allowed to be caused, the misappropriation, diversion, and misuse of the funds.

86. As a direct and proximate cause of the breaches of fiduciary duty by the Defendants, Plaintiffs and the members of the class sustained damages in an amount to be determined at trial. Plaintiffs and the class seek to recover all available remuneration, including damages and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs,

and all other relief deemed fair and just.

## Count II

### Aiding and Abetting Breach of Fiduciary Duty

**(Against Defendants Jeffrey Judd, J & J Consulting, J and J Purchasing,**

**Matthew Beasley, and Beasley Law Group PC)**

87. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

88. Defendants breached their fiduciary duties to Plaintiffs and the members of the class as set forth above.

89. In the alternative, to the extent any Defendants are found not to have directly owed and breached fiduciary duties to Plaintiffs of the class, those Defendants knew that the Defendants who owed fiduciary obligations to Plaintiffs and the class were breaching those obligations by engaging in the conduct alleged above.

90. With such knowledge, Defendants assisted in the breaches of fiduciary duty. Defendants assisted in prompting Plaintiffs and the class to send investments into the IOLTA Account where the funds would be held in trust and used solely for the purpose of purchasing interests in personal-injury settlements. Defendants assisted in perpetrating the scheme through which Defendants misappropriated, commingled, and otherwise misused investor funds and otherwise acted as alleged above in violation of fiduciary duties to investors, including Plaintiffs and the class. Defendants' assistance contributed to the misappropriation, diversion, and misuse of the funds.

91. As a direct and proximate cause of Defendants' aiding and abetting these breaches of fiduciary duty, Plaintiffs and the members of the class sustained damages in an amount to be determined at trial. Plaintiffs and the class seek to recover all available remuneration, including damages and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs, and all other relief deemed fair and just.

## Count III

### *Fraud*

### (Against Defendants Jeffrey Judd, J & J Consulting,

### J and J Purchasing, Matthew Beasley, and Beasley Law Group)

92. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

93. As set forth above, Defendants named in this Count perpetrated a fraud upon Plaintiffs and members of the class through materially false and misleading statements and omissions that misled Plaintiffs and the members of the class to believe they were investing in personal-injury settlements. Defendants knew these statements and omissions to be false.

94. Among other fraudulent conduct, Defendants made or participated in the making of the following misrepresentations and omissions:

    a.  through a uniform PPM, falsely told Plaintiffs and members of the class that their investments would be used to purchase interests in personal-injury settlements;

    b.  falsely promised returns on their investments;

    c.  concealed from Plaintiffs and members of the class that they were operating a Ponzi scheme by, among other unlawful acts, commingling investor funds and paying earlier investors with funds obtained from later investors; and

    d.  concealed from Plaintiffs and members of the class that Defendants misappropriated and misused millions of investor funds for improper purposes.

95. In addition, by breaching their fiduciary duties to Plaintiffs and members of the class and not disclosing such breaches, Defendants are liable for constructive fraud.

96. Plaintiffs and members of the class reasonably relied to their detriment upon these misrepresentations and omissions when they invested with Defendants.

97. As a direct and proximate cause of the fraud by Defendants, Plaintiffs and the members of the class sustained damages in an amount to be determined at trial. Plaintiffs and the class seek to recover all available remuneration, including damages, punitive damages, and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs,

and all other relief deemed fair and just.

## Count IV

### *Civil Conspiracy*

### (Against all Defendants)

98. Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

99. Defendants named in this Count agreed to unlawfully and unjustly perpetrate a scheme in which they solicited Plaintiffs and members of the class to provide Defendants with millions of dollars by creating the false appearance through materially false and misleading statements and omissions that Plaintiffs and members of the class were investing in personal-injury settlements.

100.    In furtherance of the conspiracy and in pursuit of the object of conspiracy, Defendants drafted and executed numerous agreements creating the false appearance that Plaintiffs and members of the class were investing in personal-injury settlements, when in truth and in fact those funds were misappropriated to unjustly enrich Defendants.

