Eric H. Gibbs (*pro hac vice*)
David K. Stein (*pro hac vice*)
Iudis Sominskaia (*pro hac vice*)
**GIBBS LAW GROUP LLP**
505 14th Street
Oakland, California 94612
(510) 350-9700
ehg@classlawgroup.com
ds@classlawgroup.com
ids@classlawgroup.com

Scott L. Silver (*pro hac vice*)
**SILVER LAW GROUP**
11780 W. Sample Road L
Coral Springs, Florida 33065
(954) 755-4799
ssilver@silverlaw.com

Miles N. Clark (NBN 13848)
**KNEPPER & CLARK LLC**
5510 S. Fort Apache Rd., Suite 30
Las Vegas, NV 89148-7700
(702) 856-7430
miles.clark@knepperclark.com

*Counsel for Plaintiffs and Proposed Class*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| BARRETT HENZEL, BRYCE BUSSEY, ALLAN CARSO ,TINA GUILDER, ANTHONY GUILDER, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>WELLS FARGO BANK, N.A., a national banking association formed in Delaware,<br><br>*Defendant.* | Case No.: 2:22-cv-00529-JAD-NJK<br><br>**AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs Barrett Henzel, Bryce Bussey, Allan Carso, Tina Guilder, and Anthony Guilder, on behalf of themselves and all others similarly situated, allege the following against Defendant Wells Fargo, N.A., a national banking association formed in Delaware.

**INTRODUCTION**

1.   Beginning in 2017 and continuing through March 2022, Matthew Beasley and Jeffrey Judd ran a massive Ponzi scheme centered in Las Vegas, Nevada. The scheme enticed investors to pay large sums for the opportunity to buy shares of future personal injury settlements. The investors were promised large, annualized rates of return. And they were told the investments featured little to no risk; their funds would be held in an attorney trust account for extra safety.

2.   The scheme went unimpeded for over five years. In early 2022, law enforcement received a tip and contacted Judd and Beasley. When the FBI arrived at Beasley's residence, Beasley brandished a firearm, threatened to commit suicide, and was subdued only after a multi-hour standoff involving a hostage negotiator. As Beasley was finally apprehended, he confessed to the Ponzi scheme. He told law enforcement that he was able to pull off the scheme because he was a lawyer, and that the full nature of the scheme would be clear as soon as they reviewed his attorney trust account bank records.

3.   On this point, at least, Beasley was being honest. The account statements for the attorney trust account (or "IOLTA") at Wells Fargo show unmistakable signs of a Ponzi scheme. While privy to all that activity, Wells Fargo opted not to investigate or warn investors, and instead continued to provide its services to Beasley.

4.   But Wells Fargo, like other banks, is tasked with taking steps to prevent money laundering, and it has sophisticated and automated processes to analyze its customers' account activity. When a new customer opens an account, Wells Fargo gathers information about that customer's identity and anticipated account activity, and then over time compares its predictions with the ways in which the account is actually used. Wells Fargo is particularly knowledgeable about IOLTAs because it maintains IOLTA-specific procedures that enable it to be listed among the banks in Nevada qualified to offer such accounts.

5.   With Beasley's IOLTA, Wells Fargo had a clear picture of what to expect. When Beasley

AMENDED CLASS ACTION COMPLAINT - 2
Case No.: 2:22-cv-00529 -JAD-NJK

opened the IOLTA in January 2017, he told the bank he was a solo practitioner, with a local law practice, which brought in $350,000 in gross annual sales.

6. During the five years that followed, however, Wells Fargo ignored obvious and continuous signs of fraud and money laundering. Nearly every transaction within the IOLTA involved large round numbers—often $50,000, $80,000, or $100,000. Deposits were typically followed by prompt withdrawals to one of several accounts. Rather than transactions pertaining to Beasley's local person-injury and family-law practice, many of the deposits were executed with notations making explicit that the money was being deposited for investment purposes.

7. Most glaring of all, after being told to anticipate $350,000 in gross annual revenues, Wells Fargo witnessed nearly $500 million flow through the account. This eye-popping figure was not only orders of magnitude higher than what Beasley had forecasted for the bank, but also noteworthy in comparison to statewide IOLTA holdings. The Nevada State Bar has reported that, in recent years, daily holdings across all IOLTAs in the state averaged approximately $700 million.

8. The law does not allow Wells Fargo to ignore such obvious signs of fraud. Nor does the law permit Wells Fargo to continue to offer its services uninterrupted while refusing to investigate or take any other action to protect the victims of the fraud. Yet that is precisely what Wells Fargo did. And, left free to run their Ponzi scheme, Beasley and Judd siphoned so much money from the IOLTA that, by the time law the FBI took action in March 2022, a mere $4 million remained in the account. Investors have lost hundreds of millions of dollars, which they are unlikely to recover unless Wells Fargo is held accountable for its unlawful conduct.

9. Plaintiffs are among the many investors who seek to hold Wells Fargo accountable. They sue on behalf of themselves and all other similarly situated investors. They seek full recovery of their losses and all other relief provided for by law or equity.

**PARTIES**

**I.    Plaintiffs**

10. Plaintiff Barrett Henzel is a citizen and resident of Las Vegas, Nevada.

11. Plaintiffs Tina Guilder and Anthony Guilder are citizens and residents of Trabuco Canyon, California.

12. Plaintiff Bryce Bussey is a citizen and resident of Payson, Utah.

13. Plaintiff Allan Carso is a citizen of Las Vegas, Nevada.

**II.    Defendant**

14. Defendant Wells Fargo Bank, N.A. is a national banking association formed in Delaware, with its principal place of business in Sioux Falls, South Dakota.

**RELEVANT NON-PARTIES**

15. Jeffrey Judd is a citizen and resident of Nevada.

16. J & J Consulting Services, Inc., is a Nevada corporation, owned by Judd.

17. J & J Consulting Services, Inc., is an Alaska corporation with its principal place of business in Nevada and is owned by Judd.

18. J & J Purchasing, LLC, is a Florida limited liability company with its principal place of business in Nevada and is owned by Judd. (The above "J & J" companies are referred to collectively as the "J & J Entities.")

19. Matthew Beasley is a citizen and resident of Nevada.

20. Beasley Law Group PC is a Nevada professional corporation, owned by Beasley, with its principal place of business in Nevada.

**JURISDICTION AND VENUE**

21. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 (codified at 28 U.S.C. § 1332(d)(2)). At least one member of the proposed class is a citizen of a different state than Defendant, there are more than one hundred members of the proposed class, and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

22. This Court has specific personal jurisdiction over Defendant because Plaintiffs' claims

arise out of and relate to Defendant's unlawful conduct in Nevada.

23. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant's unlawful course of conduct occurred in large part in this District.

**STATEMENT OF FACTS**

**I.    The Ponzi Scheme**

24. In March 2017, Beasley and Judd, with several promoters working at their direction, began offering would-be investors the opportunity to buy "lawsuit settlement contracts."

25. In describing the investment opportunity, they told investors that periodically an injured party involved in litigation would receive a settlement from an insurance company. The injured party sometimes desired a portion of the settlement funds before the settlement payment would be made. Through the lawsuit settlement contracts, the injured party (through their attorney) would sell their interest in the eventual settlement proceeds to one of the J & J Entities. The J & J Entity would advance funds, which the injured party then repaid 90 days later plus interest and fees.

26. From 2017 to 2022, the scheme continued, operated through the J & J entities and Beasley Law Group P.C. Largely through the use of promoters, they marketed the scheme primarily in Nevada, Utah, California, and Washington. Promoters typically approached potential investors with whom they shared some common interest, often at their gym or place of worship.

27. The lawsuit settlement contracts were typically priced at $80,000 or $100,000, although investors sometimes purchased half of the contract ($40,000 or $50,000, respectively) or, in rare instances, even smaller portions. Investors were promised high rates of return: for instance, 12.5% after 90 days, which translated to 50% annually, along with additional payments if the returns were delayed. Investors' funds were usually automatically re-allocated once their initial investments had matured.

28. Investors were told that lawsuit settlement contracts were scarce and therefore rare and attractive investment opportunities. The promoters conveyed that the venture had made as many as 20,000 such purchases and had never had one go bad. Ex. C, at p. V1-38; Ex. D., at V1-71. They described the investments as risk-free, "ironclad", and "immaculate." Ex. D., at pp. V1-

59, V1-77.

