Eric H. Gibbs (*pro hac vice*)
David K. Stein (*pro hac vice*)
Iudis Sominskaia (*pro hac vice*)
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
ds@classlawgroup.com
ids@classlawgroup.com

Daniel C. Girard (*pro hac vice*)
Jordan Elias (*pro hac vice*)
Makenna Cox (*pro hac vice*)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dgirard@girardsharp.com
jelias@girardsharp.com
mcox@girardsharp.com

*Interim Co-Lead Counsel*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| *In re J&J Investment Litigation* | Case No.: 2:22-cv-00529-GMN-NJK |
| | Assigned for All Purposes to:<br>Hon. Gloria M. Navarro |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| | JURY TRIAL DEMANDED |

1

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

PARTIES ...............................................................................................................................3

   I.  Plaintiffs ....................................................................................................................3

   II.  Defendant ................................................................................................................4

RELEVANT NON-PARTIES ................................................................................................4

JURISDICTION AND VENUE .............................................................................................4

FACTUAL ALLEGATIONS ..................................................................................................5

   I.  The Beasley and Judd Ponzi scheme ....................................................................5

   II.  Plaintiffs invested in the fraudulent scheme. .......................................................7

      A.   Plaintiff Barrett Henzel ....................................................................................7

      B.   Plaintiff Allan Carso ........................................................................................8

      C.   Plaintiff Rodney Michaelis ..............................................................................8

      D.   Plaintiff Joshua Luekenga ................................................................................9

      E.   Plaintiff Gary Lundin .....................................................................................10

      F.   Plaintiff Bryce Kelly ......................................................................................11

      G.   Plaintiffs Clint and Dan McDaniel .................................................................12

   III.  Wells Fargo is required by law to know its customers and their banking behavior. ....................12

      A.   Wells Fargo maintains a system of sophisticated internal controls to monitor, detect, and analyze suspicious banking activity. .........................................................15

ii

1.  Wells Fargo monitors its customers' account activity. .........................................15

2.  Wells Fargo enhanced its internal control mechanisms before the Ponzi scheme began. .....16

3.  Wells Fargo employees are trained to monitor and understand account activity.................17

4.  Wells Fargo's personnel and systems work together to monitor customer and account activity. .......................................................................................................................18

B.  Wells Fargo is familiar with the unique nature and use of IOLTAs.........................................19

C.  Consistent with its regulatory obligations, Wells Fargo formed expectations about what to expect as to what future account activity in Beasley's IOLTA would look like. ...............20

D.  Beasley's use of the IOLTA was consistently and patently improper, triggering many of the FFIEC's red flags. ...............................................................................................................22

1.  The funds running through the IOLTA far exceeded what should have been reasonably expected from Beasley's law practice. ...................................................................23

2.  The size, shape, and speed of the deposits and withdrawals in the IOLTA triggered red flags. ...................................................................................................................26

3.  The transactions frequently reflected practices that were, on their face, impermissible for an IOLTA..................................................................................................................33

4.  None of the IOLTA activity resembled that of a local solo law practice.............................38

5.  The account activity was also inconsistent with the operation of a legitimate investment fund. .............................................................................................................44

TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION.................................................45

CLASS ACTION ALLEGATIONS .................................................................................................45

CAUSES OF ACTION ....................................................................................................................47

Count I .............................................................................................................................................48

Count II .............................................................................................................................................49

Count III.............................................................................................................................................50

Count IV ........................................................................................................................52

REQUEST FOR RELIEF .................................................................................................53

DEMAND FOR JURY TRIAL ..........................................................................................53

CONSOLIDATED COMPLAINT
Case No.: 2:22-cv-00529 -GMN-NJK

Plaintiffs Barrett Henzel, Allan L Carso, Gary W. Lundin, Joshua Luekenga, Craig Rodney Michaelis, Bryce Kelly, Clint McDaniel, and Dan McDaniel, on behalf of themselves and all others similarly situated, allege the following against Defendant Wells Fargo, N.A., a national banking association formed in Delaware.

## INTRODUCTION

1.    Beginning in 2017 and continuing through March 2022, Las Vegas solo practitioner Matthew Beasley and Jeffrey Judd (whose background was in real estate and pharmaceutical sales), ran a massive Ponzi scheme centered in Las Vegas, Nevada. They sold investors on the opportunity to fund advances to plaintiffs awaiting payment on personal injury settlements. Investors were promised attractive rates of return, with little to no risk, and were told their investments would be deposited into a Wells Fargo attorney trust account for added security.

2.    The scheme went unimpeded for over five years. Then, in early 2022, law enforcement received a tip and contacted Judd and Beasley. When the FBI arrived at Beasley's residence, Beasley brandished a firearm, threatened to commit suicide, and was subdued only after a multi-hour standoff involving a hostage negotiator. When Beasley was finally apprehended, he confessed that all of the personal-injury settlement investments had been nothing more than a Ponzi scheme. He told law enforcement that he was able to pull it off because he was a lawyer, and that the full nature of the scheme would be clear as soon as they reviewed his attorney trust account bank records.

3.    As those bank records confirm, Beasley and Judd could not have carried out the scheme without Wells Fargo's assistance. Wells Fargo tracked the account activity and saw that Beasley was misusing the attorney trust account to operate an investment enterprise. Wells Fargo nevertheless accepted hundreds of millions of dollars into the account, and then executed transactions through which the funds were dissipated and commingled—in the form of cash withdrawals, transfers to vaguely denominated shell companies, and round trip "lulling payments" to investors, under the guise of returns on investment. Rather than terminate the account in response to these misuses, Wells Fargo carried out Beasley's instructions, accepting investor funds and then executing transfers to place the funds out of investors' reach, all while lending the J&J enterprise the credibility of a major banking institution.

4.    The account that Beasley used to perpetrate the scheme was not a simple business checking

account, but a specialized account known as a law firm "interest on lawyers' trust account" (or "IOLTA"). Wells Fargo is familiar with the proper use of such accounts, as it offers IOLTAs in all fifty states and has agreed to follow IOLTA-specific procedures in Nevada. As Wells Fargo knows, IOLTAs typically hold multiple clients' funds, which requires a clear audit trail with notations on checks and transfers to match each transaction to a corresponding client. Deposits and incoming transfers into IOLTAs are frequently made out to both law firm and client as co-payees. And outgoing transfers are typically to a client, a lienholder, or the attorney's operating account (but only to the extent the attorney has already earned the fee). As Wells Fargo saw, however, Beasley's IOLTA activity never reflected these practices. The account activity did not contain notations matching transactions to clients. Deposits were made to Beasley only. And Wells Fargo consistently processed outgoing transactions that bore no resemblance to a small firm's practice, including hundreds of thousands of dollars to pay off car loans and millions more to pay title companies for real estate. The bank also allowed Beasley to withdraw over a million dollars in cash, even though cash withdrawals are perhaps the most widely recognized indication that an attorney is misusing client funds.

5.      Wells Fargo saw many other signs of misuse. When Beasley opened the IOLTA, he told Wells Fargo that he was a solo practitioner generating $350,000 in annual sales. Yet Wells Fargo provided uninterrupted services as nearly $500 million flowed through the IOLTA during the five-plus years that followed—orders of magnitude more than Beasley had told the bank to expect.

6.      Wells Fargo also observed that Beasley's usage of the IOLTA did not match his stated occupation—a federally recognized indicator of potential illegal activity. At the time of his IOLTA application, Beasley marketed his firm as a personal injury and family law practice. But the deposits never resembled litigation settlement proceeds. Incoming payments were not from law firms or insurance companies. Funds transfers came from entities with "Investment" or "Financial" in their title, and the transfer-notations often noted that the money was being sent for investment purposes.

7.      Even beyond that, the pattern of activity within the Beasley IOLTA tracked well-known indicators of money laundering and fraud. For example, federal regulators tell banks to look for "large, round dollar" transactions. Nearly all of the deposits into Beasley's IOLTA were in large, round number form—usually in multiples of $50,000, $80,000, or $100,000. And almost immediately after

those deposits entered the IOLTA, similar large, round-number transfers sent the funds out of the account, mostly to entities controlled by Judd or Beasley (the entities bore names like "J&J Consulting" and "J&J Enterprises").

8.    Yet another red flag for fraudulent banking exists when account activity does not match the business's location or reach. Beasley had told Wells Fargo his firm had a "local" practice, and he was the business's sole signatory. Yet Wells Fargo allowed deposits into the IOLTA in at least 43 different Wells Fargo branches across the country, including in Washington, Utah, and Indiana. In addition, Wells Fargo processed incoming wire transfers from investors in Australia, Taiwan, and Singapore.

9.    All of this suspicious activity did not go unnoticed by Wells Fargo. Wells Fargo uses sophisticated electronic monitoring systems, and has dedicated personnel, all working to identify the very types of suspicious patterns exhibited within the Beasley IOLTA. Plaintiffs' pre-filing investigation confirmed that Wells Fargo employees working in at least one Nevada branch noticed suspicious transactions and flagged concerns about what they were seeing in the IOLTA. Yet in each instance that a Wells Fargo employee raised a concern about Beasley's IOLTA, Wells Fargo responded the same way. It told its employees to continue providing Beasley with the requested services.

10.    With Wells Fargo actively facilitating his transactions despite signs of impropriety, Beasley was able to take in and then divert hundreds of millions of dollars of investors' money using the IOLTA. Despite taking note of the suspicious behavior, Wells Fargo never terminated its relationship with Beasley, and never took steps to stop the fraudulent scheme and breaches of fiduciary duty. Instead, the bank continued to serve Beasley and execute the transfers of investor funds held in trust, which led to catastrophic losses for the investors.

11.    Plaintiffs, like many other victims, lost hundreds of thousands of dollars in this scheme, resulting in significant financial hardship for them and their families. They bring suit against Wells Fargo on behalf of themselves and all other similarly situated. They seek to hold Wells Fargo accountable for its essential contributions to the scheme and seek to fully recover their losses.

                                   **PARTIES**

**I.    Plaintiffs**

12.    Plaintiff Barrett Henzel is a citizen and resident of Las Vegas, Nevada.

13.     Plaintiff Allan L. Carso is a citizen and resident of Las Vegas, Nevada.

14.     Plaintiff Gary W. Lundin is a citizen and resident of Payson, Utah.

15.     Plaintiff Joshua Luekenga is a citizen and resident of Bountiful, Utah.

16.     Plaintiff Bryce Kelly is a citizen and resident of West Richland, Washington.

17.     Plaintiff Craig Rodney Michaelis is a citizen and resident of Spokane, Washington.

18.     Plaintiffs Clint McDaniel and Dan McDaniel are citizens and residents of Corona, California.

**II.     Defendant**

19.     Defendant Wells Fargo Bank, N.A. is a national banking association formed in Delaware, with its principal place of business in Sioux Falls, South Dakota.

## RELEVANT NON-PARTIES

20.     Jeffrey Judd is a citizen and resident of Nevada.

21.     J&J Consulting Services, Inc., is a Nevada corporation with its principal place of business in Nevada and is owned by Judd.

22.     J&J Consulting Services, Inc., is an Alaska corporation with its principal place of business in Nevada and is owned by Judd.

23.     J&J Purchasing, LLC, is a Florida limited liability company with its principal place of business in Nevada and is owned by Judd. (The above three "J&J" companies are referred to collectively as the "J&J Entities.")

24.     Matthew Beasley is a citizen and resident of Nevada.

25.     Beasley Law Group PC is a Nevada professional corporation, owned by Beasley, with its principal place of business in Nevada.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 (codified at 28 U.S.C. § 1332(d)(2)). At least one member of the proposed class is a citizen of a different state from Defendant, there are more than one hundred members of the proposed class, and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

27.     This Court has specific personal jurisdiction over Defendant because Plaintiffs' claims arise out

4

of and relate to Defendant's unlawful conduct in Nevada.

28.   Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant's unlawful course of conduct occurred in large part in this District.

## FACTUAL ALLEGATIONS

### I.   The Beasley and Judd Ponzi scheme

29.   In March 2017, Beasley and Judd, with several promoters working at their direction, began offering would-be investors the opportunity to buy "lawsuit settlement contracts."

30.   Investors were told that the opportunity arose when a personal injury litigant reached a settlement with an insurance company and needed their money immediately, before the settlement payment was due. The injured party (through their attorney) would purportedly sell their interest in the settlement proceeds to one of the J&J Entities. The J&J Entity would then purportedly advance the funds, which the injured party would repay 90 days later, plus interest and fees. In actuality, the J&J Entities were not procuring interests in lawsuit settlements. Instead, they presented investors with made up documentation and claimed to be contracting with personal injury attorneys who had no connection to the scheme. (The overall scheme is at times referred to as the "J&J enterprise.")

31.   From 2017 to 2022, the scheme continued, operated through the J&J Entities and Beasley Law Group PC, largely through the use of promoters. The scheme was marketed primarily in Nevada, Utah, California, and Washington. Promoters frequently approached potential investors with whom they shared some common interest, often at their gym or place of worship.

32.   The lawsuit settlement contracts were typically priced at $80,000 or $100,000, although investors sometimes purchased half of the contract ($40,000 or $50,000, respectively) or even smaller portions. Investors were promised high rates of return: for instance, 12.5% after 90 days, which translated to 50% annually, along with additional payments if the returns were delayed. Investors' funds were usually automatically re-allocated to another purported settlement interest once the initial investment had matured.

33.   Investors were told that lawsuit settlement contracts were scarce and therefore rare and attractive investment opportunities. The promoters conveyed that the venture had made as many as 20,000 such purchases and had never had one go bad. ECF No. 22-2, Ex. C ("Judd Transcript") at p.

40; ECF No. 22-2, Ex. D ("Jongeward Transcripts") at pp. 52, 76. They described the investments as "risk-free," "ironclad," and "immaculate." Jongeward Transcripts at pp. 59, 77.