101.    In furtherance of the conspiracy, Defendants solicited investors to transfer millions of dollars to Defendants to fund the purchase of interests in personal-injury settlements, when they well knew that the investors' funds would be misappropriated by Defendants to unjustly enrich themselves and their coconspirators.

102.    As a direct and proximate cause of Defendants' civil conspiracy, Plaintiffs and the members of the class sustained damages in an amount to be determined at trial. Plaintiffs and the class seek to recover all available remuneration, including damages, punitive damages, and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs, and all other relief deemed fair and just.

//

//

## Count V

### *Unjust Enrichment*

**(Against Defendants Jeffrey Judd, J & J Consulting,**

**J and J Purchasing, Matthew Beasley, and Beasley Law Group)**

103.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

104.    Defendants named in this Count received and maintained the funds of Plaintiffs and members of the class in a trust account. The trust account was used to carry out the Ponzi scheme.

105.    The funds held by Defendants and used to further the scheme belonged to Plaintiffs and the members of the class. Defendants used such funds to make false distributions and take profit. Thus, Plaintiffs and members of the class conferred benefits upon the Defendants in the form of deposits from which Defendants generated income and profits.

106.    Defendants knowingly and voluntarily accepted, and retained, the deposits and those benefits.

107.    It would be inequitable for Defendants to retain the benefits they generated from monies of Plaintiffs and the members of the class.

108.    As a direct and proximate result of the above-described conduct of Defendants, Plaintiffs and the members of the class sustained damages in an amount to be determined at trial. Plaintiffs and the class seek to recover all available remuneration, including disgorgement of Defendants' ill-gotten gains and restitution, plus accrued and accruing interest, prejudgment interest, costs, and all other relief deemed fair and just.

## Count VI

### *Conversion*

**(Against Defendants Jeffrey Judd, J & J Consulting,**

**J and J Purchasing, Matthew Beasley, and Beasley Law Group)**

109.    Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

CLASS ACTION COMPLAINT - 19

110.     The above-described acts of Defendants were intentional and resulted in serious interference with the personal property rights of Plaintiffs and members of the class.

111.     Defendants exercised dominion and control over Plaintiffs' personal property, namely their investment funds, by converting the same to their own use.

112.     Defendants are not the rightful owners of the personal property of Plaintiffs and members of the class.

113.     Defendants' intentional acts directly and proximately caused the conversion of the personal property of Plaintiffs and members of the class.

114.     As a direct and proximate result of the above-described conduct of Defendants, Plaintiffs and the members of the class sustained damages in an amount to be determined at trial. Plaintiffs and the class seek to recover all available remuneration, including damages and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs, and all other relief deemed fair and just.

### Count VII

*Equitable Accounting*

**(Against J & J Consulting, J and J Purchasing, and Beasley Law Group)**

115.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

116.     Defendants J & J Consulting and J and J Purchasing had a fiduciary relationship and/or were in contractual privity with Plaintiffs and members of the class.

117.     Defendants J & J Consulting and J and J Purchasing entered into and were participants in complex transactions as set forth above.

118.     Plaintiffs demand an accounting of the accounts related to these complex transactions and of the accounts related to Defendants J & J Consulting and J and J Purchasing.

119.     For purposes of this Count, Plaintiffs allege, in the alternative to the other Counts asserted in this complaint, Plaintiffs lack a full and adequate remedy at law. Plaintiffs, on behalf of themselves and all similarly situated individuals and entities, therefore demand an accounting of the Beasley IOLTA, all of Defendants J & J Consulting and J and J Purchasing's

foreign and domestic accounts, and for such further relief as is fair and just.