29. Investors were consistently instructed to wire or deposit their investment capital into an Interest on Lawyers' Trust Account ("IOLTA") at Wells Fargo that belonged to Beasley's law firm, Beasley Law Group PC.

30. The promoters used the safeguards inherent in using an IOLTA as a selling point to boost their scheme and assure investors that the operation was above board. It worked; investors felt more secure sending their funds to an attorney trust account. Ex. D, at p. V1-57 (also in image below).

```
                                          Page 26
       1         MIKE:  So -- okay.  So they've already gone
       2    through a process with, like, an insurance company.
       3    They have some representing them.
       4         MR. JONGEWARD:  Yeah.
       5         MIKE:  Is it a law firm, like --
       6         MR. JONGEWARD:  Yeah, so we have an attorney
       7    that represents us --
       8         MIKE:  Okay.
       9         MR. JONGEWARD:  -- and so we use his IOLTA
      10    account, his lawyer's trust account, and that lawyer's
      11    trust account is a state bar regulated account.  If
      12    you're not familiar with those it's --
      13         MIKE:  Yeah.
      14         MR. JONGEWARD:  Yeah.  It's very similar to
      15    an escrow account for real estate.
      16         MIKE:  And what's the attorney's name?
      17         MR. JONGEWARD:  His name is Matt Beasley,
      18    B-e-a-s-l-e-y,  Beasley Law Group.
      19         MIKE:  Okay.
```

31. The Ponzi scheme continued until March 2022, when it finally collapsed. That month, FBI agents began attempting to make contact with Judd and Beasley. When they arrived at Beasley's home, Beasley opened the door holding a gun against his head. He then aimed the gun at the agents, who shot him twice. Beasley ran inside, which began a stand-off that required the intervention of a hostage negotiator. Eventually a SWAT team raided the home and took Beasley into custody.

32. The SEC has since filed a complaint against Beasley and Judd in federal court, alleging, among other things, securities violations and fraud.

33. According to transcripts filed by the SEC, Beasley repeatedly confessed to the Ponzi scheme during his standoff with the FBI. In it, he states that he "got names of attorneys" but "never actually talked to them," Ex. E, at p. V1-107, and that he continued to invent fictitious attorney deals to satisfy the quickly growing investor demand. *Id.* He also states that he was able to "pull the whole thing off" precisely because he was an attorney. *Id.* at p. V1-151.

---

Page 30

```
1    for a living, Matthew?
2        MR. BEASLEY:  I'm an attorney.  That's how I
3    was able to pull the whole thing off.
```

---

34. Beasley admitted to agents that the Ponzi scheme would be "clear as soon as they go through my bank records." Ex. E, at p. V1-102.

**II.    Wells Fargo Knew of Beasley's Wrongful Use of the IOLTA Yet Did Not Investigate and Continued Facilitating His Use of the IOLTA.**

35. Beasley's admission was accurate: the existence of his Ponzi scheme becomes apparent upon review of the Wells Fargo IOLTA statements. Immediately after the IOLTA was first opened, the account activities reflected a number of the most common—and glaring—signs of money laundering and fraud.

**A.    Wells Fargo Monitors Its Customers' Account Activity**

36. Wells Fargo and other banks are required under federal law to know their customers. This entails collecting and maintaining customer information and understanding their banking behavior in order to, among other things, detect and prevent fraud.

37. The bank maintains procedures to know the identity of each customer, 31 C.F.R. § 1020.220(a)(1), (2), and to collect information about the holder of each account, 31 C.F.R. § 1020.220(a)(2). When an entity rather than an individual opens an account, the bank obtains information about the individual with control of the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C).

38. Wells Fargo and other banks also maintain internal controls to ensure ongoing compliance with the Bank Secrecy Act (BSA), 12 C.F.R. § 21.21, which include independent testing of the bank's compliance, daily coordination and monitoring of compliance by a designated person, and training of appropriate personnel. These controls also include customer due diligence programs to prevent and detect money laundering. Under these programs, Wells Fargo maintains an awareness of the unique financial activity of its customers and can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account. This knowledge is used to identify unusual and suspicious transactions.

39. When Wells Fargo becomes aware during its normal account monitoring that customer information has materially changed, these internal controls require that the bank update that information and, where appropriate, reassess the customer's risk profile or rating. This includes when the customer's transactions are inconsistent with Wells Fargo's understanding of the nature and purpose of the type of account the customer has with it—for instance, when there are significant, unexplained changes in account activity.

40. Wells Fargo's compliance officer designates an individual at each office or branch to monitor day-to-day compliance with the BSA. And Wells Fargo makes employee compliance with the BSA a condition of employment and incorporates compliance with the BSA and its implementing regulations into job descriptions and performance evaluations. Accordingly, Wells Fargo gives BSA training to all operational personnel whose duties may require knowledge of the BSA, including tellers and wire room personnel, who can then identify indicia of money laundering and fraud.

41. Wells Fargo receives guidance from the Federal Financial Institutions Examination Council (FFIEC), a federal inter-agency body tasked with ensuring consistency in BSA compliance and anti-money laundering (or "AML") efforts across the banking sector. FFEIC publications describe certain "red flags" that tip off banks to possible money laundering schemes.

42. Per this guidance, banks like Wells Fargo give "closer scrutiny" to customer activity that

does not appear to have a reasonable business or legal purpose or is inconsistent with the known purpose for the customer's account.

43. One such "red flag" is customer activity inconsistent with the customer's business—for example, where a business has dramatically different patterns of deposits from those of similar businesses, where a large volume of transfers is made to and from the account, but the nature of the accountholder's business would not appear to justify them, or where the accountholder purchases good or services that do not match the stated line of business.

44. Another category of "red flags" is where the fund transfers have certain suspicious characteristics. This includes transfers to and from accounts held by related entities with no apparent business reason; unexplained repetitive transfers; transfers of large, round dollar amounts; activity inconsistent with the client's business, and payments or receipts with no apparent links to legitimate contracts, goods, or services.

### B. Wells Fargo Ramped Up Its Internal Control Mechanisms Before the Ponzi Scheme Began.

45. Wells Fargo first started to build out its enterprise-level Operational Risk Management and Compliance group in 2005. The group focused on AML/ BSA, and other compliance issues. By 2011, the bank had installed its first Chief Risk Officer and empowered the executive to identify and escalate compliance issues to upper management, the newly established Risk Committee, and the Board.

46. Between 2011 and 2017, as Wells Fargo developed its internal protocols, it incurred fines and was subject to other disciplinary measures from federal agencies for its compliance failings, including those due to serious deficiencies in its AML/BSA-related oversight.

47. In 2013, in response to regulatory scrutiny, Wells Fargo retained an outside consultant to reevaluate its system of internal controls. Following this audit, the bank adopted a Risk Management Framework and made other substantive changes. In 2016, Wells Fargo testified to Congress that its policies, procedures, and internal controls were effective and compliant with AML laws.

48. By the time Beasley opened his IOLTA in 2017, the bank had restructured its internal

audit functions and directed substantial resources to the development and implementation of surveillance technology. Wells Fargo also expanded its compliance-focused workforce significantly, which included realigning over 5,000 employees to report into Corporate Risk and expanding its Audit Services department to include over 1,350 team members.

49. As a result of these efforts, the bank boasts a sophisticated system of internal controls including but not limited to:

a. continuous monitoring of business accounts, including automated algorithm-based mechanisms that flag suspicious activity;

b. enhanced documentation, tracking, reporting, and escalation protocols;

c. a Data Analytics & Innovation department tasked with improving existing compliance surveillance mechanisms;

d. a Financial Crimes department which focuses largely on AML and BSA compliance and regularly tests existing audit methods to ensure they are timely, effective, and accurate; and

e. a Regulatory Compliance department.

50. As a matter of course, Wells Fargo collects information about new business account clients, including the purpose and nature of the business, anticipated activity in the account (*e.g.*, volume, value (number and dollar), and type of transaction), where the customer expects to transact business, products and services commonly used by the customer, as well as other factors.

51. Using the information collected, as well as external resources like internet search engines and state record databases, Wells Fargo creates an initial client profile and assigns a compliance-related risk rating. Neither the profile, nor the risk rating, is final or static. Instead, these are periodically updated to reflect the customer's behavior as it evolves, for instance with newly acquired negative information about the account, reviews of the customer relationship, and other risk factors.