34.    Investors were instructed to wire or deposit their investment capital into an IOLTA at Wells Fargo that belonged to Beasley's law firm, Beasley Law Group PC, acting as trustee of the funds. This was used as a selling point to boost the scheme and assure investors that the operation was above board. Promoters emphasized that investor funds would be deposited and held in a regulated attorney trust account. A representative excerpt from a transcript of one such pitch to an investor appears below.

```
                                    Page 26
    1          MIKE:  So -- okay.  So they've already gone
    2    through a process with, like, an insurance company.
    3    They have some representing them.
    4          MR. JONGEWARD:  Yeah.
    5          MIKE:  Is it a law firm, like --
    6          MR. JONGEWARD:  Yeah, so we have an attorney
    7    that represents us --
    8          MIKE:  Okay.
    9          MR. JONGEWARD:  -- and so we use his IOLTA
   10    account, his lawyer's trust account, and that lawyer's
   11    trust account is a state bar regulated account.  If
   12    you're not familiar with those it's --
   13          MIKE:  Yeah.
   14          MR. JONGEWARD:  Yeah.  It's very similar to
   15    an escrow account for real estate.
   16          MIKE:  And what's the attorney's name?
   17          MR. JONGEWARD:  His name is Matt Beasley,
   18    B-e-a-s-l-e-y,  Beasley Law Group.
   19          MIKE:  Okay.
```

Jongeward Transcripts at p. 57.

35.    The Ponzi scheme continued into March 2022, when it finally collapsed. That month, FBI agents began trying to contact Judd and Beasley. When they arrived at Beasley's home, Beasley opened the door holding a gun against his head. He then aimed the gun at the agents, who shot him twice. Beasley ran inside, which led to a stand-off that required the intervention of a hostage negotiator. Eventually, a SWAT team raided the home and took Beasley into custody.

36.    The U.S. Securities and Exchange Commission has since filed a complaint against Beasley and Judd in federal court, alleging securities fraud and other violations. According to transcripts filed by the

SEC, Beasley confessed to the Ponzi scheme during his standoff with the FBI. In the transcript, he states that he "got names of attorneys" but "never actually talked to them," ECF No. 22-2, Ex. E ("Transcript of FBI Standoff") at p. 107, and that he continued to invent fictitious attorney deals to satisfy the quickly growing investor demand. *Id.* at 150. Beasley told agents that the Ponzi scheme would be "clear as soon as they go through my bank records." *Id*. at 151.

**II.    Plaintiffs invested in the fraudulent scheme.**

**A.    Plaintiff Barrett Henzel**

37.    Between December 2019 and March 2022, when the Ponzi scheme was exposed, Plaintiff Barrett Henzel invested $400,000 into the venture through Henzelhaus, LLC, a Nevada limited liability company that Henzel owns jointly with his wife.

38.    Henzel learned of the opportunity to invest in the venture from Warren Rosegreen, one of the scheme's promoters who had known Judd since college.

39.    Rosegreen told Henzel that his money would be used to purchase an interest in a lawsuit settlement contract. Rosegreen presented the safeguards inherent in using an IOLTA as a selling point to boost the scheme.

40.    On or about December 9, 2019, per Rosegreen's instructions, Henzel wired $70,000 to Beasley's IOLTA to fund his initial investment. Rosegreen told Henzel that his money would purchase 70% of a $100,000 lawsuit settlement contract, and that he would receive a 12.5% return on his investment in 90 days.

41.    Subsequently, Henzel funded additional investments on or about March 9, 2020, May 12, 2020, May 19, 2020, and November 22, 2021, totaling $330,000.

42.    Throughout his dealings with the venture, Henzel was typically instructed to wire investment funds directly to Beasley's IOLTA. Henzel felt more secure sending his funds to an attorney trust account.

43.    During the period he was making the investments, Henzel was never informed of the true nature of the J&J enterprise or how his funds were actually being misused. Had he known the truth, Henzel never would have invested in the J&J enterprise.

44.    To date, Henzel has received payments of approximately $296,250 as purported returns on his

investments. The losses Henzel has incurred have caused hardship to Henzel and his family.

**B.    Plaintiff Allan Carso**

45.    Between February 2020 and March 2022, when the Ponzi scheme was exposed, Plaintiff Allan Carso invested $280,000 in the venture through the Carso Family Revocable Trust, a California trust, of which Carso is the trustee.

46.    Plaintiff Carso learned of the opportunity to invest in the venture from his daughter who knew Judd and Shane Jager, a promoter of the scheme, from her church.

47.    Jager told Carso that his money would be used to purchase an interest in a lawsuit settlement contract. Jager presented the safeguards inherent in using an IOLTA as a selling point to boost the scheme.

48.    On or about February 11, 2020, per Jager's instructions, Carso wired $80,000 to Beasley's IOLTA to fund his initial investment. Jager told Carso that his money would purchase an $80,000 purchase contract, and that he would receive a 12.5% return on his investment in 90 days.

49.    Subsequently, Carso funded additional investments on or about March 11, 2020, April 7, 2020, June 21, 2021, and January 18, 2022, totaling $200,000.

50.    Throughout his dealings with the venture, Carso was typically instructed to wire investment funds directly to Beasley's IOLTA. Carso felt more secure sending his funds to an attorney trust account.

51.    During the period he was making the investments, Carso was never informed of the true nature of the J&J enterprise or how his funds were actually being misused. Had he known the truth, Carso never would have invested in the J&J enterprise.

52.    To date, Carso has received payments of approximately $174,000 as purported returns on his investments. The losses Carso has incurred have caused hardship to Carso and his family.

**C.    Plaintiff Rodney Michaelis**

53.    Between December 2021 and March 2022, when the Ponzi scheme was exposed, Plaintiff Rodney Craig Michaelis invested $80,000 into the venture through Vista Land Solutions LLC, a Washington limited liability company of which he is the sole member.

54.    Michaelis learned of the opportunity to invest in the venture from a colleague who had also

invested into the scheme. The colleague introduced Michaelis to Jason Jongeward, one of the scheme's promoters.

55.    Jongeward told Michaelis that his money would be used to purchase an interest in a lawsuit settlement contract. Jongeward presented the safeguards inherent in using an IOLTA as a selling point to boost the scheme.

56.    On or about December 8, 2021, per Jongeward's instructions, Michaelis wired $80,000 to Beasley's IOLTA to fund his initial investment. Jongeward told Michaelis that his money would purchase a $80,000 lawsuit settlement contract, and that he would receive a 12.5% return on his investment in 90 days.

57.    Michaelis was instructed to wire investment funds directly to Beasley's IOLTA. Michaelis felt more secure sending his funds to an attorney trust account. Michaelis knew of the concept of trust accounts and believed that misuse of a lawyer trust account could lead to disbarment.

58.    During the period he was making the investments, Michaelis was never informed of the true nature of the J&J enterprise or how his funds were actually being misused. Had he known the truth, Michaelis never would have invested in the J&J enterprise.

59.    To date, Michaelis has received no payments as purported returns on his investment. The losses Michaelis has incurred have caused hardship to Michaelis and his family.

**D.    Plaintiff Joshua Luekenga**

60.    Between March 2021 and March 2022, when the Ponzi scheme was exposed, Plaintiff Joshua Collyer Luekenga invested $160,000 into the venture through JC Luekenga, LLC, a Utah limited liability company that Luekenga opened in order to invest into the scheme.

61.    Luekenga learned of the opportunity to invest in the venture from a relative who had also invested. Luekenga's relative put him in touch with Judd.

62.    Judd told Luekenga that his money would be used to purchase an interest in a lawsuit settlement contract. Judd presented the safeguards inherent in using an IOLTA as a selling point to boost the scheme.

63.    On or about March 15, 2021, per Judd's instructions, Luekenga wired $80,000 to Beasley's IOLTA to fund his initial investment. Judd told Luekenga that his money would purchase an $80,000

lawsuit settlement contract, and that he would receive a 15% return on his investment in 90 days.

64.    Subsequently, on or about August 3, 2021, Luekenga again wired $80,000 to Beasley's IOLTA to purchase a $80,000 purported lawsuit settlement contract.

65.    Throughout his dealings with the venture, Luekenga was typically instructed to wire investment funds directly to Beasley's IOLTA. Luekenga had heard of IOLTAs, saw the use of an IOLTA as an added safeguard, and thus felt more secure sending his funds to an attorney trust account.

66.    During the period he was making the investments, Luekenga was never informed of the true nature of the J&J enterprise or how his funds were actually being misused. Had he known the truth, Luekenga never would have invested in the J&J enterprise.

67.    To date, Luekenga has received $48,000 in payments as purported returns on his investments. The losses Luekenga has incurred have caused hardship to Luekenga and his family.

**E.    Plaintiff Gary Lundin**

68.    Between December 2020 and March 2022, when the Ponzi scheme was exposed, Plaintiff Gary W. Lundin invested $200,000 into the venture from his personal bank account and 401K savings account.

69.    Lundin learned of the opportunity to invest in the venture from a friend who had also invested into the scheme. Lundin's friend put him in touch with Jager, one of the scheme's promoters.

70.    Jager told Lundin that his money would be used to purchase an interest in a lawsuit settlement contract. Jager presented the safeguards inherent in using an IOLTA as a selling point to boost the scheme.

71.    On or about December 9, 2020, per Jager's instructions, Lundin wired $50,000 to Beasley's IOLTA to fund his initial investment. Jager told Lundin that his money would purchase 62.5% of a $80,000 purported lawsuit settlement contract, and that he would receive a 10% return on his investment in 90 days.

72.    Subsequently, Lundin funded additional investments on March 16, 2021, and December 21, 2021, totaling $150,000.

73.    Throughout his dealings with the venture, Lundin was typically instructed to wire investment funds directly to Beasley's IOLTA. Lundin understood that an IOLTA was an attorney trust account

and thus felt safe sending his funds to the IOLTA.

74.    During the period he was making the investments, Lundin was never informed of the true nature of the J&J enterprise or how his funds were actually being misused. Had he known the truth, Lundin never would have invested in the J&J enterprise.

75.    To date, Lundin has received $40,000 in payments as purported returns on his investments. The losses Lundin has incurred have caused hardship to Lundin and his family.

### F.    Plaintiff Bryce Kelly

76.    Between October 2021 and March 2022, when the Ponzi scheme was exposed, Kelly invested $500,000 into the venture through K2K Investments, LLC, a Washington limited liability company of which Kelly is the manager.

77.    Kelly learned of the opportunity to invest in the venture after being introduced to Jason Jongeward, one of the scheme's promoters.

78.    Jongeward told Kelly that his money would be used to purchase an interest in a lawsuit settlement contract. Jongeward presented the safeguards inherent in using an IOLTA as a selling point to boost the scheme.

79.    On or about October 27, 2021, per Jongeward's instructions, Kelly wired $300,000 to Beasley's IOLTA to fund his initial investment. Jongeward told Kelly that his money would purchase three $100,000 lawsuit settlement contracts, and that he would receive a 12% return on his investment in 90 days.

80.    Subsequently, Kelly funded additional investments on November 15, 2021, November 16, 2021, and November 17, 2021, totaling $200,000.

81.    Throughout his dealings with the venture, Kelly was typically instructed by Jongeward to wire investment funds directly to Beasley's IOLTA. Kelly felt more secure sending his funds to an attorney trust account.

82.    During the period he was making the investments, Kelly was never informed of the true nature of the J&J enterprise, or how his funds were actually being misused. Had he known the truth, Kelly never would have invested in the J&J enterprise.

83.    To date, Kelly has received $62,500 as purported returns on his investments. The losses Kelly

has incurred have caused hardship to Kelly and his family.

### G.    Plaintiffs Clint and Dan McDaniel

84.    Between May 2021 and March 2022, when the Ponzi scheme was exposed, Plaintiffs Clint and Dan McDaniel invested a total of $1,185,000 into the venture through Waymaker McD, LLC, a California limited liability company, of which they are both majority interest holders.

85.    Clint and Dan learned of the opportunity to invest in the scheme through Judd whom they met because Clint's son played soccer with Judd's son.

86.    Judd told Clint and Dan that their money would be used to purchase an interest in a lawsuit settlement contract. Judd presented the safeguards inherent in using an IOLTA as a selling point to boost the scheme, and assured Clint and Dan that "a lawyer ran things."

87.    On or about May 28, 2021, per Judd's instructions and after Judd's representations on the investment, Clint and Dan wired $100,000.00 to fund an initial investment. Judd told Clint and Dan their money would purchase a lawsuit settlement contract, and that they would receive a 15% return on their investment in 90 days.

88.    Clint and Dan were instructed by Judd to wire investment funds directly to Beasley's IOLTA. Clint and Dan felt more secure sending their funds to an attorney trust account after being told the investments were run by an attorney, which to them meant heightened oversight.

89.    Subsequently, Clint and Dan funded a total of $1,085,000of additional investments, also to purportedly purchase interests in personal-injury settlements on July 16, 2021, August 27, 2021, January 19, 2022, and February 16, 2022.

90.    During the period Clint and Dan were making the investments, they were never informed of the true nature of the J&J enterprise or how his funds were actually being misused. Had they known the truth, they never would have invested in the J&J enterprise.

91.    To date, Clint and Dan, through Waymaker McD, LLC have received $52,500 in purported returns on their investment. The losses Clint and Dan incurred have caused hardship for Clint, Dan and their families.

### III.    Wells Fargo is required by law to know its customers and their banking behavior.

92.    Federal law requires banks to know their customers and understand their customers' banking

behavior. *See* 31 C.F.R. §§ 1020.220(a)(1), (2). Thus, Wells Fargo is required to collect information about the holder of each account. When an entity opens an account, Wells Fargo obtains information concerning the individuals who control the account.

93.     Federal regulations, including 12 C.F.R. § 21.21, require Wells Fargo to develop, administer and maintain a program to ensure compliance with federal Anti-Money-Laundering (AML) laws. The program is approved by the bank's board of directors and: (1) provides a system of internal controls to ensure compliance at all times, (2) provides for independent testing of the bank's ongoing compliance, (3) designates an individual to coordinate and monitor compliance, and (4) provides training for appropriate personnel.