### Count VIII

*Violation of NRS 41.600*

**(Against Defendants Jeffrey Judd, J & J Consulting,**

**J and J Purchasing, Matthew Beasley, and Beasley Law Group)**

120.     Plaintiffs incorporate by reference all of the foregoing allegations as if fully set forth herein.

121.     Nevada Revised Statue ("NRS") 598.0923(2) provides that it is a deceptive trade practice for any person to knowingly, in the course of their business and profession, "[f]ail[] to disclose a material fact in connection with the sale or lease of goods or services." NRS 598.023(3) provides that it is a deceptive trade practice for a person to knowingly, in the course of their business and profession, "[v]iolate[] a state or federal statute or regulation relating to the sale or lease of goods or services."

122.     NRS 598.100 defines a "pyramid promotional scheme" as

[A]ny program or plan for the disposal or distribution of property and merchandise or property or merchandise by which a participant gives or pays a valuable consideration for the opportunity or chance to receive any compensation or thing of value in return for procuring or obtaining one or more additional persons to participate in the program, or for the opportunity to receive compensation of any kind when a person introduced to the program or plan by the participant procures or obtains a new participant in such a program.

123.     NRS 598.110 provides that "[e]very person who contrives, prepares, sets up, proposes, operates, advertises or promotes any pyramid promotional scheme or endless chain commits a deceptive trade practice" under NRS 598.0923(3).

124.     Based on the facts stated herein, Defendants named in this Count knowingly operated a pyramid promotional scheme under NRS 598.100, which they used to sell illusory goods and services to Plaintiffs and class members. Defendants operated this scheme in the course of their business and/or profession. Accordingly, Defendants violated NRS 598.0923(3).

125.     Additionally, Defendant knowingly concealed material facts regarding the transactions in question, *i.e.*, they failed to disclose the true nature of the scheme and its means of raising revenue. Defendants' concealment came in the course of their business and/or profession. Accordingly, Defendants violated NRS 598.0923(2).

126.     NRS 41.600(2)(e) provides that a person commits "consumer fraud" when violating, inter alia, NRS 598.0923(2)-(3). Accordingly, Plaintiffs and class members are all "victims of consumer fraud" as contemplated by NRS 41.600(1).

127.     Plaintiffs and the class seek to recover all available remuneration, including damages and restitution, from the Defendants plus accrued and accruing interest, prejudgment interest, costs, reasonable attorney's fees, and all other relief deemed fair and just.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court enter a judgment awarding the following relief:

a.  An order certifying the proposed class and appointing the undersigned counsel as class counsel;

b.  An award of actual damages, compensatory damages, statutory damages, restitution, punitive damages, and all other forms of monetary relief provided for or made available by law or equity;

c.  An award of Plaintiffs' reasonable attorneys' fees and litigation costs;

d.  An order commanding Defendants to submit to an accounting of Defendants' accounts; and

e.  Such other and further relief as this Court may deem just and proper.

//

//

//

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury as to all issues so triable.

Dated: March 25, 2022.,                    Respectfully submitted,


                                           /s/ *Miles N. Clark*
                                           Miles N. Clark, Esq.
                                           Nevada Bar No. 13848
                                           **KNEPPER & CLARK LLC**
                                           5510 S. Fort Apache Rd., Suite 30
                                           Las Vegas, NV 89148-7700
                                           Phone: (702) 856-7430
                                           miles.clark@knepperclark.com

                                           Eric H. Gibbs (*will comply with LR
                                           IA 11-2 within* 14 *days*)
                                           David K. Stein (*will comply with LR
                                           IA 11-2 within* 14 *days*)
                                           Iudis Sominskaia (*will comply with LR
                                           IA 11-2 within* 14 *days*)
                                           **GIBBS LAW GROUP LLP**
                                           505 14th Street
                                           Oakland, California 94612
                                           ehg@classlawgroup.com
                                           ds@classlawgroup.com
                                           ids@classlawgroup.com

                                           Scott L. Silver (*will comply with LR IA
                                           11-2 within* 14 *days*)
                                           **SILVER LAW GROUP**
                                           11780 W. Sample Road
                                           Coral Springs, Florida 33065
                                           (954) 755-4799
                                           ssilver@silverlaw.com

                                           *Counsel for Plaintiffs and the Proposed Class*