**C.    Wells Fargo Knows What Typical and Appropriate IOLTA Activity Looks Like.**

52. All or substantially all of the funds that went through the Ponzi scheme in this case ran through the Beasley law firm's IOLTA at Wells Fargo. This IOLTA was formally designated as such when first opened at a Wells Fargo branch in January 2017.

53. An IOLTA (which stands for "Interest on Lawyers' Trust Account") is a limited-use trust account offered only at qualified financial institutions. Wells Fargo has taken the steps needed to act as such a qualified financial institution within the state of Nevada, including by signing an acknowledgment of IOLTA-specific requirements. Wells Fargo has also taken the steps necessary to operate IOLTAs in other states across the country.

54. In addition to acknowledging IOLTA-specific restrictions, Wells Fargo committed to reporting discrepancies to the Nevada State Bar. Ex. F, at p. V2-13; *see also* NV SCR 785. Wells Fargo thus understands that proper IOLTA activity follows consistent patterns: for example, predictable transfer activity, meticulous separation of client funds, and no personal spending.

55. IOLTAs are to be used for deposits of "clients' funds which are nominal in amount or to be held for a short period of time." *Id.* at p. V2-34. The only payments that attorneys may make out of an IOLTA are "payments on behalf of [a] client … including paying client costs and expenses (*e.g.*, court filing fees or deposition transcript costs) that the client has prepaid, disbursing settlement proceeds, paying yourself earned and undisputed legal fees, etc." *Id.* at p. V2-35.

56. The Nevada Bar's Trust Accounting Manual provides that an attorney has a "non-waivable, personal fiduciary responsibility … for every penny as long as the funds remain in [his or her] possession." *Id.* at p. V2-13; *see also* SCR 78.5."

57. Commingling funds within an IOLTA is improper. *Id.* at p. V2-25. The Nevada State Bar dictates that attorneys must keep meticulous ledgers to ensure easy audits of the account. Because a thorough audit trail is expected, IOLTA transactions typically contain detailed notations to indicate the nature of the expense and the name of the client. *Id.* at pp. V2-27-28. For the same reason, proper use of such accounts does not ordinarily include making checks out to

cash or withdrawing cash from the account. *Id.* Indeed, IOLTAs typically don't come with a debit card or ATM access. *Id.* at p. V2-29.

58. When client funds are deposited, the money has yet to be earned by the lawyer (or else it would go into the lawyer's operating account). *Id.* at pp. V2-33-34. So, proper use of the account entails that lawyers withdraw payments for fees only as they are earned, and precisely in the amount owed (and not rounded up or down). *Id.*

59. Fee payments must be made out directly to the attorney (whether by check or transfer). The attorney may not cover operating, personal, or any other expenses from the IOLTA in lieu of payment for his work, even if the amount of fees owed to the attorney is sufficient to cover those expenses. *Id.* at p. V2-35.

60. Additionally, with client authorization, client funds within an IOLTA may be used to cover specific costs or services directly related to attorney's work for that client. *Id.* at pp. 33-34.

61. Wells Fargo maintains a Legal Specialty group that, among other things, "gathers and compiles law firm data" on a quarterly basis, including "billable hours, revenue per attorney, profit, headcount, and trends by region and sector." Ex. G, at p. V2-73. The bank uses its proprietary Comparative Analytical Tool (CAT) to process the data and glean relevant insights on the industry. *Id.* Thus, Wells Fargo also has substantial insight into the typical revenues and incomes of solo Nevada practitioners like Beasley.

### D.  Wells Fargo Knew How the Beasley's IOLTA was to be Used and Knew How Appropriate (Non-Fraudulent) Activity within the IOLTA Would Appear.

62. On January 26, 2017, Matthew Beasley applied for a Wells Fargo business account for his law firm, Beasley Law Group PC, specifically an Analyzed Business IOLTA.

63. Wells Fargo does not make IOLTA applications available as part of its online offerings. Instead, to apply for an IOLTA, a lawyer must go to a branch and personally process the application with a Wells Fargo banker.

64. Per the account-opening record, Beasley submitted the application at the 215 Wells Fargo Branch located at 6585 N Decatur Blvd., Las Vegas, NV 89131, with the help of Virginia

Arreola, a Wells Fargo personal banker. Ex. A, at p. V1-13 (relevant portion reproduced below).

| Customer 1 Information | | | Business Account Application |
| --- | --- | --- | --- |
| Customer Name: BEASLEY LAW GROUP PC | | | |
| Enterprise Customer Number (ECN): 356876861909115 | | Street Address: 1872 SHY ALBATROSS AVE | |
| Account Relationship: Sole Owner | | Address Line 2: | |
| Taxpayer Identification Number (TIN): ███████1156 | TIN Type: EIN | Address Line 3: | |
| Business Type: Corporation Type C | | City: NORTH LAS VEGAS | State: NV |
| Business Sub-Type/Tax Classification: Professional Corporation | Non-Profit: No | ZIP/Postal Code: 89084-2069 | Country: US |
| Date Originally Established: 04/18/2011 | Current Ownership Since: | Number of Employees: 1 | Business Phone: 702/483-6800 | Fax: |
| Annual Gross Sales: $350,000.00 | Year Sales Reported: 01/01/2017 | Fiscal Year End: | Cellular Phone: | Pager: |
| Primary Financial Institution: | Number of Locations: 1 | e-Mail Address: matthew@beasleylawgrouplv.com | |
| Primary State 1: | Primary State 2: | Primary State 3: | Website: |
| Primary Country 1: | Primary Country 2: | Primary Country 3: | Sales Market: LOCAL |
| Industry: Other Services (except Public Administration) | | | |
| Description of Business: Law office | | | |

65. In the application, Beasley told Wells Fargo he was the sole owner of Beasley Law Group PC, and that he would be the sole signatory for the account. He also stated that the annual gross sales for the firm were $350,000, and that the sales market for his business was "local." The mailing address Beasley provided for the account was the address of his personal residence: 1872 Shy Albatross Avenue in North Las Vegas, Nevada.

66. The "Bank Use Only" portion of the account application stated that the bank conducted a verification of Beasley's law firm with the Nevada Secretary of State.

67. Around this time, Beasley advertised his firm as a solo "family law and personal injury practice." The Beasley Law Group, PC website had a rudimentary design and limited functionality; in short, it looked like a modest, solo practice that made only a few hundred thousand dollars in annual gross revenue. *See* Ex. H, at p. V2-76.

68. Operating an "Analyzed IOLTA" at Wells Fargo requires linking an eligible billing account. Ex. I, at p. V2-87. So, while Beasley maintained the IOLTA at Wells Fargo, he also maintained a Wells Fargo business checking account for his firm. This account is referenced in

banking documents as "Beasley Law Group Business Checking" (hereinafter "BLG operating account").

     **E.**    **Beasley's Use of the IOLTA Was Consistently, and Patently, Improper.**

69. Consistent with the foregoing, when Wells Fargo opened Beasley's IOLTA, it understood the nature of IOLTAs generally and what sort of activity to expect in such accounts; it forecasted that Beasley's IOLTA would be used in a manner consistent with a solo practitioner's law firm earning well under half a million dollars a year; and Wells Fargo monitored Beasley's IOLTA activity with that in mind.

70. From the start, however, Beasley's use of the IOLTA bore no resemblance to that predicted account activity and showed no signs of following mandated practices for IOLTAs.

     **1.**    **The Amount of Funds Running Through the IOLTA Was Orders of Magnitude Higher than Wells Fargo Expected.**

71. The amount of funds flowing through the IOLTA were higher than forecasted from the very start, and only grew as time passed. The table below, compiled by Amir Salimi, a forensic accountant for the Securities and Exchange Commission, depicts the dollar amounts flowing through the IOLTA during the relevant time period. Ex. A, at p. V1-7 (reproduced below).

| Beasley IOLTA Account | | |
|---|---|---|
| Wells Fargo - 5598 | | |
| Year | Average Monthly Inflows | Average Monthly Outflows |
| 2017 | 583,907 | (546,036) |
| 2018 | 1,370,127 | (1,291,958) |
| 2019 | 4,147,822 | (4,096,741) |
| 2020 | 9,240,054 | (9,045,776) |
| 2021 | 20,435,193 | (20,317,308) |
| 2022 | 28,399,421 | (30,110,959) |

72. According to Mr. Salimi's analysis, a total of $491.5 million was deposited into the IOLTA between January 2017 and March 2022.