94.     Wells Fargo also maintains a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

95.     Wells Fargo designates a senior bank official to be the compliance officer responsible for coordinating and monitoring compliance with federal AML laws. The compliance officer, in turn, designates an individual at each office or branch to monitor the bank's day-to-day compliance, including the branches Beasley used to operate the IOLTA account.

96.     The federal government established the Federal Financial Institutions Examination Council ("FFIEC") in 1979. Wells Fargo receives guidance from the FFIEC, which is tasked with ensuring consistency in AML compliance efforts across the banking sector. FFIEC publications describe certain "red flags" that indicate possible money laundering schemes and other misconduct mandating further inquiry. Examples of these suspicious indicia relevant to Beasley's banking activities at Wells Fargo include:

      a.     "Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

      b.     "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

c.  "Unusual use of trust funds in business transactions or other financial activity."

d.  "Customer makes high value transactions not commensurate with the customer's known incomes."

e.  "A large volume of … funds transfers is deposited into … an account when the nature of the accountholder's business would not appear to justify such activity."

f.  "A retail business has dramatically different patterns of currency deposits from similar businesses in the same general location."

g.  "Goods or services purchased by the business do not match the customer's stated line of business."

h.  "Goods or services, if identified, do not match profile of company provided by respondent bank or character of the financial activity…."

i.  "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

j.  "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

k.  "Funds transfers contain limited content and lack related party information."

l.   "Funds transfers are sent or received from the same person to or from different accounts."

m.  "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

n.  "Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose."

o.  "Purpose of shell company is unknown or unclear."

p.  "Customer has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank."

q.  "A large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

r.  "Customer repeatedly uses a bank or branch location that is geographically distant from the customer's home or office without sufficient business purpose."

s.  "Deposits are structured through multiple branches of the same bank or by groups of people who enter a single branch at the same time."

t.  "Funds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations."

u.  "Funds are sent or received via international transfers from or to higher-risk locations."

Ex. 1 ("FFIEC Red Flags") at pp. 1-9.

97.  As detailed below, immediately after Beasley opened the IOLTA, his activities began to reflect many common—and glaring—signs of money laundering and fraud. Yet Wells Fargo chose not to terminate its relationship with Beasley and instead continued providing banking services to Beasley throughout the life of the scheme.

**A.  Wells Fargo maintains a system of sophisticated internal controls to monitor, detect, and analyze suspicious banking activity.**

98.  Consistent with FFIEC guidance, Wells Fargo maintains a system of controls sufficient to identify broad patterns of account activity, sometimes spanning several accounts. The substantive nature of the transactions, the relationships between the transacting parties, and the parties' identities, are all subject to this examination. Wells Fargo contextualizes its scrutiny, analyzing suspicious activity against the backdrop of industry norms and each customer's background. Wells Fargo is expected to use external sources of information like the internet, commercial database searches, and direct inquiries to ascertain the identity of originators and beneficiaries, and/or the nature of suspicious account transactions. FFIEC Red Flags at p. 6.

**1.  Wells Fargo monitors its customers' account activity.**

99.  Wells Fargo collects and maintains information about its customers and their banking behavior in order to, among other things, detect and prevent money laundering and fraud and to protect itself from third party liability and reputational injury.

100.  Wells Fargo maintains procedures to know the identity of each customer, 31 C.F.R. §§ 1020.220(a)(1), (2), and to collect information about the holder of each account, 31 C.F.R.

15

§ 1020.220(a)(2). When an entity rather than an individual opens an account, the bank obtains information about the individual who will control the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C). The information that Wells Fargo collects about new business account clients includes the purpose and nature of the business, anticipated activity in the account (e.g., volume, value (number and dollar), and type of transaction), where the customer expects to transact business, and the products and services commonly used by the customer.

101.  Using the information collected, as well as external resources like internet search engines and public and commercial record databases, Wells Fargo creates an initial client profile and assigns a compliance-related risk rating. Neither the profile, nor the risk rating, is final or static. When Wells Fargo becomes aware that customer information has materially changed, its internal controls require updating that information and, where appropriate, reassessing the customer's risk profile or rating. One of the ways in which the bank becomes aware of such changes is when the customer's transactions appear inconsistent with the bank's understanding of the nature and purpose of the account—for instance, when there are significant, unexplained changes in account activity.

102.  Wells Fargo and other banks also maintain internal controls to ensure ongoing compliance with federal AML law. These include independent testing of the bank's compliance, regular monitoring of compliance, and training of personnel. These controls also include customer due diligence programs to prevent and detect money laundering.

103.  Through these programs, Wells Fargo obtains information that gives it an understanding of the unique financial activity of its customers. Likewise, Wells Fargo can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account. This knowledge is used to identify unusual and suspicious transactions.

## 2.    Wells Fargo enhanced its internal control mechanisms before the Ponzi scheme began.

104.  Between 2011 and 2017, Wells Fargo incurred fines and was subject to other disciplinary measures from federal agencies for its compliance failings, including those due to deficiencies in its AML oversight.

105.  In 2013, in response to regulatory scrutiny, Wells Fargo reevaluated its systems. Following an

16

audit, the bank adopted a risk-management framework and made other substantive changes, including realigning over 5,000 employees. The bank also devoted substantial resources to developing and implementing surveillance technology, including artificial intelligence software, designed to enhance Wells Fargo's account-transaction monitoring system. By 2016, a Wells Fargo executive testified to Congress that the bank's policies, procedures, and internal controls were effective and compliant with AML laws.

106.  Thus, by the time Beasley opened his Wells Fargo IOLTA in 2017, the bank's system of internal controls, including its company-wide compliance awareness protocols, risk management framework, and monitoring technology portfolio, provided Wells Fargo with the tools to readily detect Beasley's misuse of the IOLTA.

### 3.   Wells Fargo employees are trained to monitor and understand account activity.

107.  Wells Fargo also makes employees' compliance with banking regulations, and knowledge of AML guidelines, conditions of their employment, and Wells Fargo incorporates these concepts into job descriptions and performance evaluations.

108.  The bank gives AML training to all personnel whose duties may require such knowledge, including tellers and wire room personnel, enabling them to detect money laundering and fraud.

109.  In addition, supervising personnel, specially designated by Wells Fargo's chief compliance officer, oversee the day-to-day implementation of the bank's risk management framework at the individual branches.

110.  The Wells Fargo Code of Ethics and Business Conduct reinforces the bank's compliance policies, and orders employees to "complete all customer due diligence requirements[,] be alert to—and report—suspicious activity[,]" and sets the policy of "completing all required …. Compliance training on a timely basis." Ex. 2 ("WF Code of Ethics"). The document also states that the bank has adopted policies to comply with applicable laws relating to money laundering. *Id*.

111.  Bankers opening new accounts are trained to ask at least 20 fact-finding questions, including what the account is going to be used for and the client's long-term intentions for the account. New accounts that are less than 60 days old are also subject to greater scrutiny and additional limitations,

17

including mandatory review by additional personnel.

112.  Along the same lines, a banker processing an outgoing wire transfer is trained to ask the customer questions designed to detect possible money-laundering, including the purpose of the transaction, and the nature of the relationship between the parties. Wires between $25,000 and $100,000 automatically prompt personnel to use a checklist to evaluate the transaction. A customer service manager who approves outgoing wires often conducts a secondary review, confirming that the checklist questions were adequately addressed. Wire transactions above $100,000 require additional approval of a regional Wells Fargo employee, and transactions over $500,000 also require branch manager authorization.

113.  Similarly, before the bank credits a large check, multiple bankers review the check image for potential indicators of fraud or other misconduct, including unusual notations and disparities between the location of the payor, the payee (i.e., the customer), and the depositor. When these efforts detect unusual activity, employees examine the account more fully, including by reviewing the account's transaction history and consulting with employees who opened or who have worked on the account.

114.  Various branch-level personnel also regularly review Balance Fluctuation Reports. These reports highlight substantial balance fluctuations and list the account activity in the accounts covered by the reports.

115.  Bank personnel are also required to fill out Currency Transaction Reports on any cash transaction exceeding $10,000. Law firms are ineligible for an exemption from this requirement.

4.      **Wells Fargo's personnel and systems work together to monitor customer and account activity.**

116.  Complementing these human efforts is Wells Fargo's advanced transaction monitoring software portfolio, which includes Actimize, an artificial intelligence and data analytics software platform. Actimize markets its product as "entity-centric," and capable of revealing hidden connections and relationships between transacting parties across multiple accounts and transactions.

117.  Actimize automatically reviews transactions against customers' backgrounds and transaction histories, compares account activity against AML and other compliance red flags, and automatically detects and analyzes abnormal or risky behavior. When the software identifies activity warranting

further review or escalation, it alerts bank personnel.

**B.    Wells Fargo is familiar with the unique nature and use of IOLTAs.**

118.   An IOLTA is a limited-use trust account offered only at qualified financial institutions. Wells Fargo is qualified to maintain IOLTAs in Nevada and has formally acknowledged IOLTA-specific requirements. Wells Fargo has also taken the steps necessary to operate IOLTAs in other states across the country. Wells Fargo must report overdrafts on the accounts to the State Bar of Nevada and IOLTAs must be clearly identified by the bank as "trust" or "escrow" accounts (Wells Fargo designated Beasley's IOLTA as "BEASLEY LAW GROUP PC NV IOLTA ACCT"). ECF 22-3, Ex. F ("NV Bar Trust Accounting") at p. 13; *see also* NV SCR 785.

119.   Nevada Supreme Court Rule 217 defines an IOLTA as a trust account maintained by a Nevada attorney as part of his or her legal representation to hold clients' funds "nominal in size or . . . to be held for a short period of time."

120.    In Nevada, interest earned on IOLTAs is disbursed to the Access to Justice Commission, an organization that helps fund legal aid for the state's low-income population. Because interest earned on IOLTA funds are donated in this way, Nevada attorneys holding substantial funds for their clients typically hold those funds in accounts that bear interest for the benefit of the client, rather than in an IOLTA. Every month, Wells Fargo disburses IOLTA interest to the Nevada Law Foundation, and produces an IOLTA Remittance Report that includes various account information, including the average account balance for the period of remittance. *See* Ex. 3 ("NV IOLTA Enrollment Form").

121.   Consistent with the fact that IOLTAs are trust accounts, the State Bar of Nevada's Trust Accounting document recognizes that an attorney has a "non-waivable, personal fiduciary responsibility … for every penny as long as the funds remain in [his or her] possession." NV Bar Trust Accounting at p. 12; *see also* NV SCR 78.5.

122.   The only payments that attorneys may make out of an IOLTA are "payments on behalf of [a] client … including paying client costs and expenses (e.g., court filing fees or deposition transcript costs) that the client has prepaid, disbursing settlement proceeds, paying yourself earned and undisputed legal fees, etc." NV Bar Trust Accounting at p. 35.

123.   Wells Fargo understands that proper IOLTA activity follows consistent patterns: for example,

19

predictable transfer activity, meticulous separation of client funds, notations to enable clear accounting of which funds belong to which clients, and no personal spending. Commingling funds within an IOLTA is improper. *Id*. at p. 24-25. The State Bar of Nevada requires attorneys to keep meticulous ledgers for each client to ensure easy audits of the account. *Id.* at pp. 27-28.

124.  Particularly given these accounting imperatives, attorneys should not make checks drawn on IOLTAs out to cash or withdraw cash from IOLTAs. *Id.* Consistent with the State Bar of Nevada guidelines, Wells Fargo does not provide debit cards nor ATM access for IOLTAs. Cash withdrawals are a prominent indicator of an attorney misusing funds in an IOLTA.

125.  When client funds are deposited into an IOLTA, the attorney's fee has not yet been separated out (or else the money would go directly into the lawyer's operating account). *Id.* at pp. 33-34. So lawyers withdraw payments for fees as they are earned, and precisely in the amount owed (and not rounded up or down). *Id*. Fee payments must be made out directly to the attorney (whether by check or transfer). The attorney may not cover operating, personal, or any other expenses from the IOLTA in lieu of payment for his or her work, even if the amount of fees owed to the attorney is sufficient to cover those expenses. *Id*. at p. 35.

126.  Wells Fargo maintains a Legal Specialty group that, among other things, "gathers and compiles law firm data" on a quarterly basis, including "billable hours, revenue per attorney, profit, headcount, and trends by region and sector." ECF No. 22-3, Ex. G ("WF Legal Specialty Group Webpage") at p. 73. The bank uses its proprietary Comparative Analytical Tool (CAT) to process the data and glean relevant insights on the industry. *Id*. Thus, Wells Fargo also has substantial insight into the typical revenues and incomes associated with different law practices, including a solo Las Vegas family law practitioner like Beasley.

    **C.**    **Consistent with its regulatory obligations, Wells Fargo formed expectations about what to expect as to what future account activity in Beasley's IOLTA would look like.**

127.  On January 26, 2017, Matthew Beasley applied for a Wells Fargo business account for his law firm, Beasley Law Group PC, specifically an Analyzed Business IOLTA. Wells Fargo does not make IOLTA applications available as part of its online offerings. Instead, to apply for an IOLTA, a lawyer

20

must go to a branch and personally process the application with a Wells Fargo banker.

128.  According to the account-opening record, Beasley submitted the application at the 215 Wells Fargo Branch located at 6585 N. Decatur Blvd., Las Vegas, NV 89131, with the help of Virginia Arreola, a Wells Fargo personal banker. ECF No. 22-2, Ex. A ("Salimi Decl.") at p. 13.