73. The amount of funds flowing into the IOLTA was—from the start—larger than anticipated, and it only grew steadily larger from there. In 2017, the first year the IOLTA was open, more six million dollars flowed through the account. In 2018, an average of more than $1 million entered the account each month. In 2019, an average of more than $4 million entered the account each month. By 2020, it was up to $9 million monthly. In 2021, over $20 million on average entered each month. By 2022, nearly $30 million on average entered the IOLTA each a month.

74. The sheer volume of funds passing through the Beasley IOLTA signaled an unmistakable disparity between what Beasley had told Wells Fargo about his firm, and about its revenues, and the subsequent use of the account.

75. In addition, because Wells Fargo also maintained the Beasley firm's operating account, it saw that Beasley was withdrawing substantially more than forecasted as ostensible firm revenues.

76. Attorney earnings that flow through an IOLTA typically make up only a portion of a practitioner's income. Yet within months of its opening, the funds moving from the IOLTA into the BLG operating account were already orders of magnitude higher than what Beasley had told Wells Fargo his annual gross revenues were.

77. For example, in June 2017, Beasley transferred $190,000 from the IOLTA to his firm's operating account at Wells Fargo. The following month, Beasley transferred $124,000 from the IOLTA to the firm's operating account. The month after that, $275,000 moved from the IOLTA to operating account. So, within a three-months span, the amount sent from the IOLTA to the operating account exceeded $350,000 – the amount Beasley had identified to Wells Fargo as his firm's annual gross revenue.

78. The disparity between the revenues Beasley forecasted for Wells Fargo, and what was moved from the IOLTA into the BLG operating account, only grew from there. Between 2017 and 2022, approximately $17.1 million flowed from the IOLTA to the Beasley firm's operating

account. These ostensible firm revenues were about ten times more than Beasley had told Wells Fargo to expect.

        **2.**      **The IOLTA's pattern of deposits and withdrawals also showed clear indicia of Ponzi behavior.**

79. In addition to the sheer amount of funds running through the IOLTA, the nature of the account's activity bore no resemblance to the proper use of an IOLTA – let alone for a firm like Beasley's. The Ponzi-like account patterns were unmistakable.

80. Mr. Salimi, the SEC accountant, asserted in his declaration filed along with the SEC complaint, that based on her review of the IOLTA bank records, a pattern of suspected Ponzi activity was already apparent in as early as January 2017 (the month the IOLTA was opened). Ex. A., at p. V1-6.

81. Reflecting one of the more glaring and easy-to-spot indicia of fraud and money laundering, the vast majority of the deposits into the IOLTA consisted of large round-number transfers, predominantly in increments of $40,000, $50,000, $80,000, or $100,000, as shown in example below. Ex. L, at p. V4-172.

\
\
\
\
\
\
\
\
\
\
\

Account number: ████5598 ■ January 1, 2022 - January 31, 2022 ■ Page 2 of 11



**Electronic deposits/bank credits (continued)**

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 01/04 | 80,000.00 | WT Seq#80251 Pilar Do Sul LLC /Org= Srf# Ow00001880274762 Trn#220104080251 Rfb# Ow00001880274762 |
| | 01/04 | 100,000.00 | WT Fed#00113 America First Fede /Org=Andrew Hansen Srf# 1857611318545536 Trn#220104100295 Rfb# |
| | 01/04 | 800,000.00 | WT Seq108859 Pine Valley Investments /Org=Pine Valley Investments Srf# Gw00000047650502 Trn#220104108859 Rfb# 529 |
| | 01/04 | 50,000.00 | WT Seq116427 Kristy E Herlean /Org= Srf# 0063656004374557 Trn#220104116427 Rfb# |
| | 01/04 | 50,000.00 | WT Fed#02919 Bank of America, N /Org=Faith Koa Investments LLC Srf# 2022010400418871 Trn#220104148686 Rfb# Qgyvdpdzb |
| | 01/04 | 200,000.00 | WT Fed#04128 Bank of America, N /Org=Dale A McIntire Trustee Srf# 2022010400445185 Trn#220104168325 Rfb# 370093914 |
| | 01/04 | 80,000.00 | WT Fed#07929 Utah Community Cre /Org=Joseph Loveridge Srf# 3243778200062605 Trn#220104184214 Rfb# Joseph Loveridge |
| | 01/05 | 100,000.00 | Rpm Investment G Sender 220105 xxxxx0706 0000Beasley Law Grou |
| | 01/05 | 25,000.00 | WT Fed#02444 Bank of America, N /Org=Michaeline Zavala Srf# 2022010500104832 Trn#220105014403 Rfb# 370131258 |
| | 01/05 | 300,000.00 | WT Fed#00483 US Bank, NA /Org=Jrje LLC Srf# 220105005952 Trn#220105041084 Rfb# 220105005952 |
| | 01/05 | 80,000.00 | WT Fed#01074 Jpmorgan Chase Ban /Org=Prestige Consulting LLC Srf# 3101622005Es Trn#220105015231 Rfb# Boh of 22/01/05 |
| | 01/05 | 200,000.00 | WT Fed#00173 Ally Bank /Org=Bryce J Barker Srf# 35357536 Trn#220105058672 Rfb# 2556981 |
| | 01/05 | 200,000.00 | WT Fed#00342 Mountain America F /Org=M2 Holdings Lp Srf# Trn#220105073743 Rfb# |
| | 01/06 | 80,000.00 | WT Fed#00395 Morgan Stanley and /Org=ML Kopald M Crow CO-Ttee Margaret Srf# 5062306234910 Trn#220106072775 Rfb# |
| | 01/06 | 200,000.00 | WT Fed#07942 Bank of America, N /Org=Acac, LLC Srf# 2022010600288834 Trn#220106075252 Rfb# 370339636 |
| | 01/06 | 80,000.00 | WT Fed#00389 National Financial /Org=1/Michael William Sarsom Ttee Srf# 3506758006Fs Trn#220106095898 Rfb# Swf of 22/01/06 |
| | 01/07 | 100,000.00 | WT Fed#08248 Bank Forward /Org=Mak Capital Srf# 0913108540010658 Trn#220107177361 Rfb# |
| | 01/10 | 200,000.00 | WT Fed#00457 Jpmorgan Chase Ban /Org=Brian S Gabrielson OR Sofia Srf# 3015292006Es Trn#220110012968 Rfb# Dcd of 22/01/08 |
| | 01/10 | 50,000.00 | WT Seq#30500 Exemption Trust Under T /Org= Srf# Ow00001890101633 Trn#220110030500 Rfb# Ow00001890101633 |
| | 01/10 | 50,000.00 | WT Fed#09398 Bank of America, N /Org=Darcy K Fitch Srf# 2022011000398859 Trn#220110097957 Rfb# 370765968 |
| | 01/10 | 100,000.00 | WT Fed#09663 Bank of America, N /Org=Scott R Kanter Srf# 2022011000405144 Trn#220110101803 Rfb# 370788412 |
| | 01/10 | 100,000.00 | Deposit Made In A Branch/Store |
| | 01/10 | 100,000.00 | WT Fed#05069 Jpmorgan Chase Ban /Org=Webster-Webster CO LLC Srf# 3409432010Es Trn#220110119744 Rfb# Dcd of 22/01/10 |
| | 01/10 | 400,000.00 | WT Fed#01103 Banccentral Nation /Org=Tj Investment Partners Inc Srf# 34352 Trn#220110138010 Rfb# |
| | 01/10 | 600,000.00 | WT Fed#03002 Bank of America, N /Org=Matthew B Brooks Srf# 2022011000459653 Trn#220110141599 Rfb# 2201101431000007 |
| | 01/10 | 80,000.00 | WT Fed#01729 Boulder Dam Credit /Org=Plutus Ltd Srf# 3224840290014398 Trn#220110152136 Rfb# |

©2010 Wells Fargo Bank, N.A.
All rights reserved. Member FDIC

82. When the funds left the IOLTA, the vast majority (approximately $487 million during the same five-year span) was sent one of a short list of individuals and entities. A subset of that, $411 million (or 84% of the total outgoing transfers) went to one of just five entities:

a. J & J Consulting Services received over $313.7 million.

b. Stirling Consulting LLC, an entity associated with a major promoter of the scheme, received $37.2 million.

c. CJ Investments LLC, another entity associated with a promoter, received $31 million.

d. Triple Threat Basketball, LLC, another entity associated with a promoter, received $12.3 million.

e. As discussed, $17.1 million went to the Beasley firm's operating account.