**Customer 1 Information**

| | | Business Account Application |
| --- | --- | --- |
| Customer Name: BEASLEY LAW GROUP PC | | |
| Enterprise Customer Number (ECN): 356876861909115 | Street Address: 1872 SHY ALBATROSS AVE | |
| Account Relationship: Sole Owner | Address Line 2: | |
| Taxpayer Identification Number (TIN): ████1156 | TIN Type: EIN | Address Line 3: |
| Business Type: Corporation Type C | City: NORTH LAS VEGAS | State: NV |
| Business Sub-Type/Tax Classification: Professional Corporation | Non-Profit: No | ZIP/Postal Code: 89084-2069 | Country: US |
| Date Originally Established: 04/18/2011 | Current Ownership Since: | Number of Employees: 1 | Business Phone: 702/483-6800 | Fax: |
| Annual Gross Sales: $350,000.00 | Year Sales Reported: 01/01/2017 | Fiscal Year End: | Cellular Phone: | Pager: |
| Primary Financial Institution: | Number of Locations: 1 | | e-Mail Address: matthew@beasleylawgrouplv.com |
| Primary State 1: | Primary State 2: | Primary State 3: | Website: |
| Primary Country 1: | Primary Country 2: | Primary Country 3: | Sales Market: LOCAL |
| Industry: Other Services (except Public Administration) | | |
| Description of Business: Law Office | | |

129.  In his application, Beasley identified himself to Wells Fargo as the sole owner of Beasley Law Group PC, and sole signatory for the IOLTA. He reported annual gross sales for his firm of $350,000 and said the sales market for his business was "local." The mailing address Beasley provided for the account was the address of his personal residence: 1872 Shy Albatross Avenue in North Las Vegas, Nevada. The "Bank Use Only" portion of the account application stated that the bank conducted a verification of Beasley's law firm with the Nevada Secretary of State. *Id*. at p. 14.

130.  Around the time of the IOLTA's opening, Beasley advertised his firm as a solo "family law and personal injury practice." The website for Beasley Law Group, PC, had a rudimentary design and limited functionality; in short, it looked like a locally based, solo practice, consistent with Beasley's estimated gross revenues of $350,000 per year. *See* ECF No. 22-3, Ex. H ("Beasley Practice Website") at p. 76.

131.  The Beasley IOLTA was an "Analyzed IOLTA" at Wells Fargo; as such, and per bank policy, it was linked to another eligible Wells Fargo account. ECF No. 22-3, Ex. I ("Wells Fargo Business

Accounts") at p. 87. The IOLTA records show that the Beasley law firm maintained at least two business checking accounts for his firm at Wells Fargo: (i) a business checking account ending in 5580, and (ii) a second business checking account ending in 8898. The fact that Beasley asked Wells Fargo to open a second checking account for his firm, with no practical justification for a one-person law firm to need multiple checking accounts at the same bank, implicated at least one FFIEC red flag known to the bank, which arises when a "[c]ustomer … establishe[s] multiple accounts in various … names that lack sufficient business purpose for the account complexities."

### D. Beasley's use of the IOLTA was consistently and patently improper, triggering many of the FFIEC's red flags.

132.  When Wells Fargo opened Beasley's IOLTA, it understood the restrictions and rules governing the accounts and what sort of activity to expect. It forecast that Beasley's IOLTA would be used in a manner consistent with a solo practitioner's law firm earning less than half a million dollars a year. And it monitored Beasley's IOLTA activity with those parameters in mind.

133.  But from the very start, and throughout the years that followed, Beasley's use of the IOLTA bore no resemblance to that predicted activity. Instead, the account activity triggered one red flag after another at Wells Fargo, as detailed below.

134.  As Amir Salimi, a forensic accountant for the SEC, said in a declaration filed with the SEC complaint, based on his review of the IOLTA bank records, a pattern of suspected Ponzi activity was already apparent by January 2017, the month the IOLTA was opened. Salimi Decl. at p. 6.

135.  Wells Fargo and its employees took note of the suspicious activity. A former Regional Banking District Manager of a Wells Fargo branch in Henderson, Nevada, interviewed in connection with the preparation of this complaint, confirmed that he recalled a number of individuals physically present at a branch in the district he managed, deposit or transfer funds into the Beasley IOLTA. The manager recalled that branch personnel concluded that the transactions were suspicious and had doubts about their propriety. Those personnel, pursuant to Wells Fargo protocols, contacted a corporate group within Wells Fargo to convey their suspicions about the transactions. In each of the multiple instances, however, Wells Fargo responded to the reports by directing the branch employees to execute the suspicious transactions.

136.  So, even though Beasley's improper use of the account was apparent from the start, Wells Fargo allowed Beasley to use the account uninterrupted over more than five years, as many millions of dollars flowed into the bank's coffers. Wells Fargo's assistance was crucial to the scheme's viability. Wells Fargo not only served as the conduit for the fraud's proceeds, but also lent the scheme the credibility of an IOLTA, which investors were told provided extra security for their funds.

1.      **The funds running through the IOLTA far exceeded what should have been reasonably expected from Beasley's law practice.**

137.  After telling Wells Fargo that his solo-practitioner law firm generated revenues of $350,000 annually, between 2017 and early 2022, Beasley moved nearly $500 million through the IOLTA.

138.  The amount of trust funds flowing through the IOLTA was higher than forecast from the start, and it grew exponentially with time. The table below, compiled by the SEC's forensic accountant, Mr. Salimi, shows the dollar amounts flowing through the IOLTA during the relevant time period.

| Beasley IOLTA Account | | |
|---|---|---|
| Wells Fargo - 5598 | | |
| Year | Average Monthly Inflows | Average Monthly Outflows |
| 2017 | 583,907 | (546,036) |
| 2018 | 1,370,127 | (1,291,958) |
| 2019 | 4,147,822 | (4,096,741) |
| 2020 | 9,240,054 | (9,045,776) |
| 2021 | 20,435,193 | (20,317,308) |
| 2022 | 28,399,421 | (30,110,959) |

*Id.* at p. 7.

139.  According to Mr. Salimi's analysis, a total of $491.5 million was deposited into the IOLTA between January 2017 and March 2022.

    a.  In 2017, within the first year of its existence, more than $6 million flowed through the IOLTA.

    b.  In 2018, the amount deposited more than doubled, with an average of more than $1 million

entering the account every month.

    c.  In 2019, deposits increased again, with an average of more than $4 million entering the account each month.

    d.  By 2020, monthly deposits were up to $9 million.

    e.  In 2021, over $20 million on average entered the IOLTA each month.

    f.  And by 2022, nearly $30 million on average entered the IOLTA each month.

140.  The sheer volume of funds passing through the Beasley IOLTA reflected a material disparity between what Beasley had told Wells Fargo about his firm and its revenues, and his actual use of the account.

141.  Wells Fargo also maintained the Beasley firm's checking accounts and knowingly assisted Beasley in moving substantially more than forecast from the IOLTA to his firm as ostensible firm revenue. Attorney earnings that flow through an IOLTA typically make up only a portion of a practitioner's income. Yet within months of its opening, Wells Fargo already moved to the Beasley firm's operating account funds that were orders of magnitude higher than the annual gross revenues Beasley had reported to the bank.

142.  By May 2017, less than half a year after Wells Fargo opened the IOLTA, the amount that Beasley transferred from the IOLTA to his firm's Wells Fargo operating account already exceeded $350,000—the amount Beasley had identified to Wells Fargo as his firm's annual gross sales. Around the same time, Wells Fargo allowed Beasley to make large cash withdrawals; such that by the end of June 2017, he had taken withdrawn over $355,000 in cash. So, by the six-month mark, Beasley's firm had already doubled its projected yearly gross revenues.

143.  This practice only accelerated with time. Between January 2017 and March 2022, Beasley transferred a total of over $17 million from the IOLTA to his firm's operating accounts, including several transfers of hundreds of thousands of dollars. Examples of such transfers appear below.

| 06/10 | 20,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib089Fnpv5 on 06/10/20 |
| 06/11 | 412,777.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib089Kwb7G on 06/11/20 |
| 06/12 | 50,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib089Sgz6G on 06/12/20 |

ECF No. 22-4, Ex. K ("IOLTA Bank Records – Pt. 1") at p. 187 (emphases added) (within three days in June 2020, over $482,000 was transferred from the IOLTA to the business checking account ending in -5580).

| 12/31 | 415,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib09Jrxcld on 12/31/20 |

ECF No. 22-5, Ex. L ("IOLTA Bank Records – Pt. 2") at p. 45 (emphases added) (online transfer from the IOLTA to the same business account for $415,000 in December 2020).

| 03/01 | 100,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx8898 Ref #Ib09x3Gpjl on 02/27/21 |
| 03/01 | 300,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib09x3H6V2 on 02/27/21 |
| 03/04 | 400,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib09Y8Q3Vk on 03/04/21 |

*Id*. at p. 71 (emphases added) (within three days in March 2021, $800,000 was transferred from the IOLTA to the two operating accounts).

144.  Between 2017 and 2022, per the SEC's analysis, a total of $17.1 million in funds held in trust flowed from the IOLTA to the Beasley firm's operating accounts. These ostensible firm revenues were approximately ten times more than what Beasley told Wells Fargo to expect when he opened the trust account. In addition to being well beyond what Beasley forecast for Wells Fargo, the magnitude of those earnings would have made him an outlier in Nevada among lawyers practicing family and personal-injury law.

145.  These disparities implicated various FFIEC red flags, which Wells Fargo was actively monitoring the IOLTA activity to detect, including:

      a.  "customer makes high value transactions not commensurate with the customer's known incomes."

      b.  "[a] large volume of … funds transfers is deposited into … an account when the nature of the accountholder's business would not appear to justify such activity."

      c.  "[a] retail business has dramatically different patterns of currency deposits from similar

25

businesses in the same general location."

d. "[t]he stated occupation of the customer is not commensurate with type or level of activity." and

e. "unusual use of trust funds in business transactions or other financial activity."

**2. The size, shape, and speed of the deposits and withdrawals in the IOLTA triggered red flags.**

146. As noted, Wells Fargo actively monitors account activity for transactions reflecting suspicious patterns. This includes repeated large, round-number transfers.

147. Throughout its existence, the account activity within the IOLTA was typified by just that type of account activity. The vast majority of incoming funds came in deposits or transfers of the large, round-number variety—typically in increments of $40,000, $50,000, $80,000, or $100,000 (and eventually multiples of $100,000), as reflected by the following IOLTA statement excerpts.

| | | |
|---|---|---|
| 10/11 | 80,000.00 | Deposit Made In A Branch/Store |
| 10/18 | 100,000.00 | WT Fed#01771 National Financial /Org=Mark A Murphy Srf# 0013200291HI Trn#171018029486 Rfb# Swf of 17/10/18 |
| 10/18 | 50,000.00 | WT Saq#91016 Triple Threat Basketbal /Org= Srf# 0073048290131533 Trn#171018091016 Rfb# |
| 10/18 | 50,000.00 | WT Fed#02400 Bank of America, N /Org=Acac, LLC Srf# 2017101800381142 Trn#171018162736 Rfb# 213909206 |
| 10/19 | 100,000.00 | WT Fed#00560 Zb, NA DBA Nevada /Org=Herlean Financial Services LLC Srf# 2017101900002674 Trn#171019067462 Rfb# |
| 10/19 | 80,000.00 | WT Fed#00561 Zb, NA DBA Nevada /Org=Herlean Financial Services LLC Srf# 2017101900002700 Trn#171019067496 Rfb# |
| 10/24 | 50,000.00 | WT Saq124756 Shane M Jager /Org= Srf# 0000733297437583 Trn#171024124756 Rfb# |
| 10/25 | 100,000.00 | WT Fed#02510 National Financial /Org=Mark A Murphy Srf# 5491100298Fm Trn#171025031395 Rfb# Swf of 17/10/25 |
| 10/25 | 80,000.00 | Deposit Made In A Branch/Store |
| 10/26 | 80,000.00 | WT Fed#02431 Bank of America, N /Org=Charles J Portz Srf# 2017102500417345 Trn#171026008677 Rfb# Kmapqk7Yg |

IOLTA Bank Records – Pt. 1 at p. 35 (October 2017).

| 08/01 | 80,000.00 | WT Fed#04198 Jpmorgan Chase Ban /Org=Rumble Pest Solutions LLC Srf# 5402500213Es Trn#180801105544 Rfb# Dcd of 18/08/01 |
| 08/01 | 80,000.00 | WT 0001032627648 Charles Schwab & /Org=Tanner Capital Group LLC 2600 P Srf# 0001032627648 Trn#180801150223 Rfb# |
| 08/01 | 80,000.00 | WT 0000342573859 Charles Schwab & /Org=Zzyzx Capital LLC LLC 2600 P V Srf# 0000342573859 Trn#180801151911 Rfb# |
| 08/07 | 80,000.00 | WT Saq139789 Tmg LLC /Org= Srf# 0065784219692150 Trn#180807139789 Rfb# |
| 08/08 | 80,000.00 | WT Fed#02241 Bank of America, N /Org=Derek Ronnebaum LLC Srf# 2018080700401539 Trn#180808013911 Rfb# 56Vlwvaau |
| 08/08 | 50,000.00 | WT Fed#02963 US Bank, NA /Org=Donald B Rowland Srf# 180808027309 Trn#180808131704 Rfb# 180808027309 |
| 08/14 | 40,000.00 | WT Fed#06956 Bank of America, N /Org=Brent D Barlow CPA Pllc Srf# 2018081400284930 Trn#180814080243 Rfb# C7Zcvjou6 |
| 08/14 | 40,000.00 | WT Fed#00019 State Bank of Sout /Org=William Bryce Huff Srf# 2018081400044749 Trn#180814153473 Rfb# |
| 08/15 | 100,000.00 | WT 0000957892155 Charles Schwab & /Org=Tanner Capital Group LLC 2600 P Srf# 0000957892155 Trn#180815139412 Rfb# |
| 08/15 | 80,000.00 | eDeposit IN Branch/Store 08/15/18 01:32:56 PM 1985 E 7000 S Salt Lake City UT 5598 |
| 08/21 | 100,000.00 | WT Fed#00936 Bank of The West ( /Org=Sz Properties LLC Srf# 2018082100004266 Trn#180821129660 Rfb# WT18082101046569 |
| 08/21 | 50,000.00 | WT Fed#01350 Bank of America, N /Org=Portz Holdings LLC Srf# 2018082100370221 Trn#180821157635 Rfb# A39Sgfxsr |
| 08/22 | 80,000.00 | WT Fed#00181 Navy Federal Cred /Org=Jeffrey M Peason Srf# Opf45540341 Trn#180822016663 Rfb# Opf900005179 |
| 08/22 | 50,000.00 | WT Fed#02110 Bank of America, N /Org=Carli Marie West Srf# 2018082200018992 Trn#180822015007 Rfb# 4E9Kgmulq |
| 08/22 | 80,000.00 | eDeposit IN Branch/Store 08/22/18 09:46:19 Am 1985 E 7000 S Salt Lake City UT |
| 08/22 | 80,000.00 | WT 0001982975696 Charles Schwab & /Org=Tanner Capital Group LLC 2600 P Srf# 0001982975696 Trn#180822083256 Rfb# |
| 08/30 | 100,000.00 | WT Fed#03952 US Bank, NA /Org=Donald B Rowland Srf# 180830038386 Trn#180830171743 Rfb# 180830038386 |