### 3. The names of the entities transacting with the IOLTA were not plausible clients of a solo practitioner's law firm and instead showed the IOLTA was being used to receive investment funds.

83. As noted above, IOLTAs are expected to have account activity that reflects client names to ease with accounting. This often means including clients as co-payees on checks or transfers. In the case of Beasley's IOLTA, all transfers and deposits were made out to Beasley's law firm as the sole payee.

84. And while many of the transactions reflected the names of those transmitting the incoming wires and transfers, the names of those entities ruled out any possible connection with a law firm conducting the sort of business that Beasley had reported to Wells Fargo. Instead, most of the deposits (and many outgoing transfers) were notated as having come from entities with names that unmistakably related to finance and investment activity, such as:

1. Atma Investments LLC

2. Bam Investments

3. BCB 5 Investments

4. Bellaire Investments LLC

5. Bm Investments 1 LLC

6. Dudz Investment LLC

7. Eag Investments

8. Herlean Investments

9. Jal Investments

10. J K Investments

11. McMH Investments, LLC

12. Mrrv Investments LLC

13. Rwl Investments

14. Reign Investments

15. Rpm Investment Group

16. Ruger Investments LLC

17. Shonduras Investments LLC

18. SM Financial Investment

19. Smiling Man Investments, LLC

20. Tj Investment Partners LLC

21. We Capital Investments

22. Westshore Investments

23. Herlean Financial Services

24. Capital Core Financial

25. 3D Capital Group Inc

26. Procor Capital Fund I LLC

27. JFK Financial

28. McGregor Equity Group

29. South Wind Financial

30. Zzyx Capital LLC

31. Perseverance Capital Management LLC

32. Tanner Capital Group

33. Shimmer Holdings LLC

34. Bsm Holdings LLC

35. A & A Holdings LLC

36. Portz Holdings LLC

37. Erum Holding Limited Partnership

38. Wwf Holdings LLC

39. Big Game Holdings LLC

40. Diversified Transactions LLC

41. Leukenga Nma Holdings

42. Jersey Isles Holdings

43. Bennett Enterprises Capital

44. Montero Holdings

45. Elite Entrepreneurs LLC

46. Tab Capital LLC

47. LEC Holdings LLC

48. C & C Holdings LLC

49. Wos Holdings LLC

50. Drn Lopez Investments LLC

51. Battle Born Funding

52. CJ Investments LLC

53. Brahman Holdings LLC

54. Stagebrush State Holding

55. Blue Holdings

56. ECCC Investments

57. 5K Investments

58. Ruger Investments Inc

59. Badgerland Holdings LLC

60. Red Hill Investments

61. Lessismore Investments

62. Sbz Capital LLC

63. 824 Capital LLC

85. The above examples show that time and again, the parties sending and receiving money from the IOLTA were—by name—not plausibly connected to a small family-law or personal-injury practice.

86. To the extent the entities' names left any doubt, many investors included notations when sending money into the IOLTA, stating expressly the purpose of the investment.

87. For instance, Plaintiff Carso – himself a Wells Fargo customer – included a notation indicating "Capital Investment" when initiating his Wells Fargo wires. He also told various Wells Fargo employees that the purpose of the transfer was investment, including a discussion about the nature of the investment scheme, and the underlying documents, with a Wells Fargo financial advisor. The images below depict examples of the wire requests submitted by Plaintiff Carso in February, March, and April of 2020, and January 2022. These requests were processed by Wells Fargo bankers Matt Smith, Araxie Baghdadlian, Daniel Veloso, and Daniel Mahavong at the 5223 branch in Las Vegas: Ex. J, pp. V3-3-7.



88. Other investors similarly stated in wire memos, and/or to bank employees – both at Wells Fargo, and other banks - that they were wiring funds for investment purposes.

89. The line items on the IOLTA's bank statements are replete with references to "dividends", "reinvestment[s]," "capital investment," "contract[s]," "loan settlement," and "credit on new contract[s]." *See*, *e.g.*, Ex. J, at p. V4-6 (reproduced below).

| | | |
|---|---|---|
| | | US2007/2700154594 Trn#2007127201124 Rfb# Qst-2713M6 05.20 |
| 07/27 | 20,000.00 | Triple Threat Ba Deposit ▮▮▮▮1975 Payment |
| 07/27 | 112,000.00 | Stirling Consult Deposit ▮▮▮▮5941 Capital Reinvestments for Dr John and Rex Mitchel |
| 07/28 | 80,000.00 | WT Fed#04343 Jpmorgan Chase Ban /Org=Enduro Development, LLC Srf# 4694720210Es Trn#200728064918 Rfb# Bpl of 20/07/28 |
| 07/28 | 25,000.00 | WT Fed#06558 Clark County Credi /Org=Robert A. Seik Srf# 3224841130007495 Trn#200728069381 Rfb# |

90. Another frequent hallmark of money laundering in the IOLTA, was the frequency of transfers by repeat senders. The IOLTA statements reveal repeat transfers from many of the same senders, in some cases on dozens of occasions.

91.  And while Beasley had told Wells Fargo that his firm covered a "local market," throughout the relevant period, payments to the IOLTA were made from all over the United States. The IOLTA also received payments from at least three foreign investors: from Australia, Taiwan, and Singapore –highly unusual for a local Nevada practitioner – and a red flag under the FIEEC guidance.

**4.  Beasley Frequently Used the IOLTA in Patently Improper Ways.**

92. In addition to the foregoing, Beasley repeatedly used funds in the IOLTA to pay for obvious non-law-firm expenses. Ex. A, at p. V1-9.

93. For example, less than two months after opening the IOLTA, Beasley made a payment of $42,008.08 to "Capital One Auto Carpay … Robert P Villanueva" from the IOLTA, an apparent payment for a car loan. Ex. K, at p. V3-15.

94. In September 2021, Beasley directed a payment of $95,486.04 to Cjf Automotive, LLC, an entity associated with a local car dealership. Ex. J, at p. V4-135.

95. Other payments for personal expenses included payments to title companies, which totaled over $4 million, Ex. A., at p. V1-9, and nearly $7 million in gambling debts,. *Id.* at p. V1-8; Ex. B, at p. V1-20.

96. In addition, the flow of funds from the Beasley firm's operating account into the IOLTA violated fundamental IOLTA rules. Generally, no funds that belong to an attorney or law firm should be deposited into an IOLTA. The exception is where a lawyer needs to deposit their own funds "for the sole purpose" of paying bank servicing charges—and even then, "only in an amount necessary for that purpose." Ex. F, at p. V2-34. Yet the BLG operating account sent a number of large transfers into the IOLTA: (i) $150,000 on September 6, 2017, Ex. K, at p. V3-32, (ii) $600,000 on March 31, 2021, Ex. L, at p. V4-71, (iii) $150,000 on November 8, 2021, *id.* at p. V4-151, (iv) $450,000 on November 17, 2021, *id.* at p. V4-154, (v) $20,000 on November 29, 2021, *id.* at V4-156, (vi) $80,000 also on November 29, 2021, *id.*, and (vii) $400,000 on November 30, 2021. *Id.*

97. Beasley's use of the IOLTA also regularly violated Wells Fargo's own policies, as well as the more stringent standards to which IOLTA accounts are subject, and of which Wells Fargo is aware. For example, Beasley's use of account checks frequently featured gaps in the sequence of checks drawn on the account—a point that Wells Fargo noticed and flagged on the account. *See, e.g.*, Ex. K, at p. V3-36 (reproduced below).