*Id*. at p. 75 (August 2018).

| 03/05 | 200,000.00 | Acac, LLC Vendor Pmt 200305 xxxxx4652 Beasley Law Grou |
|---|---|---|
| 03/09 | 4,025.00 | WT 0001618014160 Charles Schwab & /Org=John P McDonough III Charles Schwa Srf# 0001618014160 Trn#200309040633 Rfb# |
| 03/09 | 100,000.00 | WT Fed#09272 Jpmorgan Chase Ban /Org=Seth A Johnson OR Tawnie Johnson Srf# 5097500069Es Trn#200309071762 Rfb# Bmg of 20/03/09 |
| 03/09 | 100,000.00 | WT Fed#09032 National Financial /Org=Michael W Sansom Ttee Srf# 5777232069Fs Trn#200309163595 Rfb# Swf of 20/03/09 |
| 03/09 | 10,000.00 | Online Transfer From J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib07Rxnd7M on 03/09/20 |
| 03/10 | 80,000.00 | WT Fed#00754 Jpmorgan Chase Ban /Org=Bradley Scott Melis Maryjane Melis Srf# 7049500069Es Trn#200310017221 Rfb# Dcd of 20/03/09 |
| 03/10 | 100,000.00 | WT Fed#00025 First United Bank /Org=Ernest Andy Mahard Srf# Trn#200310054757 Rfb# |
| 03/10 | 50,000.00 | WT Fed#00065 First United Bank /Org=Kaitlin Mahard Srf# Trn#200310083480 Rfb# |
| 03/10 | 180,000.00 | WT Fed#01056 Zions Bancorporati /Org=Advanced Energy Technologis LLC Srf# 2020031000003233 Trn#200310088916 Rfb# |
| 03/10 | 40,000.00 | WT Fed#00013 Jpmorgan Chase Ban /Org=Kdsm LLC Srf# 5132600070Es Trn#200310102907 Rfb# Boh of 20/03/10 |
| 03/10 | 40,000.00 | WT Fed#00112 America First Fede /Org=Dustan Haycock Srf# 1255313862056839 Trn#200310111116 Rfb# |
| 03/10 | 100,000.00 | WT Fed#02483 US Bank, NA /Org=Mark V Petersen Srf# 200310022716 Trn#200310113032 Rfb# 200310022716 |
| 03/10 | 80,000.00 | WT Fed#00214 Boeing Employees C /Org=Alex L. Parrish Srf# 20200700061400 Trn#200310150892 Rfb# |
| 03/11 | 40,000.00 | WT 0000858394707 Charles Schwab & /Org=Tanner Capital Group LLC 2600 P Srf# 0000858394707 Trn#200311003852 Rfb# |
| 03/11 | 80,000.00 | WT Seq#52257 99 Celsius LLC /Org= Srf# 0006874070858225 Trn#200311052257 Rfb# |

*Id.* at p. 167 (March 2020).

| 07/06 | 100,000.00 | WT Fed#03579 Jpmorgan Chase Ban /Org=Steven E Schneider OR Cristy A Srf# 3623091187Es Trn#210706204433 Rfb# Dcd of 21/07/06 |
|---|---|---|
| 07/06 | 100,000.00 | WT Fed#04659 Bank of America, N /Org=Bm Investments 1 LLC Srf# 2021070600646121 Trn#210706153531 Rfb# 2176D00320G72L45 |
| 07/06 | 100,000.00 | WT Seq#229833 Samuel Newman /Org= Srf# 0072582187641824 Trn#210706229833 Rfb# |
| 07/06 | 200,000.00 | WT Fed#04653 US Bank, NA /Org=Christopher Ronn Humphries Srf# 210706048044 Trn#210706236412 Rfb# 210706048044 |
| 07/06 | 400,000.00 | Deposit Made In A Branch/Store |
| 07/06 | 80,000.00 | WT Seq#249084 Dae Kekk, LLC /Org= Srf# 0007175187190134 Trn#210706249084 Rfb# |
| 07/06 | 200,000.00 | Cj Investments L Deposit Dp03928578 Beasley Law Group |
| 07/07 | 80,000.00 | WT Fed#04612 Bank of America, N /Org=Joshua Q Ward Srf# 2021070700271206 Trn#210707037954 Rfb# 346466098 |
| 07/07 | 400,000.00 | WT Fed#09914 Bank of America, N /Org=Ruger Investments Rm Inc Srf# 2021070700380708 Trn#210707107320 Rfb# 346504834 |
| 07/07 | 80,000.00 | WT Fed#00295 Bank of America, N /Org=Red Hills Investments Inc Srf# 2021070700383942 Trn#210707109509 Rfb# 346506164 |
| 07/07 | 200,000.00 | WT Fed#01281 Zions Bancorporati /Org=Wwf Holdings LLC Srf# 2021070700004506 Trn#210707110648 Rfb# |
| 07/07 | 100,000.00 | WT Fed#08282 Jpmorgan Chase Ban /Org=Larry R Newton OR John F Newton Srf# 3320061188Es Trn#210707124248 Rfb# Ppl of 21/07/07 |
| 07/07 | 160,000.00 | WT Fed#00148 Columbia State Ban /Org=Peak Investments LLC Srf# 0090 Trn#210707127160 Rfb# |
| 07/07 | 80,000.00 | WT Seq#160205 We Capital Investments /Org= Srf# 0w00001479058636 Trn#210707160205 Rfb# 0w00001479058636 |
| 07/07 | 100,000.00 | WT Fed#00319 Great Western Bank /Org=Eric Lamont Mack Srf# Trn#210707161810 Rfb# |

IOLTA Bank Records – Pt. 2 at p. 105 (July 2021).

CONSOLIDATED COMPLAINT
Case No.: 2:22-cv-00529 -GMN-NJK

| | | |
|---|---|---|
| 01/04 | 80,000.00 | WT Seq#80251 Pilar Do Sul LLC /Org= Srf# Ow00001880274762 Trn#220104080251 Rfb# Ow00001880274762 |
| 01/04 | 100,000.00 | WT Fed#00113 America First Fede /Org=Andrew Hansen Srf# 1857611318545536 Trn#220104100295 Rfb# |
| 01/04 | 800,000.00 | WT Seq108859 Pine Valley Investments /Org=Pine Valley Investments Srf# Gw00000047550502 Trn#220104108859 Rfb# 529 |
| 01/04 | 50,000.00 | WT Seq116427 Kristy E Herlean /Org= Srf# 0063656004374557 Trn#220104116427 Rfb# |
| 01/04 | 50,000.00 | WT Fed#02919 Bank of America, N /Org=Faith Koa Investments LLC Srf# 2022010400418871 Trn#220104148686 Rfb# Qgyvdpdzb |
| 01/04 | 200,000.00 | WT Fed#04128 Bank of America, N /Org=Dale A McIntire Trustee Srf# 2022010400445185 Trn#220104168325 Rfb# 370093914 |
| 01/04 | 80,000.00 | WT Fed#07929 Utah Community Cre /Org=Joseph Loveridge Srf# 3243778200062605 Trn#220104184214 Rfb# Joseph Loveridge |
| 01/05 | 100,000.00 | Rpm Investment G Sender 220105 xxxxx0706 0000Beasley Law Grou |
| 01/05 | 25,000.00 | WT Fed#02444 Bank of America, N /Org=Michaeline Zavala Srf# 2022010500104832 Trn#220105014403 Rfb# 370131258 |
| 01/05 | 300,000.00 | WT Fed#00483 US Bank, NA /Org=Jrje LLC Srf# 220105005952 Trn#220105041084 Rfb# 220105005952 |
| 01/05 | 80,000.00 | WT Fed#01074 Jpmorgan Chase Ban /Org=Prestige Consulting LLC Srf# 3101622005Es Trn#220105015231 Rfb# Boh of 22/01/05 |
| 01/05 | 200,000.00 | WT Fed#00173 Ally Bank /Org=Bryce J Barker Srf# 35357536 Trn#220105058672 Rfb# 2556981 |
| 01/05 | 200,000.00 | WT Fed#00342 Mountain America F /Org=M2 Holdings Lp Srf# Trn#220105073743 Rfb# |
| 01/06 | 80,000.00 | WT Fed#00395 Morgan Stanley and /Org=M L Kopald M Crow CO-Ttee Margaret Srf# S062006234940I Trn#220106072775 Rfb# |
| 01/06 | 200,000.00 | WT Fed#07942 Bank of America, N /Org=Acac, LLC Srf# 2022010600288834 Trn#220106075252 Rfb# 370339636 |
| 01/06 | 80,000.00 | WT Fed#00389 National Financial /Org=t/Michael William Sansom Ttee Srf# 3506756006Fs Trn#220106095898 Rfb# Swf of 22/01/06 |
| 01/07 | 100,000.00 | WT Fed#08248 Bank Forward /Org=Mak Capital Srf# 091310864010658 Trn#220107177361 Rfb# |
| 01/10 | 200,000.00 | WT Fed#00457 Jpmorgan Chase Ban /Org=Brian S Gabrielson OR Sofia Srf# 3015292006Es Trn#220110012968 Rfb# Dcd of 22/01/08 |
| 01/10 | 50,000.00 | WT Seq#30500 Exemption Trust Under T /Org= Srf# Ow00001890101633 Trn#220110030500 Rfb# Ow00001890101633 |
| 01/10 | 50,000.00 | WT Fed#09398 Bank of America, N /Org=Darcy K Fitch Srf# 2022011000398859 Trn#220110097957 Rfb# 370765968 |
| 01/10 | 100,000.00 | WT Fed#09663 Bank of America, N /Org=Scott R Kanter Srf# 2022011000405144 Trn#220110101803 Rfb# 370768412 |
| 01/10 | 100,000.00 | Deposit Made In A Branch/Store |
| 01/10 | 100,000.00 | WT Fed#05069 Jpmorgan Chase Ban /Org=Webster-Webster CO LLC Srf# 3409432010Es Trn#220110119744 Rfb# Dcd of 22/01/10 |
| 01/10 | 400,000.00 | WT Fed#01103 Bancocentral Nation /Org=Tj Investment Partners Inc Srf# 34352 Trn#220110138010 Rfb# |
| 01/10 | 600,000.00 | WT Fed#03002 Bank of America, N /Org=Matthew B Brooks Srf# 2022011000440842 Trn#220110144899 Rfb# Imnnnn007 |

*Id.* at p. 172 (January 2022).

148.  Likewise, outgoing transfers from the IOLTA were typically in large, round numbers. By April 2020, Beasley had begun regularly making transfers of several million dollars a month to a small, repeating group of entities, nearly all in round-number amounts (identified below). Examples of the practice appear below.

29

| 11/23 | 1,000,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib0999B3N2 on 11/21/20 |
| 11/23 | 1,000,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib0999B4Y8 on 11/21/20 |
| 11/25 | 171,000.00 | WT 201125-211676 Bank of America, NE /Bnf=American Colocation Cervices Srf# 0072801330214275 Trn#201125211676 Rfb# |
| 11/25 | 310,500.00 | WT Seq211884 Triple Threat Basketbal /Bnf=Triple Threat Basketball,LLC Srf# 0072801330727275 Trn#201125211884 Rfb# |
| 11/25 | 50,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib099Xytzz on 11/25/20 |
| 11/30 | 532,375.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib09Bfx48C on 11/28/20 |
| 11/30 | 1,000,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib09Bfx5Wl on 11/28/20 |
| 11/30 | 1,000,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking |

*Id*. at p. 37 (emphases added) (making two transfers of $1 million each, and a transfer of nearly $600,000 on November 9, 2020, then making two transfers of $1 million each a week later on November 16, 2020).

| 04/12 | 1,000,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib0B85Mmm on 04/10/21 |
| 04/12 | 1,000,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib0B85MT77 on 04/10/21 |
| 04/12 | 500,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib0B85Mvsx on 04/10/21 |
| 04/12 | 617,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib0B85My7F on 04/10/21 |
| 04/12 | 90,000.00 | Online Transfer to J & J Consulting Services, Inc. Business Checking xxxxxx0153 Ref #Ib0B8Cwpw5 on 04/11/21 |

*Id*. at p. 82 (emphases added) (two transfers of $1 million each, followed by a $500,000 transfer, a $617,000 transfer, and a $90,000 transfer—all on April 12, 2021).

149.  By late 2021, Beasley began making individual transfers exceeding $1 million—at times more than once in a single day. The images below, from the IOLTA's November 2021 – January 2022 statements, show multiple sequential transfers over $1 million.