**Checks paid**

| Number | Amount | Date | Number | Amount | Date | Number | Amount | Date |
|---|---|---|---|---|---|---|---|---|
| 106 | 13,482.26 | 10/23 | 109 | 1,342.00 | 10/24 | 110 | 54,285.83 | 10/30 |
| 108* | 2,022.90 | 10/24 | | | | | | |
| | **$71,132.99** | | **Total checks paid** | | | | | |

\* Gap in check sequence

| | **$611,411.41** | | **Total debits** | |
|---|---|---|---|---|

98. In the same vein, return payments were repeatedly processed on the account, in conflict with Nevada State Bar rules for IOLTAs. *See, e.g.*, Ex. K, at p. V3-99 (reproduced below).

| | | | | |
|---|---|---|---|---|
| | | Harmon Tan Srf# 0001965637586 Trn#190115072833 Rfb# | | |
| 01/15 | 149,955.00 | WT Seq102787 WF Return Wires IN Proc /Org= Srf# 2019011400172907 Trn#190115102787 Rfb# | | |
| 01/15 | 40,000.00 | WT Fed#01812 Boulder Dam Credit /Org=Kay Geez Stock Lc Srf# 3224840290007644 Trn#190115136081 Rfb# | | |
| 01/15 | 20,000.00 | WT Fed#02497 Mufg Union Bank, N /Org=Maurtua, Cesar A. Srf# | | |

99. Limited access to the account is another well-known feature of IOLTAs. Having more than one authorized signatory is strongly discouraged, and in some circumstances proscribed. Ex. F, at p. V2-29. Beasley's IOLTA application provided that he would be the sole signatory on the account. Ex. A, at p. V1-16. Wells Fargo policy is to permit only authorized account signatories to deposit funds into accounts. Yet Beasley's IOLTA statements list electronic deposits of funds were made by unauthorized individuals on a regular basis. For example, on September 12, 2018, a deposit was made into the IOLTA in San Francisco, California, in the morning, and then another deposit was made in Provo, Utah, the same afternoon. In addition, a "branch/ store deposit" (presumably at a third location) was also made that day. Ex. K, at p. V3-80 (reproduced in part below).

| e | date | Amount | Transaction detail |
|---|------|--------|--------------------|
|   | 09/12 | 40,000.00 | eDeposit IN Branch/Store 09/12/18 10:22:23 Am 2 Grant Ave San Francisco CA |
|   | 09/12 | 80,000.00 | Deposit Made In A Branch/Store |
|   | 09/12 | 120,000.00 | eDeposit IN Branch/Store 09/12/18 04:18:02 PM 66 E 1650 N Provo UT |

**5. The IOLTA Account Statements Show No Signs of Expected IOLTA Activity, Such as Depositing Client Funds, Paying Attorney Fees, or Paying Select Litigation Costs.**

100. None of the IOLTA account activity from 2017 to 2022 resembled appropriate use of an IOLTA.

101. The deposits into the IOLTA, for example, never resembled litigation settlement proceeds from Beasley's purported law practice. As Ms. Salimi, the SEC accountant, testified, analysis of the IOLTA identifies no incoming deposits from personal injury law firms, lawyers, insurance companies, or tort claimants.

102. Had the deposits been settlement proceeds, moreover, the IOLTA statements should have shown contemporaneous and proportionate disbursements to clients. The statements show no such activity. For instance, in March 2017, *all* of the recorded debit transactions were for cash withdrawals, transfers to the BLG operating account, and an apparent payment for Beasley's personal expenses.

103. Nor do the deposits appear to reflect retainer payments for the Beasley firm's services. Because IOLTA deposits are to be either nominal in amount or short-term in duration, a large retainer would be permissible only if it could be quickly earned. A personal injury or family law attorney at a one-lawyer firm in North Las Vegas earns only a few hundred dollars (at most) per hour. That rate would not justify a single transfer of $100,000, much less a constant stream of transfers of tens of thousands of dollars over a period of years.

104. Similarly, the round number transfers from the IOLTA to the BLG operating account, mostly in amounts divisible by $5,000, did not vary enough to be consistent with bona fide hourly basis earnings. Nor did the transfers from the IOLTA to the BLG operating account resemble percentage-based attorney fees; the transfers were too numerous and were not congruent with a percentage-based fee—they typically far exceeded any reasonable percentage fee in comparison to recent deposits.

105. Payments from the IOLTA were also inconsistent with payment of client expenses. For one, payment of client expenses is supposed to be made directly to third parties, and not first to the attorney's operating account. In addition, regular business and litigation expenses do not typically entail large, round-number transactions.

106. If these were indeed settlement proceeds, the IOLTA bank statements would show contemporaneous and proportionate disbursements to clients. This did not happen. For instance, in March 2017, *all* of the recorded debit transactions were for cash withdrawals, transfers to the BLG account, and an apparent payment for Beasley's personal expenses.

### 6. The Account Activity Was Also Inconsistent with the Operation of a Legitimate Investment Fund.

107. Finally, even if operating an investment fund through an IOLTA could be deemed permissible, the banking activity within the account was starkly inconsistent with that purpose too.

108. As the SEC accountant Mr. Salimi testified, the account activity showed no indications of acquisitions of investment assets. Ex. A, at p. V1-6. No payments were made, for example, to

insurance companies, law firms, or third-party plaintiffs – as might be expected if Beasley and Judd were running the sort of investment operation that investors had been led to believe. *Id.*

109. Instead, the consistent pattern was showed investment funds entering the IOLTA, then being promptly funneled out to Beasley- and Judd-controlled accounts, or to a small number of additional accounts maintained by the scheme's promoters. Many of these outgoing transfers from the IOLTA went into business accounts also maintained at Wells Fargo.

### F. Wells Fargo's Bad Faith Refusal to Investigate, and Its Continued Assistance to Beasley Throughout the Life of the Ponzi Scheme, Caused Investors' Losses.

110. From January 2017, when Wells Fargo first opened Beasley's IOLTA, to March 2022, when law enforcement was finally able to end the Ponzi scheme, nearly $500 million of investor funds flowed into the IOLTA.

111. As of March 2022, however, only $4 million remained. The innocent investors enticed into investing in the scheme stand to lose hundreds of millions of dollars.

112. Throughout the period, Wells Fargo was in a unique opportunity to see the nature of the fraud being perpetrated and to take action to stop it.

113. Wells Fargo knew ample facts to give rise, at the very least, to a duty to investigate the account activity within the IOLTA. Yet the bank opted not to investigate. All the while, it benefited from the millions of dollars laundered through its bank. Wells Fargo thus acted in bad faith and with the requisite scienter to be held liable for the misconduct perpetrated using the IOLTA.

114. Indeed, Beasley and Judd were only able to perpetrate their Ponzi scheme for as long as they did because of Wells Fargo's assistance. Wells Fargo lent the scheme the credibility of using an IOLTA, which investors were told provided security for their funds since they were being held in a trust account. And Wells Fargo continuously processed deposits, withdrawals, and other account activity despite knowing, or being recklessly indifferent to, the flagrantly unlawful use of the account.

### III.   Plaintiffs' Facts

<u>Plaintiff Barrett Henzel</u>

115. Between December 2019 and March 2022, when the Ponzi scheme was exposed, Plaintiff Barrett Henzel invested $400,000 into the Ponzi venture, using Henzelhaus, LLC, a Nevada limited liability company that Henzel owns jointly with his wife.

116. Henzel learned of the opportunity to invest in the venture from a friend who had known Judd since college and who had promoted the venture to others on Judd's behalf.

117. On or about December 9, 2019, per a promoter's instructions, Henzel wired $70,000 to fund his initial investment. The promoter told Henzel that his money would purchase 70% of a $100,000 lawsuit settlement contract, and that he would receive a 12.5% return on his investment in 90 days. Subsequently, Henzel funded a total of $300,000 more in additional investments, also to purportedly purchase interests in personal-injury settlements.

118. Throughout his dealings with the venture, Henzel was typically instructed to wire investment funds directly to Beasley's IOLTA account.

119. To date, Henzel received payments of approximately $296,250 as purported returns on his investments. The losses Henzel has incurred have caused hardship to Henzel and his family.

<u>Plaintiff Allan Carso</u>

120. Between February 2020 and March 2022, when the Ponzi scheme was exposed, Plaintiff Allan Carso invested $280,000 in the Ponzi venture.

121. Plaintiff Carso learned of the opportunity to invest in the venture from his daughter who knew Judd and a promoter of the scheme, from her church.

122. On or about February 11, 2020, per a promoter's instructions, Carso wired $80,000 to fund his initial investment. The promoter told Carso that his money would purchase an $80,000 purchase contract, and that he would receive a 12.5% return on his investment in 90 days. Subsequently, Carso funded a total of $200,000 more in additional investments, also to purportedly purchase interests in personal-injury settlements.