30

| 11/24 | 0.70 | Simmons Bank Transfer G Scott Dicus G Scott Dicus |
| 11/29 | 894,500.00 | WT Seq204497 J &J Consulting Servic /Bnf=J J Consulting Services, Inc Srf# 0075679333278494 Trn#211129204497 Rfb# |
| 11/29 | 1,888,000.00 | WT Seq204678 Stirling Consulting L L /Bnf=Stirling Consulting L L C Srf# 0075679333679494 Trn#211129204676 Rfb# |

*Id.* at p. 159 (a single transfer in excess of $1.88 million in November 2021).

| 12/15 | 1,000,000.00 | WT Seq213834 Stirling Consulting L L /Bnf=Stirling Consulting L L C Srf# 0075679349284326 Trn#211215213834 Rfb# |
| 12/20 | 1,125,500.00 | WT Seq222516 J &J Consulting Servic /Bnf=J J Consulting Services, Inc Srf# 0075679354789956 Trn#211220222516 Rfb# |
| 12/20 | 1,342,000.00 | WT Seq222630 Stirling Consulting L L /Bnf=Stirling Consulting L L C Srf# |

*Id.* at p. 168 (two transfers in excess of $1 million on one day in December 2021).

| 01/19 | 1,700,000.00 | WT Fed#02171 Bank of America, N /Org=Mrrv Investments, LLC Srf# 2022011900430081 Trn#220119125173 Rfb# 43Prxve4N |

*Id.* at p. 175 (a single transfer of $1.7 million in January 2022).

150.  When the funds left the IOLTA, approximately $411 million out of the $487 million in total outgoing transfers was sent to entities controlled by five promoters of the scheme as follows:

a.   The J&J Entities received over $313.7 million. Nearly all transfers were made in round-number transactions, incompatible with legitimate business activity.

b.   Stirling Consulting LLC, an entity associated with a major promoter of the scheme received $37.2 million. Nearly all transfers were made in round-number transactions, incompatible with legitimate business activity.

c.   CJ Investments LLC, another entity associated with a promoter, received $31 million. Nearly all transfers were made in round-number transactions, incompatible with legitimate business activity.

d.   Triple Threat Basketball, LLC, another entity associated with a promoter, received $12.3 million. Nearly all transfers were made in round-number transactions, incompatible with legitimate business activity.

e.   As discussed, a total of $17.1 million went to the Beasley law firm's operating accounts at Wells Fargo.

CONSOLIDATED COMPLAINT
Case No.: 2:22-cv-00529 -GMN-NJK

151.  In addition, the individuals associated with the above entities received additional payments to other accounts, including $1.4 million in payments to The Judd Irrevocable Trust, and over $130,000 to Jeffrey Judd personal account, and $140,500 in payments to Shane Jager's personal account.

152.  Wells Fargo had a view into both the incoming and outgoing transactions. Although at the start of the venture, Judd had used a U.S. Bank account to transact with the IOLTA, he later moved his business to Wells Fargo. Similarly, Stirling Consulting LLC, CJ Investments LLC, and Triple Threat Basketball, LLC, transacted with the IOLTA using their own Wells Fargo business accounts.

153.  These patterns of account activity were likely caught in various ways by Wells Fargo systems and personnel. For example, under bank policy, Wells Fargo personnel asked questions of the individuals transferring money into and out of the IOLTA about the purpose of the wire, and their relationship with the recipient. (At least one promoter made repeated requests to Wells Fargo to increase his business account's daily transfer limit, likely triggering added scrutiny as to the connections between the regularly transacting parties.) Large wires also required higher levels of approval within Wells Fargo and underwent risk assessment. In addition, the transactions summarized above triggered numerous FFIEC red flags, which Wells Fargo's automated systems detect when reviewing activity. The red flags included:

   a.  "[m]any funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts."

   b.  [f]unds transfer activity is unexplained, repetitive, or shows unusual patterns."

   c.  "[a] retail business has dramatically different patterns of currency deposits from similar businesses in the same general location."

   d.  "[c]ustomer makes high value transactions not commensurate with the customer's known incomes."

   e.  "[u]nusual use of trust funds in business transactions or other financial activity."

   f.  [f]unds transfers are sent or received from the same person to or from different accounts." and

   g.  "[u]nusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

### 3. The transactions frequently reflected practices that were, on their face, impermissible for an IOLTA.

154. Beasley also frequently used the IOLTA in ways directly at odds with proper IOLTA usage.

155. For example, Beasley used funds in IOLTA to pay for obviously non-legal expenses.

   a. Less than two months after opening the account, Beasley made a payment of $42,008.08 to "Capital One Auto Carpay … Robert P Villanueva" from the IOLTA, an apparent payment for a car loan. *See* IOLTA Bank Records – Pt. 1 at p. 15.

   b. In September 2021, Beasley used the IOLTA to pay $95,486.04 to Cjf Automotive, LLC, an entity associated with a local car dealership. *See* IOLTA Bank Records – Pt. 2 at p. 135.

   c. Beasley also transferred funds to external accounts in his name, including a payment of $80,000 to his personal account at U.S. Bank in October 2019.

   d. Other IOLTA payments for personal expenses included over $4 million paid to title companies, Salimi Decl. at p. 9, and payments of nearly $7 million to cover gambling debts. ECF No. 22-2, Ex. B ("Ostler Decl.") at p. 20.

156. Beasley frequently withdrew cash from the IOLTA. Cash withdrawals from IOLTAs are strongly discouraged. It is for this reason that Wells Fargo does not provide ATM cards to IOLTA holders. The State Bar of Nevada's guidance on trust accounts advises: "You should always pay out money from your client trust bank account by using: a check; a wire transfer; or another instrument that specifies who is getting the money and who is paying it out. You should never pay out money in cash, or with checks or other instruments made out to cash, because you have no evidence of payment." NV Bar Trust Accounting, at p. 35.

157. Yet Beasley executed cash withdrawals from the IOLTA totaling over $1.07 million. Examples of large cash withdrawals from the IOLTA appear below.

| 05/11 | 20,576.00 | Withdrawal Made In A Branch/Store |
| 05/16 | 15,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib03Fkmcyx on 05/16/17 |
| 05/16 | 50,000.00 | WT Fed#02545 Citibank, N.A. /Ftr/Bnf=Warren Rosegreen Srf# 0072801136950700 Trn#170516119909 Rfb# |
| 05/19 | 650,000.00 | WT Seq119117 Global Trust Group, LLC /Bnf=Global Trust Group, LLC Srf# 0072801139360140 Trn#170519119117 Rfb# |
| 05/22 | 25,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib03Fzw8DD on 05/22/17 |
| 05/25 | 25,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib03G7D4Wq on 05/25/17 |
| 05/25 | 25,000.00 | Withdrawal Made In A Branch/Store |
| 05/26 | 25,000.00 | Withdrawal Made In A Branch/Store |
| 05/30 | 50,000.00 | Withdrawal Made In A Branch/Store |

IOLTA Bank Records – Pt. 1 at p. 21 (emphases added) ($120,576 in cash withdrawals in May 2017).

| 10/11 | 15,000.00 | Withdrawal Made In A Branch/Store |
| 10/11 | 49,500.00 | WT Fed#04771 Bank of America, N /Ftr/Bnf=Jon Kinney Srf# 0072801284869082 Trn#171011136985 Rfb# |
| 10/11 | 24,500.00 | WT Fed#04783 US Bank, NA /Ftr/Bnf=J and J Consulting Services Srf# 0072801284330182 Trn#171011137025 Rfb# |
| 10/13 | 50,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib03V3W7Cj on 10/13/17 |
| 10/17 | 46,000.00 | Withdrawal Made In A Branch/Store |
| 10/19 | 75,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib03Vnfysg on 10/19/17 |
| 10/23 | 42,500.00 | Withdrawal Made In A Branch/Store |

*Id.* at p. 36 (emphases added) ($103,500 in cash withdrawals in October 2017).

| 05/17 | 62,275.10 | Withdrawal Made In A Branch/Store |

*Id.* at p. 117 (emphases added) ($62,275.10 cash withdrawal on May 17, 2019).

158.  Because IOLTAs don't come with debit card or ATM access, each cash withdrawal was processed by Wells Fargo personnel. Those personnel, moreover, would have needed to first file Currency Transaction Reports in order to process the many cash withdrawals exceeding $10,000. But despite the personal involvement of Wells Fargo employees to facilitate these facially improper cash withdrawals, Wells Fargo continued to process the transactions.

159.  Deposits into the IOLTA also contravened permissible IOLTA use. Generally, no funds that belong to an attorney or law firm should be deposited into an IOLTA. The exception is where a lawyer needs to deposit their own funds "for the sole purpose" of paying bank servicing charges—and even then, "only in an amount necessary for that purpose." NV Bar Trust Accounting at p. 34. Yet the

1  Beasley firm's Wells Fargo operating accounts transferred a total of nearly $2 million into the IOLTA:

2  (i) $150,000 on September 6, 2017, IOLTA Bank Records – Pt. 1 at p. 32, (ii) $600,000 on March 31,

3  2021, IOLTA Bank Records – Pt. 2 at p. 71, (iii) $150,000 on November 8, 2021, *id*. at p. 151, (iv)

4  $450,000 on November 17, 2021, *id.* at p. 154, (v) $20,000 on November 29, 2021, *id*. at 156, (vi)

5  $80,000 also on November 29, 2021, *id*., and (vii) $400,000 on November 30, 2021. *Id*.

6  160.  Large return payments were also processed within the IOLTA. These included a return of

7  $150,000 to the Beasley firm's Wells Fargo operating account, after the same amount was sent to the

8  IOLTA, and then promptly returned, dubbed an errant transfer (illustrated below).

**Credits**

Electronic deposits/bank credits

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 09/05 | 130,000.00 | WT Fed#01211 Jpmorgan Chase Ban /Org=Add Group Holdings LLC Srf# 3048200248Es Trn#170905016141 Rfb# Boh of 17/09/05 |
| | 09/06 | 150,000.00 | Online Transfer From Beasley Law Group PC Ref #Ib03Qr4Cnl Business Checking Reversal of Errant Transfer |
| | 09/12 | 50,000.00 | WT Seq#65341 Triple Threat Basketbal /Org= Srf# 0073403254143520 Trn#1709|12065341 Rfb# |

**Debits**

Electronic debits/bank debits

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 09/05 | 30,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib03QM7Sck on 09/05/17 |
| | 09/06 | 150,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib03Qr486Q on 09/06/17 |
| | 09/08 | 75,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib03Qttqsc on 09/07/17 |

21  IOLTA Bank Records – Pt. 1. at pp. 32-33 (emphases added).

22  161.  Limited access is another well-known feature of IOLTAs. Because the attorney is "individually,

23  personally responsible for all client funds [he or she] receive[s] or hold[s] in trust, and since this

24  accountability can't be delegated to anyone else, allowing other people access to your client trust bank

25  account is risky" and strongly discouraged. NV Bar Trust Accounting at p. 29. Consistent with that

26  norm, Beasley's IOLTA application provided that he would be the sole signatory on the account.

27  Salimi Decl. at p. 16.

28  162.  Nevertheless, Wells Fargo frequently processed deposits into the Beasley IOLTA outside

Nevada where Beasley and his firm were located. And these out-of-state deposits sometimes occurred within hours of one another and at different branches in different states. For example, on September 12, 2018, a deposit was made into the IOLTA in San Francisco, California, in the morning, and then another deposit was made that same afternoon in Provo, Utah. In addition, a "branch/store deposit" (presumably at a third location) was also made that same day. IOLTA Bank Records – Pt. 1 at p. 80.

163.  All told, during the account's history, 154 eDeposits were made into the IOLTA, at 43 different branch locations, including in:

| | |
|---|---|
| - Chino Hills, California | - Meridian, Indiana |
| - Corona, California | - Las Vegas, Nevada |
| - Fullerton, California | - Henderson, Nevada |
| - Laguna Beach, California | - Salt Lake City, Utah |
| - Laguna Niguel, California | - Saint George, Utah |
| - Lake Forest, California | - Ogden, Utah |
| - Los Angeles, California | - Centerville, Utah |
| - San Clement, California | - Beaver, Utah |
| - San Diego, California | - Park City, Utah |
| - San Francisco, California | - Provo, Utah |
| - Santa Clara, California | - Midvale, Utah |
| - Riverside, California | - Spokane, Washington |

164.  The most frequently visited location was not in Las Vegas, Nevada, as one would expect of a local practice, but a Wells Fargo branch in Salt Lake City, Utah, visited at least 24 times to deposit funds into the IOLTA. The only reasonable inference to draw from the evidence is that Beasley and Wells Fargo granted third parties' access to the trust account. A trustee is obligated to possess, protect, and account for trust assets. Giving third parties access to the account was a breach of fiduciary duty by Beasley. The image below reflects the broad geographic scope of the eDeposits made into the IOLTA.

**ALL EDEPOSIT LOCATIONS INTO BEASLEY'S IOLTA**



🔴 24 visits   🔴 10-14 visits   🟠 6-8 visits   🟠 3-5 visits   🟡 1-3 visits

165.  The deposit patterns into the IOLTA reveal an enterprise of a large scope and impact. In addition to the deposits noted above, the IOLTA also received payments from at least three foreign investors (Australia, Taiwan[1], and Singapore). All these payments were highly unusual for a solo practitioner in Nevada, and inconsistent with Beasley telling Wells Fargo that his practice was "local."

166.  So, in addition to constituting misuses of an IOLTA, the manner in which Beasley used his Wells Fargo IOLTA also triggered several FFIEC red flags that Wells Fargo personnel and automated systems likely detected, including:

　　a)  "[u]nusual use of trust funds in business transactions or other financial activity."

---

[1] Taiwan was deemed a Jurisdiction of Primary Concern by the U.S. Department of State in its 2016 International Narcotics Control Strategy Report, in part due to strategic money laundering risks identified by the agency. Taiwan continues to be a higher risk jurisdiction than the U.S., according to Financial Action Task Force.

b) "[c]ustomer repeatedly uses a bank or branch location that is geographically distant from the customer's home or office without sufficient business purpose."

c) "[f]unds transfer activity occurs to or from a financial institution located in a higher risk jurisdiction distant from the customer's operations." and

d) "[f]unds are sent or received via international transfers from or to higher-risk locations."

e) "[d]eposits are structured through multiple branches of the same bank or by groups of people who enter a single branch at the same time."

### 4.    None of the IOLTA activity resembled that of a local solo law practice.

167.  In addition to the improprieties identified above, the IOLTA activity from 2017 to 2022 also bore no resemblance to how an IOLTA would be used by a solo practitioner practicing in personal injury and family law.