123. Carso's investments were made in the name of the Carso Family Revocable Trust, a California trust, of which Carso is the trustee.

124. Throughout his dealings with the venture, Carso was instructed to wire investment funds directly to Beasley's IOLTA.

125. To date, Carso received payments of approximately $174,000 as purported returns on his investments. The losses Carso has incurred have caused hardship to Carso and his family.

<u>Plaintiffs Tina and Anthony Guilder</u>

126. Between November 2019 and March 2022, the Guilder Plaintiffs invested $2,100,000 on behalf of themselves and their family members, including through TTT Partners, LLC dba T&T Partners, a California limited liability company, of which Tina Guilder is the sole owner and of which Anthony Guilder is the manager.

127. Plaintiffs Tina and Anthony Guilder were friendly with others in their California community who had invested in the Ponzi venture. In November 2019, they were introduced to a promoter who worked directly with Jeffrey Judd to solicit and process investments.

128. On or about November 29, 2019, per a promoter's instructions, the Guilder Plaintiffs wired funds for their initial investment of $100,000. The promoter told them this would purchase a $100,000 lawsuit settlement contract, and that they would receive a 10% return on their investment in 90 days. Subsequently, the Guilder Plaintiffs funded in total an additional $2,000,000 in investments, also to purportedly purchase interests in personal-injury settlements.

129. Throughout their dealings with Ponzi venture, the Guilder Plaintiffs were typically instructed to wire investment funds directly into Beasley's IOLTA account.

130. To date, the Guilder Plaintiffs have received payments of approximately $940,000 as purported returns on their investments. The losses that the Guilders have incurred have caused hardship for the Guilders and their family.

<u>Bryce Bussey</u>

131. Between May 2020 and March 2022, when the Ponzi scheme was exposed, Plaintiff Bryce Bussey invested $1,340,000 of his money, and that of his family and friends, in Ponzi venture.

132. Plaintiff Bussey was connected to one of the promoters of the Ponzi venture by an acquaintance who had invested into it as well.

133. On or about May 12, 2020, per a promoter's instructions, Bussey wired $40,000 to fund his initial investment. The promoter told Bussey that his money would purchase half of an $80,000 lawsuit settlement contract, and that he would receive a 6.25% return on his investment in 90 days. Subsequently, Bussey funded $700,000 in additional investments, also to purportedly purchase interests in personal-injury settlements. Bussey also assisted family and friends in investing $600,000 of their own funds in the venture.

134. All of Bussey's investments with the scheme were made in Bussey's name and through DIY CEO LLC, a Wyoming limited liability company of which Bussey is the sole owner.

135. Throughout his dealings with the venture, Bussey was typically instructed to wire investment funds directly to Beasley's IOLTA account.

136. To date, Bussey has received payments of approximately $239,875 as purported returns on his personal investments, and payments of approximately $91,125 as purported returns on the investments made on behalf of family members and friends. The losses that Bussey has incurred have caused hardship for Bussey and his family.

<strong>TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION</strong>

137. Plaintiffs and the proposed class did not and could not have discovered the facts constituting fraud and unlawful conduct until March 4, 2022, the day after charges against Beasley were filed following the FBI shootout, and the day the FBI victim bulletin was published. Plaintiffs then retained counsel.

138. Until then, the Relevant Non-Parties fraudulently concealed the unlawful conduct, misleading investors to believe they were engaging in legitimate investment activity.

139. Because Plaintiffs and class members could not have reasonably discovered the facts constituting Defendant's unlawful conduct until March 4, 2022, their claims accrued on that date and any applicable statutes of limitations were tolled until that date.

## CLASS ACTION ALLEGATIONS

140. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following proposed class:

*All persons and entities who invested in lawsuit settlement contracts through Judd, Beasley, or the J & J Entities' between January 2017 and March 2022.*

141. Excluded from the proposed class are Defendant and the Relevant Non-Parties; their parents, affiliates, subsidiaries, legal representatives, predecessors, successors, assigns, and employees; and any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to either of them, as well as the spouses of such persons.

142. The above proposed class definition suffices because it uses objective characteristics; class membership turns on objective criteria including whether someone transmitted money for purchase of a share in a lawsuit settlement contract. Documents identifying such investments are in the possession, custody, and control of the Relevant Non-Parties and Defendant.

143. Numerosity. The members of the class are so numerous that joinder of all members is impracticable. The size of the class, which is estimated to consist of hundreds if not thousands of individuals and business entities, can only be ascertained through discovery.

144. Typicality. Plaintiffs' claims against Wells Fargo are typical of the claims of the members of the class. Plaintiffs and class members were all victims of the Ponzi scheme, each has claims against Wells Fargo for its role in that scheme, and each claim will depend on common proof that Wells Fargo knew about the Ponzi scheme and substantially assisted.

145. Adequacy. Plaintiffs will fairly and adequately protect the interests of the members of the class and have retained counsel competent and experienced in class action and financial fraud litigation.

146. <u>Commonality and Predominance</u>. Common questions of law and fact exist as to all members of the proposed class and predominate over any questions solely affecting individual members of the proposed class. The questions of law and fact common to the class include:

    a. Whether the Relevant Non-Parties breached fiduciary duties owed to the Plaintiffs and members of the proposed class;

    b. Whether the Relevant Non-Parties engaged in fraud in connection with operating the alleged Ponzi scheme;

    c. Whether Wells Fargo opened and maintained an IOLTA for Beasley's law firm;

    d. Whether Beasley used the Wells Fargo IOLTA to perpetrate the alleged fraud and breach of fiduciary duties at issue;

    e. Whether Wells Fargo knew sufficient facts that it had a duty to investigate the use of the IOLTA;

    f. Whether Wells Fargo acted in bad faith by failing to investigate the use of the IOLTA or otherwise take action to protect investors;

    g. Whether Wells Fargo aided and abetted in the fraudulent conduct and/or breach of fiduciary duties at issue;

    h. Whether Wells Fargo breached a duty of reasonable care owed to Plaintiffs and members of the proposed class; and

    i. Whether Wells Fargo's actions and omissions were the actual and proximate cause of Plaintiffs' and other proposed class members' damages.

147. <u>Superiority</u>. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions economically feasible. Even if class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the same fraudulent scheme, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues

of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

148. In the alternative, the proposed class may be certified because: (a) the prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent adjudications; (b) the prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would impair their ability to protect their interests; and (c) Defendant have acted or refused to act on grounds generally applicable to the proposed class, thereby making appropriate final and injunctive relief with respect to the members of the proposed class as a whole.

## CAUSES OF ACTION

### Count I

***Violations of the Uniform Fiduciaries Act, Nev. Rev. Stat. Ann. §§ 160.010, et seq.***

149. Plaintiffs allege this cause of action on behalf of themselves and the proposed class, and, in doing so, incorporate all preceding allegations.

150. Wells Fargo is a bank within the meaning of Nev. Rev. Stat. Ann. § 162.020(a).

151. Beasley and Judd are fiduciaries within the meaning of Nev. Rev. Stat. Ann. § 162.020(b).

152. Plaintiffs and other members of the class are principals within the meaning of Nev. Rev. Stat. Ann. § 162.020(c).

153. Wells Fargo acted in violation of Nev. Rev. Stat. Ann. §§ 160.010, *et seq.*, including by violating Nev. Rev. Stat. Ann. § 162.080 and § 162.100.

154. Beasley and Judd (and the entities they controlled) owed fiduciary duties to Plaintiffs and the proposed class. They owed a fiduciary duty in connection with depositing funds into the Beasley law firm's IOLTA, which is a trust account and over which Beasley and his law firm acted as trustee. They also owed a fiduciary duty in conjunction with accepting funds to be used for investment purposes; they maintained control over those funds upon receiving

them and owed duties of loyalty and care to, and to deal honestly and in good faith with, Plaintiffs and the proposed class. This entailed, among other things, the fiduciary duty to use the funds in the manner expected and trusted by the Plaintiffs and proposed class.