168.  None of the deposits into the IOLTA, for example, had the attributes of litigation settlement proceeds. IOLTA deposits typically include notations with client names to ease with accounting. Indeed, clients are often named as co-payees on checks deposited or transfers into properly functioning IOLTAs. Yet in the case of Beasley's IOLTA, the transfers and deposits named Beasley's law firm as the sole payee and many transactions contained no notations.

169.  In addition, as Mr. Salimi, the SEC accountant, attested, the IOLTA received no incoming deposits or transfers from law firms, lawyers, insurance companies, or tort claimants. Salimi Decl. at p. 6.

170.  In fact, the identities of the parties transacting with the IOLTA ruled out any possible connection with a law firm conducting the sort of practice that Beasley had reported to Wells Fargo. Time and again, the parties sending and receiving money from the IOLTA were—by name—not plausibly connected to a small family-law or personal-injury practice. Account records showed that most deposits originated from (and many outgoing transfers went to) entities unmistakably related to finance and investment activity. The names associated with the transactions showed the trust account was being used for investment purposes at odds with its designation as an IOLTA. The entities depositing money into the trust account included:

- ▪ 5K Investments
- ▪ Atma Investments LLC
- ▪ Battle Born Funding
- ▪ 3D Capital Group Inc

38

- Bam Investments
- BCB 5 Investments
- Bellaire Investments LLC
- Bm Investments 1 LLC
- CJ Investments LLC
- Drn Lopez Investments LLC
- Dudz Investment LLC
- Eag Investments
- ECCC Investments
- Herlean Investments
- Jal Investments
- J K Investments
- Lessismore Investments
- McMH Investments, LLC
- Mrrv Investments LLC
- Red Hill Investments
- Reign Investments
- Rpm Investment Group
- Ruger Investments LLC
- Ruger Investments Inc
- Rwl Investments
- Shonduras Investments LLC
- SM Financial Investment
- Smiling Man Investments, LLC
- Tj Investment Partners LLC
- We Capital Investments
- Westshore Investments
- Capital Core Financial
- Herlean Financial Services
- JFK Financial
- South Wind Financial

- 824 Capital LLC
- Perseverance Capital Management LLC
- Procor Capital Fund I LLC
- Sbz Capital LLC
- Tab Capital LLC
- Tanner Capital Group
- Zzyx Capital LLC
- Elite Entrepreneurs LLC
- McGregor Equity Group
- Bennett Enterprises Capital
- A & A Holdings LLC
- Badgerland Holdings LLC
- Big game Holdings LLC
- Blue Holdings
- Brahman Holdings LLC
- Bsm Holdings LLC
- C & C Holdings LLC
- Erum Holding Limited Partnership
- Jersey Isles Holdings
- LEC Holdings LLC
- Luekenga Nma Holdings
- Montero Holdings
- Portz Holdings LLC
- Shimmer Holdings LLC
- Stagebrush State Holding
- Wos Holdings LLC
- Wwf Holdings LLC

171.  To the extent the transacting entities' names left any doubt about ongoing account misuse, any such doubt was put to rest by the notations many investors included when sending money to the IOLTA. None of the transactions in the Beasley IOLTA contained notations pertaining to Beasley's law practice. Instead, the notations on incoming funds frequently stated that the purpose of the deposit was investment.

172.   For instance, Plaintiff Carso—himself a Wells Fargo customer—asked bank personnel to include notations indicating "Capital Investment" when initiating his transfers. The images below depict examples of the wire requests submitted by Plaintiff Carso in February, March, and April 2020, and January 2022. These requests were processed in person, by Wells Fargo bankers Matt Smith, Araxie Baghdadlian, Daniel Veloso, and Michael Mahavong at the 5223 branch in Las Vegas, and were further reviewed and approved by other Wells Fargo employees.



ECF No. 22-2 ("Plaintiff Carso's Wire Requests") at pp. 3-7 (emphases in the original).

173.   In addition to requesting those notations, Carso told various Wells Fargo employees that the purpose of the transfer was investment; he even discussed the nature of the investment with a Wells Fargo financial advisor, and shared with him the underlying investment-related documents.

174.  Along the same lines, Plaintiff Luekenga wrote memos in connection with his wire transfers into the IOLTA that stated "Investment-Settlement Lien." *See, e.g.*, Ex. 4 ("Plaintiffs' Wire Requests") at pp. 2-3.





175.  Similarly, when Plaintiff Michaelis funded his investment, he too noted that the purpose of the wire was "INVESTMENT." *See e.g.*, Plaintiffs' Wire Requests at p. 1.

CONSOLIDATED COMPLAINT
Case No.: 2:22-cv-00529 -GMN-NJK

176.  Plaintiff Lundin also designated a wire into the IOLTA as being for an "investment." *See, e.g.*, Plaintiffs' Wire Requests at p. 7.



177.  Lundin also funded three of his investments from his Wells Fargo account in December 2020, March 2021, and December 2021. These requests were processed in person, by Wells Fargo bankers Jose Casimiro Osorio, Garrett Clements, and Mary-Agnes Falaula, and were further reviewed and approved by other Wells Fargo employees. When Wells Fargo bank personnel, per the bank's policy, questioned Lundin about the wire, he stated that the purpose of the wire was investment.

178.  Similarly, investments made in the name of Waymaker McD, LLC, Dan and Clint McDaniels's entity, were also funded using a Wells Fargo account. In one such instance, a Wells Fargo employee asked about the purpose of the transfer, and was told that the purpose was investment. The employee then paused to consult a higher-ranking branch employee regarding the outgoing wire. After about 20 minutes of discussion, the Wells Fargo employee proceeded with the transfer of plaintiffs' funds into the Beasley IOLTA.

179.  Other investors similarly stated in wire memos, and/or to bank employees, that they were wiring funds for investment purposes. The IOLTA's bank statements are replete with references to "dividends," "reinvestment[s]," "capital investment," "contract[s]," "loan settlement," and "credit on new contract[s]."



IOLTA Bank Records – Pt. 2 at p. 6 (emphases added) (investment notations in July 2020).

CONSOLIDATED COMPLAINT
Case No.: 2:22-cv-00529 -GMN-NJK

| 02/16 | 80,000.00 | WT Fed#00047 State Bank of Sout /Org=Loan Settlement Srf# P2021021601354419 Trn#210216281422 Rfb# |
|---|---|---|

*Id.* at p. 57 (emphases added) (investment notations in February 2021).

| 11/25 | 100,000.00 | Stirling Consult Deposit ████ 7785 NEW Capital From Jager for a NEW Contract |
|---|---|---|
| 11/25 | 100,000.00 | Stirling Consult Deposit ████ 7787 Dr John Contract Reinvest From Jager |

IOLTA Bank Records – Pt. 1 at p. 145 (emphases added) (investment notations in November 2019).

| 01/25 | 100,000,00 | WT Fed#01373 Synovus /Org=Nsure Inc Srf# 662238 Trn#220125165029 Rfb# Jr 3rd Contract |
|---|---|---|

IOLTA Bank Records – Pt. 2 at p. 176 (emphases added) (investment notations in January 2022).

180.  Although the various information discussed above ruled out the possibility that the various deposits into the IOLTA were litigation proceeds for Beasley's clients, had that nevertheless been the case, the account activity should have reflected prompt and proportionate disbursements to Beasley's clients. The statements show no such activity, either. For instance, in March 2017, all of the recorded debit transactions were for cash withdrawals, transfers to the Beasley firm's operating account, and an apparent payment for Beasley's personal expenses.

**Debits**
**Electronic debits/bank debits**

| Effective date | Posted date | Amount | Transaction detail |
|---|---|---|---|
| | 03/01 | 10,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib037Gz4KS on 03/01/17 |
| | 03/02 | 15,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib037Kr92Y on 03/02/17 |
| | 03/02 | 15,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib037L67Hg on 03/02/17 |
| | 03/02 | 25,000.00 | Withdrawal Made In A Branch/Store |
| | 03/14 | 42,008.08 | Capital One Auto Carpay 006206172890392 Robert P Villanueva |
| | 03/15 | 30,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib038Lxgsf on 03/15/17 |
| | 03/16 | 25,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib038Pzt2P on 03/16/17 |
| | 03/17 | 5,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib038Sjb6C on 03/17/17 |
| | 03/22 | 8,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib0394Hmbc on 03/22/17 |
| | 03/22 | 25,000.00 | Withdrawal Made In A Branch/Store |
| | 03/27 | 20,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib039Gvd8D on 03/27/17 |
| | 03/31 | 15,000.00 | Online Transfer to Beasley Law Group PC Business Checking xxxxxx5580 Ref #Ib039SD9Yx on 03/31/17 |
| | 03/31 | 73.45 | Int Transferred to NV ████ 1002 |
| | | **$235,081.53** | **Total electronic debits/bank debits** |

IOLTA Bank Records – Pt. 1 at p. 15.

43

181.  Nor could the deposits plausibly have been retainer payments for the Beasley firm's services. Because IOLTA deposits are to be either nominal in amount or short-term in duration, (NV SCR 2017), a large retainer would be permissible only if it could be quickly earned. A personal injury or family law attorney at a one-lawyer firm in North Las Vegas earns only a few hundred dollars per hour. That rate would not justify a single transfer of $100,000, much less a constant stream of transfers of tens and hundreds of thousands of dollars.

182.  Similarly, the transfers from the IOLTA to the Beasley firm's operating accounts, mostly in amounts divisible by $5,000, did not vary enough to potentially reflect bona fide hourly-basis earnings. Nor did the transfers resemble percentage-based attorney fees; the transfers were too numerous and were not consistent with a percentage-based fee—and typically far exceeded any reasonable percentage fee in comparison to other recent deposits.

183.  The IOLTA activity recounted in this section likewise triggered FFIEC red flags that Wells Fargo was monitoring for, including:

a)  "[t]he stated occupation of the customer is not commensurate with type or level of activity."

b)  "[u]nusual use of trust funds in business transactions or other financial activity."

c)  "[a] large number of incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers,"

d)  "Goods or services, if identified, do not match profile of company provided by respondent bank or character of the financial activity….," and

e)  "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

**5.    The account activity was also inconsistent with the operation of a legitimate investment fund.**

184.  Finally, just as the IOLTA activity bore no resemblance to what would be expected in a Nevada solo practitioner's trust account, neither did the activity resemble the operation of a legitimate investment fund.

185.  The account activity in Beasley's IOLTA showed no acquisitions of investment assets. Salimi

44

Decl. at p. 6. No payments were made, for example, to insurance companies, law firms, or third-party plaintiffs—as might be expected if Beasley and Judd were running the sort of investment operation that investors had been led to believe they were.

186.  Instead, the consistent pattern was investment funds entering the IOLTA, then being promptly funneled out to Beasley- and Judd-controlled accounts, or to a small number of additional accounts maintained by the scheme's promoters. Many of these outgoing transfers from the IOLTA went into business accounts also maintained at Wells Fargo, including Beasley's.

### TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION

187.  Plaintiffs and the other class members did not and could not have discovered the facts constituting fraud and unlawful conduct until March 4, 2022, the day after charges against Beasley were filed following the FBI shootout, and the day the FBI victim bulletin was published. Plaintiffs then retained counsel.

188.  Until then, the Relevant Non-Parties fraudulently concealed the unlawful conduct, misleading investors to believe they were engaging in legitimate investment activity.

189.  Because Plaintiffs and class members could not have reasonably discovered the facts constituting Defendant's unlawful conduct until March 4, 2022, their claims accrued on that date and any applicable statutes of limitations were tolled until that date.

### CLASS ACTION ALLEGATIONS

190.  Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following class:

> *All natural and legal persons who invested in a J&J Entity lawsuit settlement contract between January 2017 and March 2022.*

191.  Excluded from the class are Defendant and the Relevant Non-Parties; their parents, affiliates, subsidiaries, legal representatives, predecessors, successors, assigns, and employees; persons who received back more from the J&J enterprise in connection with their investments than they put in; and any judge to whom this case is assigned, his or her spouse, and all persons within the third degree of relationship to either of them, as well as the spouses of such persons.

192.  Class membership will be determined based on objective criteria including whether someone

45

transmitted money for purchase of a share in a lawsuit settlement contract. Documents identifying the investors in the class are in the possession, custody, and control of the Relevant Non-Parties and Defendant.

193.   <u>Numerosity</u>. The members of the class are so numerous that joinder of all members is impracticable. The size of the class, which is estimated to consist of hundreds if not thousands of individuals and business entities, can be ascertained only through discovery.

194.   <u>Typicality</u>. Plaintiffs' claims against Wells Fargo are typical of the claims of the members of the class. Plaintiffs and class members were all victims of the Ponzi scheme, each has claims against Wells Fargo for its role in that scheme, and each claim will depend on common proof that Wells Fargo knew about the Ponzi scheme and acted in furtherance of it.

195.   <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the interests of the members of the class and have retained counsel competent and experienced in class action and financial fraud litigation.

196.   <u>Commonality and Predominance</u>. Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members. The questions of law and fact common to the class include:

   a. Whether the Relevant Non-Parties breached fiduciary duties owed to the Plaintiffs and members of the class;

   b. Whether the Relevant Non-Parties engaged in fraud in connection with operating the alleged Ponzi scheme;

   c. Whether Wells Fargo opened and maintained an IOLTA for Beasley's law firm;

   d. Whether Beasley used the Wells Fargo IOLTA to perpetrate the alleged fraud and breach of fiduciary duties at issue;

   e. Whether Wells Fargo knew sufficient facts that it had a duty to investigate the use of the IOLTA;

   f. Whether Wells Fargo acted in bad faith by failing to investigate the use of the IOLTA or otherwise take action to protect investors;

   g. Whether Wells Fargo aided and abetted the fraudulent conduct and/or breach of fiduciary duties at issue;

h. Whether Wells Fargo breached a duty of reasonable care owed to Plaintiffs and members of the class; and

i. Whether Wells Fargo's actions and inaction were the actual and proximate cause of Plaintiffs' and class members' damages.