155. Wells Fargo knew fiduciary duties were owed to all those whose funds were deposited in the IOLTA.

156. Beasley and Judd (and the entities they controlled) breached their fiduciary duty to Plaintiffs and the other members of the proposed class. Among other things, they breached Plaintiffs' and other class members' trust by using their funds for purposes other than those intended. They caused funds to be deposited into, maintained within, and transferred from the IOLTA inconsistent with the norms and rules for such accounts, and they failed to operate the IOLTA in the manner (and using the protections with which) such trust accounts are required to be operated. Rather than spending the funds as intended by Plaintiffs and the class, they misappropriated the funds for their own personal gain.

157. Wells Fargo had actual knowledge of these breaches of fiduciary duty. Wells Fargo knowingly allowed the IOLTA to be operated in a fashion that bore no reasonable resemblance to how such trust accounts are appropriately used. Wells Fargo knew that IOLTA had been created for a solo practitioner's law firm that earned $350,000 annually in gross revenues, yet facilitated the deposit and withdrawal of nearly $500 million from the account in less than six years' time, including over $17 million moving directly from the IOLTA into the Wells Fargo operating account maintained by the Beasley firm.

158. Alternatively, Wells Fargo acted in bad faith because it knew such facts that made its actions in effecting deposits into and withdrawals out of the Beasley firm's IOLTA amount to bad faith. The IOLTA transactions here were improper on their face. Wells Fargo witnessed such clear and obvious indicia that the IOLTA was being used to breach fiduciary duties to Plaintiffs and other members of the propose class, that it had a duty to investigate, and acted in bad faith when it chose not to investigate or otherwise take action to protect Plaintiffs' and class members' funds.

159. The actual and foreseeable result of Wells Fargo's conduct was the loss of funds belonging to Plaintiffs and the members of the class, who have sustained and will continue to sustain damages as a result.

## Count II
### *Aiding and Abetting Breach of Fiduciary Duty*

160. Plaintiffs allege this cause of action on behalf of themselves and the proposed class, and, in doing so, incorporate all preceding allegations.

161. As set forth above, Judd and Beasley (and the entities they controlled) breached fiduciary duties to Plaintiffs and the proposed class, including by using Plaintiffs' and class members' funds for purposes other than those intended, depositing those funds into the IOLTA and maintaining the IOLTA in a manner inconsistent with the rules governing attorney trust accounts, and misappropriating the funds for their own personal gain.

162. Wells Fargo knowingly and substantially provided material assistance to the breaches of fiduciary duties owed to Plaintiffs and other members of the proposed class. Wells Fargo knowingly allowed the IOLTA to be operated in a fashion that bore no reasonable resemblance to how such trust accounts are appropriately used. Wells Fargo knew that IOLTA had been created for a solo practitioner's law firm that earned $350,000 annually in gross revenues, yet facilitated the deposit and withdrawal of nearly $500 million from the account in less than six years' time, including over $17 million moving directly from the IOLTA into the Wells Fargo operating account maintained by the Beasley firm. Wells Fargo witnessed systematic, continuous evidence of money laundering and Ponzi activity, yet took no action to stop the misconduct, and instead facilitated the continued operation and use of an attorney trust account at its bank to perpetrate the scheme and continued to effect all requested banking transactions involving the IOLTA.

163. As a direct and proximate result of Wells Fargo's aiding and abetting of the breaches of fiduciary duty, Plaintiffs and proposed class members have lost a significant portion of the funds they entrusted with the Relevant Non-Parties, have been denied use of their assets since March 2022, and have been damaged thereby in an amount to be determined at trial.

### Count III
#### *Aiding and Abetting Fraud*

164. Plaintiffs allege this cause of action on behalf of themselves and the proposed class, and, in doing so, incorporate all preceding allegations.

165. As set forth above, by promoting an investment opportunity to purchase in lawsuit settlement contracts with no intention to deliver the promised investment assets, while instead laundering the investment funds through the IOLTA and ultimately misappropriating those funds for their own personal use, Beasley and Judd (and the entities they controlled) committed fraud.

166. Wells Fargo knowingly and substantially provided material assistance to the Ponzi scheme. Wells Fargo knowingly allowed the IOLTA to be operated in a fashion that bore no reasonable resemblance to how such trust accounts are appropriately used. Wells Fargo knew that IOLTA had been created for a solo practitioner's law firm that earned $350,000 annually in gross revenues, yet facilitated the deposit and withdrawal of nearly $500 million from the account in less than six years' time, including over $17 million moving directly from the IOLTA into the Wells Fargo operating account maintained by the Beasley firm. Wells Fargo witnessed systematic, continuous evidence of money laundering and Ponzi activity, yet took no action to stop the misconduct, and instead permitted the continued operation of an attorney trust account to perpetrate the scheme and continued to effect all requested banking transactions involving the IOLTA.

167. As a direct and proximate consequence of Wells Fargo's conduct as described in this complaint, Plaintiffs and class members have lost a significant portion of the funds they entrusted to the Relevant Non-Parties, have been denied the use of those funds since March 2022, and have been damaged in an amount to be determined at trial.

### Count IV
*Negligence*

168. Plaintiffs allege this cause of action on behalf of themselves and the proposed class, and, in doing so, incorporate all preceding allegations.

169. Plaintiffs advance this count in the alternative to their other claims, in the event the Court find that no fiduciary duty was owed to Plaintiffs or the class in connection with the operation of the Beasley firm's IOLTA.

170. At all relevant times, Beasley and Judd (and the entities they controlled) caused funds belonging to Plaintiffs and the other members of the proposed class to be deposited into the IOLTA at Wells Fargo. Wells Fargo knew or should have known that the deposits were investment funds and were intended to be used for investment purposes only.

171. Wells Fargo knew or should have known that the funds were not being used for investment purposes and were instead being misappropriated for the personal use of Judd and Beasley.

172. Wells Fargo knew or should have known that the funds deposited into the IOLTA were not funds being held by an attorney for the benefit of the attorney's client, and it should have known the IOLTA was not being operated consistent with any of the norms and requirements applicable to such accounts.

173. Wells Fargo owed a duty to Plaintiffs and other members of the proposed class to employ at least reasonable care with respect to the maintenance and use of the Beasley firm's IOLTA account and the funds held therein.

174. Wells Fargo breached its duty to Plaintiffs and other members of the proposed class when, among other things, it allowed the IOLTA to be operated in a fashion that bore no reasonable resemblance to how such accounts are appropriately used; allowed orders of magnitude more funds to flow through the account that the bank reasonable anticipated; witnessed systematic, continuous evidence of money laundering and Ponzi activity, yet took no action to stop the misconduct, and instead facilitated the continued operation of an attorney trust account to perpetrate the scheme and continued to effect all requested banking transactions involving the IOLTA; and repeatedly failed to investigate the misuse of the

IOLTA account despite many "red flags" from the account activity indicating fraud, money laundering, or a Ponzi scheme.

175. As a direct and proximate cause of Wells Fargo's breach as described throughout this complaint, Plaintiffs and the members of the class have sustained damages in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court enter a judgment awarding the following relief:

a. An order certifying the proposed class and appointing the undersigned counsel as class counsel;

b. An award of damages and all other available monetary relief, including pre-judgment interest, on each claim in an amount to be established at trial;

c. An award of punitive damages in an amount to be established at trial;

d. An award of Plaintiffs' reasonable attorneys' fees and litigation costs;

e. Such other and further relief as this Court may deem just and proper.

//

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury as to all issues so triable.

Dated: May 6, 2022                     Respectfully submitted,


                                        /s/ Miles N. Clark
                                       _____

                                       Miles N. Clark (NBN 13848)
                                       **KNEPPER & CLARK LLC**
                                       5510 S. Fort Apache Rd., Suite 30
                                       Las Vegas, NV 89148-7700
                                       (702) 856-7430
                                       miles.clark@knepperclark.com

                                       Eric H. Gibbs (*pro hac vice*)
                                       David K. Stein (*pro hac vice*)
                                       Iudis Sominskaia (*pro hac vice*)
                                       **GIBBS LAW GROUP LLP**
                                       505 14th Street
                                       Oakland, California 94612
                                       ehg@classlawgroup.com
                                       ds@classlawgroup.com
                                       ids@classlawgroup.com

                                       Scott L. Silver (*pro hac vice*)
                                       **SILVER LAW GROUP**
                                       11780 W. Sample Road
                                       Coral Springs, Florida 33065
                                       (954) 755-4799
                                       ssilver@silverlaw.com

                                       *Counsel for Plaintiffs and the Proposed Class*