197.  Superiority. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions economically feasible. Even if class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the same fraudulent scheme, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

198.  In the alternative, the class may be certified because: (a) the prosecution of separate actions by the individual members of the class would create a risk of inconsistent adjudications; (b) the prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would impair their ability to protect their interests; and (c) Defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final and injunctive relief with respect to the members of the class as a whole.

**CAUSES OF ACTION**

199.  Plaintiffs assert the following causes of actions, all of which are personal, direct claims of the investors. Plaintiffs do not assert any claim belonging to the receiver appointed in *SEC v. Matthew Wade Beasley, et al.*, No. 2:22-cv-00612 (the "Receiver"). As such, Plaintiffs assert no claim against any of the receivership Defendants or any party subject to the Order Appointing Receiver (*SEC v. Matthew Wade Beasley, et al.*, No. 2:22-cv-00612, Dkt. 88), including: Matthew Wade Beasley; Jeffrey J. Judd; Christopher R. Humphries; Shane M. Jager; Jason M. Jongeward; Denny Sybert; Roland

47

Tanner; J&J Consulting Services, Inc., an Alaska corporation; J&J Consulting Services, Inc., a Nevada corporation; J and J Purchasing LLC; The Judd Irrevocable Trust; and BJ Holdings LLC.

## Count I

### *Violations of the Uniform Fiduciaries Act, Nev. Rev. Stat. Ann. §§ 162.010, et seq.*

200.  Plaintiffs allege this cause of action on behalf of themselves and the class, and, in doing so, incorporate all preceding allegations.

201.  Wells Fargo is a bank within the meaning of Nev. Rev. Stat. Ann. § 162.020(a).

202.  Beasley and Judd are fiduciaries within the meaning of Nev. Rev. Stat. Ann. § 162.020(b).

203.  Plaintiffs and other members of the class are principals within the meaning of Nev. Rev. Stat. Ann. § 162.020(c).

204.  Wells Fargo acted in violation of Nev. Rev. Stat. Ann. §§ 162.010, et seq., including by violating Nev. Rev. Stat. Ann. § 162.080 and § 162.100.

205.  Beasley and Judd (and the entities they controlled) owed fiduciary duties to Plaintiffs and the class. They owed a fiduciary duty in connection with funds in the Beasley law firm's IOLTA, a trust account and over which Beasley and his law firm acted as trustee. They also owed a fiduciary duty in conjunction with accepting funds to be used for investment purposes; they maintained control over those funds upon receiving them and owed duties of loyalty and care to, and to deal honestly and in good faith with, Plaintiffs and the class. This entailed, among other things, the fiduciary duty to use the funds in the manner expected and trusted by the Plaintiffs and class.

206.  Wells Fargo knew fiduciary duties were owed to all those whose funds were deposited in the IOLTA. Among other things, Wells Fargo is familiar with IOLTAs, knows they are trust accounts, and knows that attorneys owe fiduciary duties to their clients in connection with the funds in the IOLTA.

207.  Beasley and Judd (and the entities they controlled) breached their fiduciary duty to Plaintiffs and the other members of the class. Among other things, they breached Plaintiffs' and other class members' trust by using their funds for purposes other than those intended. They caused funds to be deposited into, maintained within, and transferred from the IOLTA inconsistent with the norms and rules for such accounts, and they failed to operate the IOLTA in the manner (and with the protections with which) such trust accounts are required to be operated. Rather than spending the funds as intended

48

by Plaintiffs and the class, they diverted and misappropriated funds for their own personal gain.

208.  Wells Fargo had actual knowledge of these breaches of fiduciary duty. Wells Fargo knowingly allowed the IOLTA to be operated in a manner that bore no reasonable resemblance to how such trust accounts are appropriately used. Wells Fargo knew that the IOLTA had been created for a solo practitioner's law firm that earned $350,000 annually in gross revenues, yet facilitated the deposit and withdrawal of nearly $500 million from the account in less than six years' time, including over $17 million that moved directly from the IOLTA into the Wells Fargo operating account maintained by the Beasley firm.

209.  Additionally and alternatively, Wells Fargo knew such facts that its actions in effecting deposits into and withdrawals out of the Beasley firm's IOLTA qualify as bad faith. The IOLTA transactions at issue in this case were improper on their face. Wells Fargo witnessed such clear and obvious indicia that the IOLTA was being used to breach fiduciary duties, owed to Plaintiffs and other members of the class, that it had a duty to investigate, and Wells Fargo acted in bad faith when it chose not to investigate or otherwise take action to protect Plaintiffs' and class members' funds.

210.  Wells Fargo substantially benefited from the J&J Ponzi scheme, including due to the substantial additional funds flowing through the bank as a result of the magnitude of the scheme. The scheme caused Wells Fargo to earn income from fees and from investing capital derived from J&J investors.

211.  The actual and foreseeable result of Wells Fargo's conduct was the loss of funds belonging to Plaintiffs and the members of the class, who have sustained and will continue to sustain damages as a result.

## Count II
### Aiding and Abetting Breach of Fiduciary Duty

212.  Plaintiffs allege this cause of action on behalf of themselves and the class, and, in doing so, incorporate all preceding allegations.

213.  Beasley and Judd (and the entities they controlled) owed fiduciary duties to Plaintiffs and the class. They owed a fiduciary duty in connection with funds in the Beasley law firm's IOLTA, a trust account over which Beasley and his law firm acted as trustee. They also owed a fiduciary duty in conjunction with accepting funds to be used for investment purposes; they maintained control over

those funds upon receiving them and owed duties of loyalty and care to, and to deal honestly and in good faith with, Plaintiffs and the class. This entailed, among other things, the fiduciary duty to use the funds in the manner expected and trusted by the Plaintiffs and class.

214.  As set forth above, Judd and Beasley (and the entities they controlled) breached fiduciary duties to Plaintiffs and the class, including by using Plaintiffs' and class members' funds for purposes other than those intended, depositing those funds into the IOLTA, maintaining the IOLTA in a manner inconsistent with the rules governing attorney trust accounts, and misappropriating the funds for their own personal gain.

215.  Wells Fargo knowingly and substantially provided material assistance to the breaches of fiduciary duties owed to Plaintiffs and other members of the class. Wells Fargo knowingly allowed the IOLTA to be operated in a manner that bore no reasonable resemblance to how such trust accounts are appropriately used. Wells Fargo knew that the IOLTA had been created for a solo practitioner's law firm that earned $350,000 annually in gross revenues, yet facilitated the deposit and withdrawal of nearly $500 million from the account in less than six years' time, including over $17 million that moved directly from the IOLTA into the Wells Fargo operating account maintained by the Beasley firm. Wells Fargo witnessed systematic, continuous evidence of money laundering and fraudulent activity, yet took no action to stop the misconduct, and instead facilitated the continued operation and use of an attorney trust account at its bank to perpetrate the scheme and continued to execute all requested banking transactions involving the IOLTA.

216.  Wells Fargo substantially benefited from its participation in the J&J Ponzi scheme. The scheme caused Wells Fargo to earn income from fees and from investing capital derived from J&J investors.

217.  As a direct and proximate result of Wells Fargo's aiding and abetting of the breaches of fiduciary duty, Plaintiffs and class members have lost a significant portion of the funds they entrusted with the Relevant Non-Parties, have been denied use of their assets since March 2022, and have been damaged thereby in an amount to be determined at trial.

### Count III

### *Aiding and Abetting Fraud*

218.  Plaintiffs allege this cause of action on behalf of themselves and the proposed class, and, in

1    doing so, incorporate all preceding allegations.

2    219.  As set forth above, by promoting an investment opportunity to purchase in lawsuit settlement

3    contracts with no intention to deliver the promised investment assets, while instead laundering the

4    investment funds through the IOLTA and ultimately misappropriating those funds for their own

5    personal use, Beasley and Judd (and the entities they controlled) committed fraud.

6    220.  Beasley and Judd (and the entities they controlled) intentionally misrepresented and omitted

7    material facts in connection with the sale of purported J&J securities. Plaintiffs reasonably relied to

8    their detriment on such representations and omissions by depositing their money in the IOLTA at Wells

9    Fargo and in purchasing the non-existent securities, and in their absence would not have made these

10   deposits and purchases.

11   221.  Wells Fargo knowingly and substantially provided material assistance to the Ponzi scheme.

12   Wells Fargo knowingly allowed the IOLTA to be operated in a manner that bore no reasonable

13   resemblance to how such trust accounts are appropriately used. Wells Fargo knew that the IOLTA had

14   been created for a solo practitioner's law firm that earned $350,000 annually in gross revenues, yet

15   facilitated the deposit and withdrawal of nearly $500 million from the account in less than six years'

16   time, including over $17 million that moved directly from the IOLTA into the Wells Fargo operating

17   account maintained by the Beasley firm. Wells Fargo witnessed systematic, continuous evidence of

18   money laundering and fraudulent activity, yet took no action to stop the misconduct, and instead

19   substantially assisted the continued operation of an attorney trust account to perpetrate the scheme and

20   continued to execute all requested banking transactions involving the IOLTA.

21   222.  Wells Fargo benefited from its participation in the J&J Ponzi scheme by earning income from

22   fees, using inflows to boost its deposit average metrics, and from investing capital derived from J&J

23   investors.

24   223.  As a direct and proximate consequence of Wells Fargo's conduct as described in this complaint,

25   Plaintiffs and class members have lost a significant portion of the funds they entrusted in the Beasley

26   IOLTA, have been denied the use of those funds since March 2022, and have been damaged in an

27   amount to be determined at trial.

28

**Count IV**
*Negligence*

224.  Plaintiffs allege this cause of action on behalf of themselves and the class, and, in doing so, incorporate all preceding allegations.

225.  Plaintiffs advance this count in the alternative to their other claims.

226.  At all relevant times, Beasley and Judd (and the entities they controlled) caused funds belonging to Plaintiffs and the other members of the class to be deposited into the IOLTA at Wells Fargo.

227.  Wells Fargo knew the deposits were to be held in trust, but also knew the funds were being misappropriated for the personal use of Judd and Beasley. Wells Fargo knew that the funds deposited into the IOLTA were not funds being held in a manner consistent with any of the norms and requirements applicable to such accounts.

228.  Wells Fargo owed a duty to Plaintiffs and other members of the class with respect to the maintenance and use of the Beasley firm's IOLTA and the funds held therein. Wells Fargo's duty exists by operation of law, Nev. Rev. Stat. Ann. §§ 162.010, et seq., and arises independently from any contract. Wells Fargo acted contrary to the policy of protecting investors from investment fraud. Plaintiffs and the other class members did not enter into relevant contracts with Wells Fargo, cannot recover damages in a contract suit, and, thus, seek recovery in tort.

229.  Wells Fargo breached its duty to Plaintiffs and other members of the class when, among other things, it allowed the IOLTA to be operated in a manner that bore no reasonable resemblance to how such accounts are appropriately used; allowed orders of magnitude more funds to flow through the account that the bank reasonable anticipated; witnessed systematic, continuous evidence of money laundering and fraudulent activity, yet took no action to stop the misconduct, and instead facilitated the continued operation of an attorney trust account to perpetrate the scheme and continued to execute all requested banking transactions involving the IOLTA; and repeatedly failed to investigate the misuse of the IOLTA despite many indicia of fraud.

230.  As a direct and proximate cause of Wells Fargo's breaches of duty as described throughout this complaint, Plaintiffs and the members of the class have sustained damages in an amount to be determined at trial.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court enter a judgment awarding the following relief:

a.   An order certifying the proposed class and appointing the undersigned counsel as class counsel;

b.   An award of damages and all other available monetary relief, including pre-judgment interest, on each claim in an amount to be established at trial;

c.   An award of punitive damages in an amount to be established at trial;

d.   An award of Plaintiffs' reasonable attorneys' fees and litigation costs;

e.   Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury as to all issues so triable.


Dated: July 5, 2022                         Respectfully submitted,

                                            By: */s/ Miles N. Clark*

                                            Miles N. Clark (NBN 13848)
                                            **KNEPPER & CLARK LLC**
                                            5510 S. Fort Apache Rd., Suite 30
                                            Las Vegas, NV 89148-7700
                                            (702) 856-7430
                                            miles.clark@knepperclark.com

                                            *Liaison Counsel*


                                            Eric H. Gibbs (*pro hac vice*)
                                            David K. Stein (*pro hac vice*)
                                            Iudis Sominskaia (*pro hac vice*)
                                            **GIBBS LAW GROUP LLP**
                                            1111 Broadway, Suite 2100
                                            Oakland, CA 94607
                                            Telephone: (510) 350-9700
                                            Facsimile: (510) 350-9701
                                            ds@classlawgroup.com
                                            eg@classlawgroup.com
                                            ids@classlawgroup.com

CONSOLIDATED COMPLAINT
Case No.: 2:22-cv-00529 -GMN-NJK

Daniel C. Girard (*pro hac vice*)
Jordan Elias (*pro hac vice*)
Makenna Cox (*pro hac vice*)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dgirard@girardsharp.com
jelias@girardsharp.com
mcox@girardsharp.com

Jeffrey C. Schneider (*pro hac vice*)
Jason K. Kellogg (*pro hac vice*)
Marcelo Diaz-Cortes (*pro hac vice*)
**LEVINE KELLOGG LEHMAN SCHNEIDER +
GROSSMAN LLP**
201 South Biscayne Blvd.
Citigroup Center, 22nd Floor
Miami, FL 33131
Telephone: (305) 403-8788
Facsimile: (305) 403-8789
jcs@lklsg.com
jk@lklsg.com
md@lklsg.com

Robert L. Brace (*pro hac vice*)
Maria Fernanda Elosu (*pro hac vice*)
**LAW OFFICES OF ROBERT L. BRACE**
1807 Santa Barbara St.
Santa Barbara, CA 93101
Telephone: (805) 886-8458
rlbrace@rusty.lawyer
mariaelosulaw@gmail.com

*Interim Co-Lead Counsel*

CONSOLIDATED COMPLAINT
Case No.: 2:22-cv-00529 -GMN-NJK